# EXHIBIT A

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

<u>IN THE IOWA DISTRICT COURT FOR POLK COUNTY</u>

| | |
|---|---|
| Dennis Donnelly, on behalf of himself and all others similarly situated, *Plaintiff*, | Case No.: _____ |
| | PETITION |
| v. | CLASS ACTION |
| Des Moines Register and Tribune Co., Inc.; J. Ann Selzer; Selzer & Company; and Gannett Co., Inc., *Defendants*. | JURY TRIAL DEMANDED |

Plaintiff Dennis Donnelly, by and through his counsel, brings this action against Defendants Des Moines Register and Tribune Co., Inc. ("the Des Moines Register"); J. Ann Selzer ("Dr. Selzer"); Selzer & Company; and Gannett Co., Inc. (collectively "Defendants"), and petitions as follows:

## INTRODUCTION

1. When subscribers pick up their copy of the *Des Moines Register*, they are promised "trustworthy, smart and engaging news and information" (the *Register's* mission statement). The *Register* pledges to its subscribers that it will continue its legacy as a "venerable source of information and current news for the heart of Iowa" from "the state's premier source of information."

2. The *Register* utterly failed to live up to those promises with its decision to publish its signature Iowa Poll in the days leading up to the 2024 presidential election. It promised subscribers like Dennis Donnelly that it would provide trustworthy news, and instead it delivered the dictionary definition of fake news. In doing so, it

1

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

defrauded Dennis and every other subscriber who paid good money to receive accurate, trustworthy information from the state's "premier source of information."

3. The *Register* is owned by Gannett Co. Gannett's principles of ethical news coverage include expectations like, "Don't publish a story if it doesn't feel right. Check it further." "Watch carefully for red flags that give reason to be skeptical of news-gathering or editing conduct." And "[b]e especially careful with technical terms, statistics, mathematical computations, crowd estimates and poll results."

4. But the *Register* was not careful with these poll results. Every possible red flag should have been blazing high in the sky. The poll results were contrary to historic Iowa election results, other publicly available polling in Iowa of this election, and polling in similar swing states. Yet rather than double-checking or re-running the poll or bringing in an outside expert to analyze the sample and methodology or undertaking any of the other industry practices that would validate a seemingly shocking poll number, the *Register* released it as a banner headline.

5. That banner headline brought in hundreds of thousands of "clicks" from across the world, as the shocking revelation of numbers that seemed too good to be true generated massive enthusiasm for one candidate in the final stretch of the campaign.

6. But of course, the numbers were too good to be true. They were off. Massively off. One in a million chances off. Technically, one in 3.5 million chances off.

7. This lawsuit is brought by a *Register* subscriber on behalf of a putative class of all *Register* subscribers who were provided a fundamentally flawed product. As

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

consumers, they thought they were purchasing a daily report of trustworthy news—the *Register* failed to provide the product it promised them.

## PARTIES

8.  Dennis Donnelly is a resident of West Des Moines. He is a longtime subscriber to the *Register*. In recent years he switched from a print subscription to a digital subscription (retail price, $69.99/year). He was intensely frustrated by the inaccurate poll and felt like the *Register* was disserving him and other readers when it ran and when its results were compared to the final outcome.

9.  The *Des Moines Register and Tribune Co.* is the company that owns and publishes the print and digital editions of the *Des Moines Register*. It is a wholly owned subsidiary of Gannett Co., Inc. It is a domestic for-profit corporation registered with the Iowa Secretary of State (No. 8971).

10. J. Ann Selzer (Dr. Selzer) is a natural person. She lives in the Des Moines area. She is the president of Selzer & Company. She holds a Ph.D. in Communication Theory and Research from the University of Iowa.

11. Selzer & Co. is a company that conducts polling for, among other clients, the *Des Moines Register*. Its president is Dr. Selzer. It is a domestic for-profit corporation registered with the Iowa Secretary of State (No. 200824). Its office is 308 Fifth St., West Des Moines, IA, 50265.

12. Gannett Co. Inc. is a publicly traded corporation that owns the most local newspapers of any chain in the country, led by USA Today. It is headquartered in New York City.

## JURISDICTION & VENUE

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

13. Jurisdiction is established under Iowa Code 714H.5(1) (private right of action for consumer fraud) and 602.6101 (general civil jurisdiction).

14. Venue is appropriate in Polk County pursuant to Iowa Code 616.14, as Selzer & Co., the *Des Moines Register*, and Gannett Co. (through its subsidiary the *Des Moines Register*) maintain a place of business in Polk County. Venue is also appropriate as to Dr. Selzer, who works and lives in Polk County, pursuant to Iowa Code 616.17. Similarly, Iowa Code 714.16(10) instructs that consumer protection actions should be brought in the county where the transaction took place. Here, both Mr. Donnelly and the *Register* are in Polk County.

## FACTUAL ALLEGATIONS

15. Across the country, the 2020 polling results were the most inaccurate in history to that point. It was a scandal of epic, industry-shaking proportions that the polls were off so badly. These were "the worst polls in decades," or "the worst misfire in generations." According to an after-action autopsy by the American Association of Public Opinion Research (AAPOR), "It was the highest [error] in 40 years for the national popular vote and the highest in at least 20 years for state-level estimates of the vote in presidential, senatorial, and gubernatorial contests."

16. How badly did these polls miss the final result to constitute the worst polls in decades? According to the AAPOR report, "Among polls conducted in the final two weeks, the average error on the margin in either direction was 4.5 points for national popular vote polls and 5.1 points for state-level presidential polls."

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

17. Defendants put together and published a poll that was off by <u>16 points</u> in the final pre-election presidential poll in 2024. If a miss by five points was a miss of historic proportions, then a miss by 16 points is not an innocent error—it is either intentional fraud or reckless disregard for accuracy. Either way it is actionable.

18. Dr. Selzer has a track record of undersampling Republicans in her polling. In 2018, her final poll missed the Republican candidate's eventual victory for governor by five points.[1]

19. In 2020, after showing the Republican candidate for U.S. Senate down throughout the fall, Dr. Selzer's final poll showed her up four. She won by seven.[2]

20. In 2022, her final poll missed the Republican candidate's eventual victory for attorney general by a breath-taking eighteen points.[3]

21. In the June 2024 Iowa Poll, Dr. Selzer found President Trump leading President Biden by 18 points.[4]

22. In September 2024, the first poll testing President Trump versus Vice President Harris, Dr. Selzer's Iowa Poll showed the lead had narrowed from 18 to 4 points in favor of President Trump.

---

[1] https://www.desmoinesregister.com/story/news/politics/iowa-poll/2018/11/03/iowa-poll-governor-race-kim-reynolds-fred-hubbell-jake-porter-selzer-iowa-election-2018-medicaid/1871874002/

[2] https://www.desmoinesregister.com/story/news/politics/iowa-poll/2020/10/31/election-2020-iowa-poll-greenfield-ernst-us-senate-race-voters/6055545002/

[3] https://www.desmoinesregister.com/story/news/politics/iowa-poll/2022/10/25/iowa-poll-attorney-general-election-tom-miller-brenna-bird-2022/69563197007/

[4] https://www.yahoo.com/news/trump-maintains-big-lead-over-111909245.html

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

23. Then, a month later, Dr. Selzer and the *Register* released a "stunning," "shocking," "surprise" Iowa Poll showing Vice President Harris at 47 and President Trump at 44.

24. Dr. Selzer's October poll was contrary to recent results in Iowa elections, other polling that cycle in Iowa, and other polling that cycle in similar states.

25. In 2022, Republican Governor Kim Reynolds won reelection by a substantial margin, securing 58% of the vote to Democrat Deidre DeJear's 40%. Republicans also won six of seven statewide races that year. U.S. Senator Chuck Grassley secured reelection by twelve percentage points, earning 56% of the vote compared to 44% for his Democratic challenger, Michael Franken.

26. In the 2020 election, President Trump won Iowa by eight percentage points, with 53% of the vote compared to (then titled) Vice President Biden's 45%.

27. In the 2020 election, Republican U.S. Senator Joni Ernst won reelection by seven percentage points, securing 52% of the vote to Democrat Theresa Greenfield's 45%.

28. In 2018, the Republican at the top of the ticket, Kim Reynolds, won 50 to 47 for an open seat over Democrat Fred Hubbell.

29. In 2016, President Trump won Iowa by nine percentage points, securing 51% of the vote to former Secretary Hillary Clinton's 42%.

30. In other words, in every ticket-topping race—president, governor, senator—from 2016 to 2022, the Republican has won in Iowa and usually done so by a convincing margin. A three-point lead by a Democrat candidate for president would have been markedly out-of-place compared to election results in the prior four cycles.

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

31. That result was also out-of-place compared to other polling in Iowa in the 2024 cycle. A November 2-3 poll of likely voters by SoCal Strategies showed Trump up in Iowa by eight points, 52-44.  A poll those same dates by InsiderAdvantage showed Trump up by seven points, 52-46. A poll November 1-2 by Emerson College showed Trump up nine points, 54-45. A poll a few weeks earlier by Cygnal showed Trump up about seven as well, 51.3 to 44.6%.

32. Other pollsters who frequently work in swing states, like Quinnipiac University, did not even poll in Iowa in 2024, assuming it was a lock for Trump. When news outlets like the *New York Times*, *US News*, or *Forbes* reported on the "swing states" that would determine the election, Iowa was never even on the list.[5]

33. Another red flag should have been national and swing-state polling at the time, all of which showed the race moving in President Trump's direction in mid-October. NPR, reporting on the swing state polling shortly before Dr. Selzer's poll, wrote, "Surveys in the past couple of weeks have moved in Trump's direction, and the leads Harris had in the most competitive and critical states have mostly evaporated. . . . the consistency of the change — and the fact that it's all in Trump's direction — has Democrats concerned."[6]

---

[5] See, e.g., https://www.nytimes.com/interactive/2024/us/elections/presidential-election-swing-states.html and https://www.usnews.com/news/elections/articles/7-swing-states-that-could-decide-the-2024-presidential-election and https://www.forbes.com/sites/saradorn/2024/11/05/election-2024-swing-state-polls-trump-harris-race-deadlocked-on-election-day-all-eyes-on-pennsylvania-final-update/.

[6] https://www.npr.org/2024/10/15/nx-s1-5153420/swing-state-map-donald-trump-kamala-harris-polls

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

34. A Suffolk University/*USA Today* poll of Arizona at the end of September showed Trump with a six-point lead.[7] Trump went on to win Arizona by 5.5.

35. A Suffolk University/*USA Today* poll of Wisconsin at the end of October showed Trump with a one-point lead, 48-47.[8] He went on to win Wisconsin by one point.

36. A Suffolk University/*USA Today* poll of Michigan at the end of October showed President Trump winning by 0.4%.[9] He won Michigan by 1.4 percent.

37. A Suffolk University/*USA Today* poll of Pennsylvania at the end of October showed the two candidates tied at 48.6 percent.[10] Trump won by 1.7 percent.

38. The foregoing battleground polls, all sponsored by Gannett's *USA Today* paper, all showed the momentum favoring President Trump in the final days. Dr. Selzer's poll was an obvious outlier compared to other publicly available polling in swing states.

39. PollFair, an online polling analyst that reweights polls based on historic exit poll data, took Dr. Selzer's October poll and reweighted it according to historical data. Dr.

---

[7] https://www.suffolk.edu/-/media/suffolk/documents/academics/research-at-suffolk/suprc/polls/other-states/2024/9_26_2024_arizona_press_release.pdf?la=en&hash=981425C109076562038921D972FF6F07B9A9B4D2.

[8] https://www.suffolk.edu/-/media/suffolk/documents/academics/research-at-suffolk/suprc/polls/other-states/2024/10_28_2024_wisconsin_press_release.pdf?la=en&hash=8AEAAC7A93066525EFD06619E0A0A06A86C7BFA7

[9] https://www.suffolk.edu/-/media/suffolk/documents/academics/research-at-suffolk/suprc/polls/other-states/2024/10_30_2024_michigan_press_release.pdf?la=en&hash=793141821068CC6E351B5F01772C9C242DC4B550.

[10] https://www.suffolk.edu/-/media/suffolk/documents/academics/research-at-suffolk/suprc/polls/other-states/2024/11_1_2024_pennsylvania_press_release.pdf?la=en&hash=0103970D933D95E3AEBB85DEABC178EFBFE81CCB.

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

Selzer weighted her sample at R+2, while PollFair weighted its sample at R+10. Doing so moved the results from Harris +3 (47-44) to Trump +6 (50-44).[11]

40. "'It's hard for anybody to say they saw this coming,' said pollster J. Ann Selzer, president of Selzer & Co.," in the *Register* story on Sunday, November 3, announcing the poll results.[12]

41. No one saw this coming because it wasn't coming. It was wrong. Flat-out, epically, recklessly wrong.

42. In the final event, President Trump won Iowa by thirteen points, meaning that Dr. Selzer's Iowa poll was off by sixteen points.

43. The Iowa Poll was also wrong in its polling of the First Congressional District. Dr. Selzer's poll found that "[b]y a 16-point margin, likely Iowa voters prefer a Democrat over a Republican in the 1st District, where Democrat Christina Bohannan and Republican U.S. Rep. Mariannette Miller-Meeks are competing."[13]

44. A poll from a few weeks earlier by the Democratic Party had shown Bohannan up only four points, 50-46.[14]

45. A poll from the end of August by Normington, Petts & Associates for the Bohannan campaign had showed the race tied, 47-47.[15]

---

[11] https://x.com/poll_fair/status/1852857893307158678

[12] https://www.desmoinesregister.com/story/news/politics/iowa-poll/2024/11/02/iowa-poll-kamala-harris-leads-donald-trump-2024-presidential-race/75354033007/

[13] https://www.desmoinesregister.com/story/news/politics/iowa-poll/2024/11/03/iowa-poll-democrats-preferred-over-republicans-congress-nunn-baccam-miller-meeks-bohannan-hinson/75988058007/.

[14] https://projects.fivethirtyeight.com/polls/house/2024/iowa/1/

[15] https://projects.fivethirtyeight.com/polls/house/2024/iowa/1/

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

46. The Iowa First is an R+3 seat normally according to the Cook Political Report. President Trump had won it in 2020 by three points. Kim Reynolds won it in 2018 by three points.

47. The 2024 race was a rematch between Bohannan and incumbent Mariannette Miller-Meeks. Miller-Meeks had won in 2022 by 6.7 points.

48. Thus, the idea that Bohannan was up sixteen, in an R+3 seat, when she had lost in 2022 by almost seven points, was a massive red flag that the Iowa Poll was wrong. But the Defendants ran with it anyway.

49. Miller-Meeks ended up winning the 2024 race as well, by 0.2 points, meaning that Dr. Selzer's Iowa poll was off by a scandalous sixteen points.

50. A similar story could be told in Iowa's Third Congressional District. Dr. Selzer's poll predicted that the Democrat would win by seven in a district rated R+3 by the Cook Political Report. In the end the Republican incumbent won by four, meaning Dr. Selzer was off by eleven points.

51. The other two U.S. House seats were considered safe, but the Iowa Poll was still radically off. In the Second District, Dr. Selzer found a three-point lead for the Republican, 45-42. She ended up winning 57 to 41.5, off by over twelve points. In the Fourth District, Dr. Selzer found the Republican leading 53 to 47. The final result was 67 to 33, from a predicted six-point win to an actual 34-point blow-out. Put differently, Dr. Selzer was off by 28 points.

52. Off by 16 (presidential). Off by 16 (IA-1), 12.5 (IA-2), 11 (IA-3), and 28 (IA-4). In an industry where being off by five was the greatest miss in modern history.

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

53. The same point can be made another way: the margin of error.

54. The margin of error accounts for the potential inaccuracy of a polling due to limited sample size.

55. The *Register's* story announcing the poll explains, "Questions based on the sample of 808 Iowa likely voters have a maximum margin of error of plus or minus 3.4 percentage points. This means that if this survey were repeated using the same questions and the same methodology, 19 times out of 20, the findings would not vary from the true population value by more than plus or minus 3.4 percentage points."

56. In a November 2021 Q&A with Brian Smith, the *Register* posed and answered this question from a reader's perspective: "**I see references to margin of error in articles about the Iowa Poll. Does that mean the data isn't accurate?** No. The Iowa Poll is carefully constructed to ensure that it is accurate. But, anytime you're using a representative sample, there is some room for error. The margin of error means that if the survey were repeated using the same questions and the same methodology, 19 out of 20 times, the findings would not vary from the true population value by more than plus or minus the listed margin of error."[16]

57. The margin of error in the House races was plus or minus 7.2 percent.

---

[16] Earlier in the same article, Mr. Smith wrote, "The Iowa Poll has been exclusive to the Des Moines Register since 1943. A lot has changed over the decades. . . . But, one thing that has stayed true: The Des Moines Register and its polling partner, West Des Moines-based Selzer & Co., take great care in shaping each Iowa Poll. We pay careful attention to the design of the questions, when a poll will be in the field and even how we reach Iowans. . . . [W]e continue to conduct multiple Iowa Polls each year because we believe in their value. The Iowa Poll helps us as journalists, our politicians and all Iowans to understand the viewpoints of our neighbors."

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

58. Again, with the margin of error, Dr. Selzer and the *Register* are telling their readers and subscribers, like Mr. Donnelly, that 19 out of 20 times, they will be accurate within 3.4 percent. Here they were off by 16 percent.

59. According to James Piereson of the Manhattan Institute: "The Selzer Poll, with a margin of error of 3.4, missed the real outcome by 16 points, or by as many as five standard deviations from the true result as revealed on election day. What are the odds of drawing such a sample by legitimate means? Answer: roughly one time in 3.5 million trials. In other words, given these odds, the results in the Iowa poll likely did not come about by 'honest error.'"[17]

60. They say close only counts in horseshoes and hand grenades. This wasn't even close to close. This was either intentionally fraudulent or recklessly irresponsible. Either way it is actionable.

## ALLEGATIONS ABOUT THE POLL LEAK

61. As if all of this were not bad enough on its own, the Poll leaked prior to its public release.

62. The poll originally ran in print on Sunday, November 3, immediately before the election.

63. The story about the poll posted online on Saturday, November 2, on the Register's website.

---

[17] https://newcriterion.com/dispatch/statistical-questions-about-the-iowa-poll/

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

64. About an hour before the poll was online, a tweet reported that Illinois Governor J.B. Pritzker was publicly discussing the poll's findings at a College Democrats event at Duke University.[18]

65. It is unclear at this time how Pritzker knew of the poll, but somehow the information was in the hands of a major Democrat surrogate before the general public.

66. The leak again is evidence of either an intent to defraud or a recklessness with the Poll.

## ALLEGATIONS SPECIFIC TO THE REGISTER

67. "Carol Hunter, executive editor [of the Register], has been with the Register since 2004. She has supervised award-winning politics coverage in five presidential caucus cycles. A native of Kansas and a graduate of the University of Kansas School of Journalism, she previously was top editor of the Press-Gazette in Green Bay, Wisconsin, and the Courier-News in Bridgewater, New Jersey." She "guid[es] the Register newsroom."

68. "Hunter's duties also include oversight of the Register's sister papers, the Ames Tribune and the Iowa City Press-Citizen, as well as the Sioux Falls Argus Leader in South Dakota. At various times her duties have encompassed supervision of editors at papers from Arkansas to Montana belonging to Register parent Gannett Co." This again shows the editorial management tie between Gannett papers and Gannett corporate.

---

[18] https://www.semafor.com/article/11/10/2024/gannett-probes-possible-leak-of-bombshell-iowa-poll

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

69. "Hunter joined the Register in 2004 as editorial editor and later served as political editor and then news director, the newsroom's No. 2 leadership position."

70. In mid-December 2024, Hunter announced her retirement from the *Register*.

71. In a Gannett press release about an earlier iteration of the Iowa Poll, Ms. Hunter was the spokesperson for the company, showing the tie between Gannett and the *Register* specific to the poll.[19]

72. Mike Trautmann is "News Director/Politics Editor for the Des Moines Register. Former news director for the Louisville Courier Journal. Native South Dakotan who decided he had enough of the snow and cold and then reconsidered. Reporting and editing gigs in Aberdeen, Brookings, Sioux Falls, Des Moines and Louisville."

73. Brianne Pfannenstiel is the chief political correspondent for the *Register* and the author of the story reporting the Iowa Poll's presidential results. She has a degree in journalism from the University of Kansas. "After graduating from the University of Kansas, Pfannenstiel worked as a reporter for The Kansas City Star and Lawrence Journal-World, where she covered the 2010 United States elections. She joined the Kansas City Business Journal in 2013. In 2015, she relocated to Iowa to join The Des Moines Register. In the 2016 Iowa caucus cycle, Pfannenstiel initially covered the Scott Walker campaign, followed by the Donald Trump campaign."

74. Steven Gruber-Miller is a statehouse politics reporter for the *Register* who wrote the story on the congressional race results from Dr. Selzer's poll. A graduate of Grinnell

[19] https://gannett2023cr.q4web.com/news/news-details/2023/The-Des-Moines-Register-Iowa-Poll-Partners-With-NBC-News/default.aspx

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

College, he has worked for the *Register* for seven years, including six covering Iowa politics. He previously covered local politics for the *Iowa City Press-Citizen*, another Gannett paper.

75. The *Register* exercises significant control over the way it reports Dr. Selzer's polling. "The Des Moines Register is legendarily careful with Selzer's polls."[20]

### ALLEGATIONS SPECIFIC TO SELZER & CO. AND DR. SELZER

76. Dr. Selzer's company Selzer & Co. describes itself: "Selzer & Company, a Des Moines-based company founded by J. Ann Selzer, Ph.D., is a nationally recognized, industry leading polling and audience research firm. Since 1994, Selzer has worked with a wide variety of clients, including healthcare organizations, financial institutions, universities, advocacy groups and technology start-ups. Selzer & Company conducts the Iowa Poll, which is regarded by political insiders as the gold standard for its accuracy and insights about the Iowa caucuses."

77. On her website, next to a picture of J. Ann Selzer, Ph.D., she explains, "The best news I can give to any client is the truth. This informs the way I approach their problem, develop methods, analyze data, and report results. It is a core value. Over the years, the accuracy of my work has won wide praise, and I'm humbled by the honors and kind words."

---

[20] https://www.semafor.com/article/11/10/2024/gannett-probes-possible-leak-of-bombshell-iowa-poll

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

78. Her website continues, "What sets me apart from other creative minds who have a lot of ideas is the discipline of research. I am data-driven. And so, I have a good idea when to step away from an idea that cannot be supported by evidence."

79. "After working as the internal pollster for the *Register* in 1987, Selzer founded her own company in 1992 and began conducting polls for the paper through her firm."[21]

80. "In 2016, she described the company's atmosphere to *FiveThirtyEight*, saying, 'Part of our culture in this office is we have the phrase, "I just want to say this out loud." It's a culture of overcommunication, and some day I will write a book called "Just Say It Out Loud.""" Whatever corporate culture Dr. Selzer has cultivated at her company, apparently no one had the temerity to just say out loud what someone must have thought: these poll results can't be right. Or someone did, and got railroaded.

81. "In a 2016 interview with *Politico*, Selzer explained her approach and its success, saying, 'I think it has to do with being more of a traditionalist, science-based pollster. And because it has worked for me, I've not been tempted to go and try other methods. And because I have clients who are willing to pay the premium that it takes to do it this way, I've not had to cut corners.'"

82. Asked about this poll, Dr. Selzer responded after the poll's publication but prior to election day: "These are the kinds of comments seen for virtually any poll, including mine. *The Des Moines Register* includes a methodology statement with each story they publish. It's the same methodology used to show Trump winning Iowa in the

---

[21] https://ballotpedia.org/Selzer_%26_Company

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

final polls in 2016 and 2020. It would not be in my best interest, or that of my clients—

The Des Moines Register and Mediacom—to conjure fake numbers."

## ALLEGATIONS SPECIFIC TO GANNETT CO.

83. Gannett has owned the Des Moines Register and Tribune Co. since 1985.

84. Gannett syndicates its content through the USA Today Network.

85. Upon information and belief, Gannett exercises editorial control over its affiliates to an extent unseen in other chain newspapers. As one academic study put it, "The comparison of the editorial positions taken by the Gannett papers with those taken by the non-Gannett papers showed a high level of homogeneity within the chain and significant differences between the Gannett and non-Gannett papers." Roya Akhavan-Majid, Anita Rife, and Sheila Gopinath, *Chain Ownership and Editorial Independence: A Case Study of Gannett Newspapers*, Mass Communication Faculty Publications (1991).

86. Gannett has a history of telling its newspapers what they can and cannot do while covering politically sensitive issues. See, e.g., Rick Edmonds*, Gannett is scuttling daily editorial pages at its regional papers*, Poynter (June 8, 2022); Irie Senter, *USA Today and its 200-plus local affiliates punt on presidential endorsement*, Politico (Oct. 29, 2024) ("USA Today and the 200-plus local publications under its umbrella will not endorse a presidential candidate, the latest in a slew of non-endorsements among major national outlets that have left the media industry reeling. The Gannett-owned newspaper, which oversees a network of hundreds of local affiliates, announced late

Monday that none of its publications would make an endorsement in this year's neck-and-neck presidential election.").

87. As one long-time Gannett editor, now at Middle Tennessee State University, wrote in October 2024: "It was about 45 years ago that Gannett adopted a new motto: 'A World of Different Voices Where Freedom Speaks.' It was a poetic way of saying that while the growing company was going to keep a close eye on business operations and profit margins, local newsrooms were going to be able to publish the news independently. . . A company culture can change pretty dramatically when a business is sold. New Media Investment Group (*nee* Gatehouse) acquired Gannett in 2019. It kept the name, but not the values or most of the employees. Maybe the new Gannett can dust off that circa-1980 motto to make its new standards clear. Perhaps 'A World of Different Properties Where No One Speaks Without Our Permission.'" Ken Paulson, *Gannett's gag order on local journalism*, MTSU (Oct. 29, 2024).

88. Gannett has principles of ethical conduct for its newsrooms. They begin "**WE ARE COMMITTED TO: <u>Seeking and reporting the truth in a truthful way</u>**." They continue: "We will dedicate ourselves to reporting the news accurately, thoroughly and in context." "We will be honest in the way we gather, report and present news." "We will seek to gain sufficient understanding of the communities, individuals and stories we cover to provide an informed account of activities." "We will provide the news and information that people need to function as effective citizens." "We will strive to include all sides relevant to a story and not take sides in news coverage." "We will explain to readers our journalistic processes."

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

89. The Gannett principles then explain further, "Editors are the gatekeepers who determine what will be published and what will not be. Their responsibility is to question and scrutinize, even when it is uncomfortable to do so." The "best practices" include, "When feasible, at least two editors should see stories before publication. Complex or controversial stories may require even more careful scrutiny." "Consider involving an in-house skeptic on major stories – a contrarian who can play the role of devil's advocate." "Heed their 'gut instinct.' Don't publish a story if it doesn't feel right. Check it further." "Consider how others – especially antagonists or skeptical readers – may view the story. What questions would they ask? What parts would they think are unfair? Will they believe it?" "Watch carefully for red flags that give reason to be skeptical of news-gathering or editing conduct." "Don't be stampeded by deadlines, unrealistic competitive concerns or peer pressure."

90. The Gannett principles go on in the next section, Ensuring Accuracy: "Dedication to the truth means accuracy itself is an ethical issue. Each news person has the responsibility to strive for accuracy at each step of the process." "Be especially careful with technical terms, statistics, mathematical computations, crowd estimates and poll results."

91. The Gannett principles close, "Because these Principles embody the highest standards of professional conduct, the Gannett Newspaper Division is committed to their adherence. They have been put in writing specifically so that members of every Gannett Newspaper Division newsroom know what the Division stands for and what is expected of them."

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

92. The *Register* promises on its website, "Our journalists adhere to the USA TODAY NETWORK Principles of Ethical Conduct For Newsrooms."

93. Gannett may be held liable for its influence over its local papers' newsroom decisions. *Sandmann v. Gannett Co.*, 2021 U.S. Dist. LEXIS 3792 (E.D.Ky. Jan. 8, 2021).

## FIRST AMENDMENT ANALYSIS

94. In a lawsuit against a media outlet, "[f]actual error [ . . . is . . . ] insufficient for an award of damages for false statements unless actual malice -- knowledge that the statements are false or in reckless disregard of the truth -- is alleged and proved." *Time, Inc. v. Hill*, 385 U.S. 374, 387 (1967).

95. A court "could not, consistent with the requirements of the First Amendment, impose liability for a negligently untruthful new story. Recovery may be had at best only for knowing or reckless falsehood." *Tumminello v. Bergen Evening Record, Inc.*, 454 F. Supp. 1156 (D.N.J. 1978).

96. Plaintiff alleges that the factual errors were made with knowledge that they presented a false description of the state of the electorate.

97. Plaintiff alleges alternatively that the statements were made with reckless disregard for the truth. Dr. Seltzer is an experienced pollster in Iowa. The news editors and reporters at the *Des Moines Register* are also experienced observers of Iowa politics. Their Poll was not merely wrong—it was obviously, patently wrong. And it was reckless to publish it when it was in significant contradiction with all other publicly available polling in Iowa, polling in other swing states, and election results in similar races in recent Iowa history.

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

98. The Defendants' recklessness is seen when comparing their actions to industry customs and practices. *See* RESTATEMENT (SECOND) OF TORTS § 580B cmt. g (1977) ("The defendant, if a professional disseminator of news, such as a newspaper, a magazine or a broadcasting station, or an employee, such as a reporter, is held to the skill and experience normally possessed by members of that profession. Customs and practices within the profession are relevant in applying the negligence standard, which is, to a substantial degree, set by the profession itself, though a custom is not controlling. Evidence of custom within the profession of news dissemination would normally come from an expert who has been shown to be qualified on the subject. It may be testimony that the course of conduct followed by the defendant was or was not in accordance with recognized professional practices.").

99. Here, journalistic custom and practice would dictate that a poll that is wildly different from all other publicly available polling in Iowa, polling in other swing states, and election results in similar races in recent Iowa history would be held, subject to an outside second opinion, or re-run to ensure an accurate result.

100. For instance, the American Association for Public Opinion Research, the main trade association for pollsters, has a professional code of ethics that includes, "We will not knowingly select research tools and methods of analysis that yield misleading conclusions." "We will not knowingly make interpretations of research results that are inconsistent with the data available, nor will we tacitly permit such interpretations. We will ensure that any findings we report, either privately or for public release, are a balanced and accurate portrayal of research results."

21

101.    The AAPOR's best practices for survey research advise, "Odd patterns of responses may reflect a programming error or interviewer training issue that needs to be addressed immediately."

102.    AAPOR's explanation of election-related polling notes, "Polls with misleading results often stem from methodological flaws like biased sampling, leading questions, or poor weighting."

103.    The Defendants' actions here reflect a clear failure of AAPOR standards. These were obviously "odd patterns of responses," but rather than addressing these patterns immediately, as the AAPOR recommends, the Defendants completed the poll and published it as a ground-breaking revelation, when in fact it was just false misinformation.

104.    The same can be said of the Gannett ethics principles above. The principles demand that editors be skeptical, that red flags be taken seriously, that polling be subject to special scrutiny, and that accuracy is paramount. Those principles were all tossed by the wayside here.

## PLAINTIFF CLASS ACTION CLAIM

105.    Iowa permits class actions for torts. Iowa R. Civ. P. 1.261.

106.    Class certification is appropriate where the class is so numerous that joinder of all members is impracticable.

107.    Class certification also requires that there be a question of law or fact common to the class.

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

108.    The Iowa Poll ran on Sunday, November 3, immediately prior to the Tuesday election day.

109.    The *Des Moines Register* has a subscriber base of approximately 40,000 on Sundays. This class is too numerous to join individually.

110.    There is a common question of law to the class:

   a. Do newspapers owe a duty of care to subscribers to exercise ordinary care? Or ordinary care according to journalistic practice and custom?

111.    There are also common questions of fact to the class:

   a. Did the Defendants intentionally run a fraudulent poll?

   b. Did the Defendants recklessly run an obviously inaccurate poll?

112.    This original complaint asserts a class on Count I and Counts III and IV.

113.    The Plaintiff is providing a copy of this complaint to the Iowa Attorney General with a request to permit a class action claim be included in a first amended complaint on Count II, the consumer fraud claim, pursuant to Iowa Code 714H.7.

114.    The Plaintiff is a fair representative of the class and has hired competent counsel to represent the class.

115.    Thus, Plaintiff requests that this Court certify the following class: All digital and print subscribers to the Sunday edition of the Des Moines Register as of November 3, 2024.

116.    The contact information for the class can easily be extracted from the business records of the Defendants.

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

117.    To the extent that Plaintiff may be bound by a waiver of class action claims according to the adhesion contact he may have entered as a subscriber to the *Register*, that provision is unconscionable and therefore unenforceable. *Webster v. State*, 2022 Iowa App. LEXIS 621, *7 (Aug. 17, 2022). *See Lima v. Gateway, Inc.*, 886 F. Supp. 2d 1170, 1176 (C.D.Cal. 2012) (discussing *Discover Bank v. Sup. Ct.*, 36 Cal. 4th 148, 165 (2005) (adhesion contracts with a class-action waiver provision unlawful as unconscionable in circumstances like this). *See also Lukken v. Fleischer*, 962 N.W.2d 71, 82 (Iowa 2021) (contract terms that protect against liability for intentional or reckless misconduct are disfavored).

118.    In all events, that adhesion contract applies only to Plaintiff and the *Register*, not to any other defendant.

## CLAIMS

119.    At the end of the day, the Defendants acted with intentional fraud or reckless disregard on two separate inflection points. First, when Dr. Selzer, her team at Selzer & Co., and the *Register* editorial leadership designed the poll, they did so in a way that the methodology resulted in a radically flawed result. At this point, the Poll designers failed basic journalist and polling practices to construct a reasonably accurate estimate of the Iowa electorate.

120.    Second, when the poll results came back, the Defendants acted with either intentional deceit or reckless disregard by choosing to publish the Poll results as a banner headline rather than conducting any due diligence on such wildly unbelievable results.

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

## COUNT I – Fraudulent Misrepresentation

121.    The elements of fraudulent misrepresentation are: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) justifiable reliance; and (7) resulting injury. *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 391 (Iowa 2001).

122.    The Poll was a misrepresentation of the state of the race at the time it was taken. It was more than an outlier—it was egregiously incorrect.

123.    The Poll was a *false* misrepresentation of the state of the race. It was not even close to accurate.

124.    The Poll was a *material* misrepresentation—it was long regarded as the standard in Iowa politics, and it was the banner headline story for the day that it ran. Numerous news stories from other in-state, national, and global news outlets subsequently rereported the Poll.

125.    The Poll was *knowingly* a false misrepresentation of the race. Any responsible pollster or journalist with experience in Iowa politics would recognize the clear inaccuracy of the Poll, yet Dr. Selzer and the *Register* chose to publish the poll anyway. Statistically, it was a 1 in 3,500,000 chance of an honest error.

126.    The Poll was an *intentionally deceptive* misrepresentation. Dr. Selzer and Gannett's senior staff at the *Des Moines Register* knew that the Iowa Poll was considered an accurate representation of the Iowa electorate and that this poll was inaccurate, and yet they decided to publish it anyway, showing their intent to deceive their readers and the broader electorate with a false poll.

25

127.     Given the Iowa Poll's historic accuracy and the *Register's* general reputation for accuracy, the Plaintiff and Plaintiff Class *justifiably relied* on the poll.

128.     The Plaintiff and the Plaintiff Class were *injured* by the Poll's fraudulence: they pay good money to subscribe to the *Register* to read accurate and important news, not to be misled by fraudulent misrepresentations.

129.     Dr. Selzer and Selzer & Co. are liable for presenting a false poll, the Register is liable for presenting this false poll to its subscribers including Mr. Donnelly, and Gannett is liable based on its editorial control of the *Register* and its failure to ensure the *Register* staff acted in line with its ethical principles.

**ALTERNATE COUNT I – Reckless Negligent Misrepresentation**

130.     If the Court finds that the misrepresentation was not intentional, then in the alternative plaintiff pleads the tort of reckless negligent misrepresentation.

131.     Negligent misrepresentation is also sometimes described as "the tort of negligently giving misinformation. *Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 123 (2001).

132.     "[P]rofessionals such as accountants, abstractors, and attorneys owe a duty of care in supplying information to foreseeable third parties as members of a limited class of persons who would be contemplated to use and rely upon the information." *Id*.

133.     The "duty [of care for negligent misrepresentation] arises only when the information is provided by persons in the business or profession of supplying information to others." *Id*.

134.    "[T]he foreseeability of harm helps support the imposition of a duty of care." *Id*.

135.    "[T]he pecuniary interest which a person has in a business, profession, or employment which supplies information serves as an additional basis for imposing a duty of care." *Id*.

136.    Newspaper journalists and pollsters are professionals with white-collar jobs that expect at least a bachelor's degree and some years of experience, if not advanced degrees in journalism, political science, or statistics. (Dr. Selzer has a Ph.D.).

137.    Newspaper subscribers are a limited class of foreseeable third parties who rely on the information provided by these professionals.

138.    Newspaper journalists and pollsters are in the business of supplying accurate, reliable information to others.

139.    Newspaper journalists and pollsters do not provide information to their readers in a setting that is arms-length or adversarial.

140.    The Defendants could foresee that reporting obviously inaccurate polling results would harm their readers by delivering a product other than the one they purchased. *Register* subscribers purchase a product—accurate news—not the recklessly negligent reporting of inaccurate news.

141.    The *Register* and the Seltzer Company have a pecuniary interest in their business of supplying information—this is how the *Register* gets and keeps readers and how the Seltzer Company gets and keeps clients.

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

142.    The inaccurate information supplied by Defendants harmed the Plaintiff in his relationship to third parties—it gave him a false impression of the state of the world as he thought about voting and discussed voting and politics with friends and neighbors.

143.    The information supplied by the Defendants was a false estimate of the facts, not a statement of personal opinion or future intentions.

144.    The decision of Defendants to publish this information was not reasonable. In fact, given the Defendants' knowledge of previous elections in Iowa and other polling data on Iowa at the time, it was downright reckless.

145.    Defendants' negligence created an ascertainable pecuniary loss: the value of a subscription to the *Des Moines Register*, as Mr. Donnelly and others can no longer trust what they have read or will read in the paper.

**COUNT II – Consumer Fraud**

146.    "A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes. For the purposes of this chapter, a claimant alleging an unfair practice, deception, fraud, false pretense, false promise,

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

or misrepresentation must prove that the prohibited practice related to a material fact or facts." Iowa Statutes 714H.3(1).

147.    "A consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act in violation of this chapter may bring an action at law to recover actual damages. The court may order such equitable relief as it deems necessary to protect the public from further violations, including temporary and permanent injunctive relief." Iowa Statutes 714H.5(1).

148.    "A class action lawsuit alleging a violation of this chapter shall not be filed with a court unless it has been approved by the attorney general. The attorney general shall approve the filing of a class action lawsuit alleging a violation of this chapter unless the attorney general determines that the lawsuit is frivolous." Iowa Statutes 714H.7.

149.    A newspaper is consumer merchandise—it is a service (news reporting) sold primarily for personal, family, or household usage. Iowa Statutes 714H.2.

150.    The decision by Dr. Selzer and the Register to report the poll as an accurate news item when in fact it was obviously inaccurate constituted an unfair practice, deception, fraud, misrepresentation of a material fact. It was either known or reasonably should have been known to be so.

151.    The decision to publish was made with the intent that others, at minimum subscribers like Plaintiff, would rely on the misinformation as accurate.

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

152.    The misinformation was published and pushed as a banner headline with the intention to sell newspapers, sell digital passes and subscriptions, and generate "clicks" that resulted in ad revenue for the *Register*.

153.    The Plaintiff suffered an ascertainable loss—the cost of his subscription to the *Des Moines Register*, which he can no longer rely on to provide trustworthy and accurate information. For his digital subscription, that is $69.99.

**COUNT III – Professional Malpractice**

154.    "In professional negligence actions, as in other negligence actions, the plaintiff must prove a duty of care was owed to him or her, breach of that duty, and damages caused by the breach of duty." *McGraw v. Wachovia Sec., L.L.C.*, 756 F. Supp. 2d 1053, 1070 (N.D. Iowa 2010) (applying state law).

155.    "Persons engaged in the practice of a profession or trade are held to the standard of the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." *Id.* (citation omitted).

156.    "Unless a professional's lack of care is so obvious as to be within the comprehension of a layperson, the standard of care and its breach must ordinarily be established through expert testimony." *Id.* (citation omitted).

157.    A journalist is engaged in a profession or trade. *Bank of Oregon v. Ind. News, Inc.*, 65 Ore. App. 29, 670 P.2d 616, 628 (Or. App. 1983) (holding that "when negligence is alleged against a media defendant, there should be a professional standard of care"). *See also* Restatement (Second) of Torts § 580B cmt. g (1977) (industry practice and custom for news outlets to ensure accuracy of news reports).

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

158.    A pollster is engaged in a profession or trade. As one piece of evidence that polling is a profession, it generally requires an advanced degree—Dr. Selzer holds a Ph.D.

159.    Industry standards can be seen in this instance in the AAPOR and Gannett statements of principles and best practices.

160.    A professional's duty arises when "'[r]ed flags' that would alert a" professional to the existence of a problem. *McGraw*, 756 F. Supp. 2d at 1075.

161.    Here, numerous "red flags" would notify a responsible pollster or a responsible journalist that the Iowa Poll was deeply flawed.

162.    In spite of these "red flags," the Defendants decided to recklessly proceed with publication.

163.    A professional's duty also arises to a customer—here, Mr. Donnelly and the other members of the Plaintiff Class who are customers, i.e., subscribers, of the *Register*. *McGraw*, 756 F. Supp. 2d at 1073-75.

164.    To the extent that Mr. Donnelly is an indirect customer of Dr. Selzer and Selzer & Co., Iowa recognizes that a professional may be liable to a third-party or non-customer. *See J.A.H. by R.M.H v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 260 (Iowa 1999) and *McGraw*, 756 F. Supp. 2d at 1072.

165.    A newspaper has a duty of care for information that it authors or approves (but not for advertisements it merely prints on behalf of others). *See Birmingham v. Fodor's Travel Publications*, 73 Haw. 359, 366 (1992).

166.    Here, the duty of care to exercise the ordinary care of a journalist or pollster required the Defendants to recognize the obvious problems with the Iowa Poll and not publish it without additional investigation or verification.

167.    Instead, the Defendants recklessly charged ahead and published the poll, providing inaccurate information to Mr. Donnelly and other subscribers. This denied him and other subscribers of the value of their newspaper subscription. Not only did they receive bad information that one day, but it undermined their confidence in the paper overall such that any past or future reporting can no longer be trusted.

168.    The value of that newspaper is an annual subscription cost--$69.99 for Mr. Donnelly, and a print or digital subscription cost for the Plaintiff Class.

169.    To the extent that the subscription terms that Mr. Donnelly or plaintiff class members may have accepted purports to limit damages to the value of one month of subscription cost, that is an unconscionable and unenforceable provision of an adhesion contract. *See, e.g., Mannion v. Manor Care, Inc.*, 4 Pa. D. & C.5th 321, 333-34 (2006) (damages limitation in adhesion contract unenforceable)/

**COUNT IV – Interference with the Right to Vote**

170.    Iowa recognizes a tort for interference with the right to vote. *Lane v. Mitchell*, 153 Iowa 139, 143 (1911).

171.    The tort is also recognized in the Restatement (Second) of Torts, Section 865, and the Restatement (First) of Torts, also section 865.

172.    *Lane* recognizes an after-the-fact cause for actual and nominal damages for interference with the right to vote.

173.    The Restatement defines the tort to include engaging in "fraud" "with knowledge that his act is substantially certain to result in the failure of the other to exercise the right."

174.    *Lane* says "the jury would have been warranted in awarding the plaintiff a substantial recovery" in such a case where actual damages are difficult to calculate.

175.    Academic studies show that polling data of a race affects voter choices and voter turnout. Such polling may also change the candidates that voters select based on their assessment of their viability (for instance, a voter may cast a third-party protest vote in a race that he thinks won't be close). *See generally* Andre Blais, et al., *Do Polls Influence the Vote?,* chapter in  Henry E. Brady & Richard G. C. Johnston, eds., CAPTURING CAMPAIGN EFFECTS (U. Mich. Press 2009).

176.    "Besides receiving national news coverage, this poll had a significant impact on the expectations of Iowans themselves. Such dramatic public findings, which this Iowa Poll represents, can mislead voters and undermine trust in the polling enterprise itself." Samantha J. DeRagon, Tracy Osborn, and Michael S. Lewis-Beck, *The 2024 Iowa Poll for President: A Cautionary Tale*, Univ. of Virginia (Dec. 12, 2024).[22]

177.    "The notion that published vote intention polls influence voter behavior expresses an hypothesis of long standing. Normally, it would be difficult to trace out the effect of this last minute, single poll on would-be voters in a single state. However,

---

[22] https://centerforpolitics.org/crystalball/the-2024-iowa-poll-for-president-a-cautionary-tale/

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

we had in the field our own poll of Iowa voters, namely a sample of 214 University of Iowa students. . . . The results show a statistically significant 9-percentage-point rise (p < .05, one-tailed) in expectations of a Harris victory among those who said Iowa was their home state (150 respondents). While these data are observational, they are nevertheless highly suggestive. It looks like the *Iowa Poll* did, in fact, increase Iowa public opinion favoring Harris to win the state." *Id.*

### PUNITIVE DAMAGES

178.    Pursuant to Iowa Code 668A.1(1)(a), Plaintiff pleads that he can show by a preponderance of clear, convincing, and satisfactory evidence that the conduct of the Defendant from which the claims arose constituted willful, wanton, or reckless disregard for the rights of others.

179.    Punitive damages are appropriate here where deterrence is necessary. The American people do not trust the news media—according to the Pew Research Center, only 31 percent of the American people have a great deal or fair amount of faith in the news media. That loss of faith in these important institutions is because news outlets like the *Register* publish obviously incorrect information and then trumpet it to get "clicks." Deterrence is necessary to restore faith in the media by providing a strong disincentive to intentionally or recklessly push stories that are inaccurate but would generate significant public attention and coverage from other media. *See Beeman v. Manville Corp. Asbestos Disease Comp. Fund*, 496 N.W.2d 247, 255 (Iowa 1993).

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

180.    Punitive damages are appropriate in cases of intentional or reckless misconduct. *Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005).

181.    In this case, Plaintiff has pled that Defendants acted to undertake an intentional fraud or at minimum acted with reckless disregard for the truth.

182.    Counts I, III, and IV are the predicate torts, any of which would justify punitive damages.

183.    Separately, Count II specifically authorizes punitive damages when "the finder of fact finds by a preponderance of clear, convincing, and satisfactory evidence that a prohibited practice or act in violation of this chapter constitutes willful and wanton disregard for the rights or safety of another." Iowa Code 714H.5(4).

184.    Again, the Defendants acted with either intentional or reckless disregard for the accuracy of the poll.

185.    To the extent that Mr. Donnelly's subscription contract with the *Register* may have included a waiver of punitive damages, that is an adhesion contract term that is unconscionable. *See Daniels v. Va. College at Jackson*, 478 Fed. Appx. 892, 894 (5th Cir. 2012). *See also Lukken v. Fleischer*, 962 N.W.2d 71, 82 (Iowa 2021) (contract terms that protect against liability for intentional or reckless misconduct are disfavored). It also only protects the *Register*, not the other Defendants.

## CONCLUSION AND PRAYER

Therefore, Plaintiff prays that the Court:

186.    Certify the Plaintiff Class.

E-FILED 2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

187.     Declare that the Defendants engaged in intentional misrepresentation, or alternatively that they engaged in recklessly negligent misrepresentation.

188.     Declare that the Defendants engaged in consumer fraud under the Iowa Consumer Fraud statute.

189.     Declare that the Defendants engaged in professional malpractice.

190.     Declare that the Defendants interfered with the right to vote.

191.     Award Mr. Donnelly and every Plaintiff Class member actual damages equivalent to one year's subscription, whether digital or print.

192.     Award Mr. Donnelly and every Plaintiff Class member nominal damages.

193.     Award Mr. Donnelly and every Plaintiff Class member punitive damages.

194.     Award Mr. Donnelly and the Class attorneys' fees. *See* Iowa Code 714H.5(2).

195.     Award any other relief the Court awards just and appropriate.

196.     The Plaintiff demands a trial by jury on all issues so triable.


Date:  January 6, 2024

/s/  *Robert R. Anderson*

Robert R. Anderson, Iowa State Bar No. AT9021

P.O. Box 4

Atlantic, IA 50022

Phone (515) 382-1278

Email:  Bobandersoniowan@gmail.com

*Attorney for Plaintiff*

36

E-FILED  2025 JAN 06 1:23 PM POLK - CLERK OF DISTRICT COURT

/s/  Daniel R. Suhr

Daniel R. Suhr

Center for American Rights

727 N. LaSalle Street, Suite 210

Chicago, IL 60654

Email:  Danielsuhr@gmail.com

Pro hac vice application forthcoming