IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| DENNIS DONNELLY, on behalf of himself and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> DES MOINES REGISTER AND TRIBUNE CO., INC.; J. ANN SELZER; SELZER & COMPANY; and GANNETT CO., INC., <br><br> *Defendants*. | Case No. 4:25-cv-00150-RGE-WPK <br><br><br> DEFENDANTS DES MOINES REGISTER AND TRIBUNE CO., INC. AND GANNETT CO., INC.'S ANSWER TO PETITION |

Defendants Des Moines Register and Tribune Co., Inc. ("the Des Moines Register") and Gannett Co., Inc. (collectively "Press Defendants"), through their counsel of record, respond to the Petition of Plaintiff Dennis Donnelly as follows:

**INTRODUCTION**

1.    When subscribers pick up their copy of the *Des Moines Register*, they are promised "trustworthy, smart and engaging news and information" (the *Register's* mission statement). The *Register* pledges to its subscribers that it will continue its legacy as a "venerable source of information and current news for the heart of Iowa" from "the state's premier source of information."

**ANSWER**: Press Defendants state that *The Register*'s mission statement speaks for itself, and Press Defendants deny the allegations stated in Paragraph 1 to the extent they contradict or mischaracterize that mission statement. Press Defendants deny that *The Register*'s mission statement is a "promise" or a "pledge." Press Defendants deny any remaining allegations stated in Paragraph 1.

2.      The *Register* utterly failed to live up to those promises with its decision to publish its signature Iowa Poll in the days leading up to the 2024 presidential election. It promised subscribers like Dennis Donnelly that it would provide trustworthy news, and instead it delivered the dictionary definition of fake news. In doing so, it defrauded Dennis and every other subscriber who paid good money to receive accurate, trustworthy information from the state's "premier source of information."

**ANSWER**: Press Defendants admit that the Iowa Poll and its results were published in *The Register* in the days leading up to the 2024 presidential election. Press Defendants deny the remaining allegations stated in Paragraph 2.

3.      The *Register* is owned by Gannett Co. Gannett's principles of ethical news coverage include expectations like, "Don't publish a story if it doesn't feel right. Check it further." "Watch carefully for red flags that give reason to be skeptical of news-gathering or editing conduct." And "[b]e especially careful with technical terms, statistics, mathematical computations, crowd estimates and poll results."

**ANSWER**: Press Defendants state that Gannett's principles of ethical news coverage speak for themselves, and Press Defendants deny the allegations stated in Paragraph 3 to the extent they contradict or mischaracterize those principles. Press Defendants deny that Gannett's principles of ethical news coverage are "expectations." Press Defendants admit that *The Register* is owned by Gannett. Press Defendants deny any remaining allegations stated in Paragraph 3.

4.      But the *Register* was not careful with these poll results. Every possible red flag should have been blazing high in the sky. The poll results were contrary to historic Iowa election results, other publicly available polling in Iowa of this election, and polling in similar swing states. Yet rather than double-checking or re-running the poll or bringing in an outside expert to analyze the sample

and methodology or undertaking any of the other industry practices that would validate a seemingly shocking poll number, the *Register* released it as a banner headline.

**ANSWER**: Press Defendants state they lack sufficient knowledge or information to form a belief as to the truth of the allegations stated in the third sentence of Paragraph 4 and, therefore, they deny them. Press Defendants admit that the headlines of *The Register*'s November 2 and 3 digital editions and the November 3 print edition were articles about the Iowa Poll and its results. Press Defendants deny the remaining allegations stated in Paragraph 4.

5.      That banner headline brought in hundreds of thousands of "clicks" from across the world, as the shocking revelation of numbers that seemed too good to be true generated massive enthusiasm for one candidate in the final stretch of the campaign.

**ANSWER**: Press Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegation that "[t]hat banner headline brought in hundreds of thousands of 'clicks' from across the world," and, therefore, they deny it. Press Defendants deny the remaining allegations stated in Paragraph 5.

6.      But of course, the numbers were too good to be true. They were off. Massively off. One in a million chances off. Technically, one in 3.5 million chances off.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 6.

7.      This lawsuit is brought by a *Register* subscriber on behalf of a putative class of all *Register* subscribers who were provided a fundamentally flawed product. As consumers, they thought they were purchasing a daily report of trustworthy news— the *Register* failed to provide the product it promised them.

**ANSWER**: Press Defendants admit that this lawsuit purports to allege claims on behalf of a putative class of subscribers to *The Register*, but Press Defendants deny that any such class could

or should be certified. Press Defendants state they lack sufficient knowledge or information to form a belief as to the truth of the allegation regarding what "consumers . . . thought they were purchasing" and, therefore, they deny it. Press Defendants deny the remaining allegations stated in Paragraph 7.

## PARTIES

8.     Dennis Donnelly is a resident of West Des Moines. He is a longtime subscriber to the *Register*. In recent years he switched from a print subscription to a digital subscription (retail price, $69.99/year). He was intensely frustrated by the inaccurate poll and felt like the *Register* was disserving him and other readers when it ran and when its results were compared to the final outcome.

**ANSWER**: Press Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations set forth in the first and fourth sentences of Paragraph 8 and, therefore, they deny them. Press Defendants deny the remaining allegations stated in Paragraph 8.

9.     The *Des Moines Register and Tribune Co.* is the company that owns and publishes the print and digital editions of the *Des Moines Register*. It is a wholly owned subsidiary of Gannett Co., Inc. It is a domestic for-profit corporation registered with the Iowa Secretary of State (No. 8971).

**ANSWER**: Press Defendants admit the allegations stated in Paragraph 9.

10.     J. Ann Selzer (Dr. Selzer) is a natural person. She lives in the Des Moines area. She is the president of Selzer & Company. She holds a Ph.D. in Communication Theory and Research from the University of Iowa.

**ANSWER**: Press Defendants admit the allegations stated in Paragraph 10.

11.     Selzer & Co. is a company that conducts polling for, among other clients, the *Des Moines Register*. Its president is Dr. Selzer. It is a domestic for-profit corporation registered with the Iowa Secretary of State (No. 200824). Its office is 308 Fifth St., West Des Moines, IA, 50265.

     **ANSWER**: Press Defendants admit the allegations stated in Paragraph 10.

12.      Gannett Co. Inc. is a publicly traded corporation that owns the most local newspapers of any chain in the country, led by USA Today. It is headquartered in New York City.

     **ANSWER**: Press Defendants admit the allegations stated in Paragraph 10.

## JURISDICTION & VENUE

13.     Jurisdiction is established under Iowa Code 714H.5(1) (private right of action for consumer fraud) and 602.6101 (general civil jurisdiction).

     **ANSWER**: Press Defendants state the allegations in Paragraph 13 are legal conclusions to which no response is required. To the extent a response is required, Press Defendants deny the allegations stated in Paragraph 13.

14.     Venue is appropriate in Polk County pursuant to Iowa Code 616.14, as Selzer & Co., the *Des Moines Register*, and Gannett Co. (through its subsidiary the *Des Moines Register*) maintain a place of business in Polk County. Venue is also appropriate as to Dr. Selzer, who works and lives in Polk County, pursuant to Iowa Code 616.17. Similarly, Iowa Code 714.16(10) instructs that consumer protection actions should be brought in the county where the transaction took place. Here, both Mr. Donnelly and the *Register* are in Polk County.

     **ANSWER**: Press Defendants state the allegations in Paragraph 14 are legal conclusions to which no response is required. To the extent a response is required, Press Defendants deny the allegations stated in Paragraph 14.

**FACTUAL ALLEGATIONS**

15.     Across the country, the 2020 polling results were the most inaccurate in history to that point. It was a scandal of epic, industry-shaking proportions that the polls were off so badly. These were "the worst polls in decades," or "the worst misfire in generations." According to an after-action autopsy by the American Association of Public Opinion Research (AAPOR), "It was the highest [error] in 40 years for the national popular vote and the highest in at least 20 years for state-level estimates of the vote in presidential, senatorial, and gubernatorial contests."

**ANSWER**: Press Defendants state they lack sufficient knowledge or information to form a belief as to the truth of the first sentence of Paragraph 15 and, therefore, they deny it. Press Defendants state that statements by the American Association of Public Opinion Research (AAPOR) speak for themselves, and Press Defendants deny the allegations stated in Paragraph 15 to the extent they contradict or mischaracterize those statements. Press Defendants deny the remaining allegations stated in Paragraph 15.

16.     How badly did these polls miss the final result to constitute the worst polls in decades? According to the AAPOR report, "Among polls conducted in the final two weeks, the average error on the margin in either direction was 4.5 points for national popular vote polls and 5.1 points for state-level presidential polls."

**ANSWER**: Press Defendants state that the first sentence of Paragraph 16 is a rhetorical question to which no response is required. To the extent a response is required, Press Defendants deny the allegations stated in the first sentence of Paragraph 16. Press Defendants state that statements by the American Association of Public Opinion Research (AAPOR) speak for themselves, and Press Defendants deny the allegations stated in Paragraph 16 to the extent they

contradict or mischaracterize those statements. Press Defendants deny any remaining allegations stated in Paragraph 16.

17.     Defendants put together and published a poll that was off by <u>16 points</u> in the final pre-election presidential poll in 2024. If a miss by five points was a miss of historic proportions, then a miss by 16 points is not an innocent error—it is either intentional fraud or reckless disregard for accuracy. Either way it is actionable.

    **ANSWER**: Press Defendants state the 2024 Iowa Poll results and 2024 presidential election results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 17 to the extent they contradict or mischaracterize those results. Press Defendants deny the remaining allegations stated in Paragraph 17.

18.     Dr. Selzer has a track record of undersampling Republicans in her polling. In 2018, her final poll missed the Republican candidate's eventual victory for governor by five points.

    **ANSWER**: Press Defendants state that the results of Dr. Selzer's 2018 poll regarding the gubernatorial race and the results of the 2018 gubernatorial election speak for themselves, and Press Defendants deny the allegations stated in Paragraph 18 to the extent they contradict or mischaracterize those poll or election results. Press Defendants deny the remaining allegations stated in Paragraph 18.

19.     In 2020, after showing the Republican candidate for U.S. Senate down throughout the fall, Dr. Selzer's final poll showed her up four. She won by seven.

    **ANSWER**: Press Defendants state that the results of Dr. Selzer's 2020 poll regarding the U.S. Senate race and the results of the 2020 U.S. Senate election speak for themselves, and Press Defendants deny the allegations stated in Paragraph 19 to the extent they contradict or

mischaracterize those poll or election results. Press Defendants deny any remaining allegations stated in Paragraph 19.

20.     In 2022, her final poll missed the Republican candidate's eventual victory for attorney general by a breath-taking eighteen points.

**ANSWER**: Press Defendants state that the results of Dr. Selzer's 2022 poll regarding the attorney general race and the results of the 2022 attorney general election speak for themselves, and Press Defendants deny the allegations stated in Paragraph 20 to the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 20.

21.     In the June 2024 Iowa Poll, Dr. Selzer found President Trump leading President Biden by 18 points.

**ANSWER**: Press Defendants state that the results of the June 2024 Iowa Poll speak for themselves, and Press Defendants deny the allegations stated in Paragraph 21 to the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 21.

22.     In September 2024, the first poll testing President Trump versus Vice President Harris, Dr. Selzer's Iowa Poll showed the lead had narrowed from 18 to 4 points in favor of President Trump.

**ANSWER**: Press Defendants state that the results of the September 2024 Iowa Poll speak for themselves, and Press Defendants deny the allegations stated in Paragraph 22 to the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 22.

23.     Then, a month later, Dr. Selzer and the *Register* released a "stunning," "shocking," "surprise" Iowa Poll showing Vice President Harris at 47 and President Trump at 44.

**ANSWER**: Press Defendants state that the results of the October 2024 Iowa Poll speak for themselves, and Press Defendants deny the allegations stated in Paragraph 23 to the extent they contradict or mischaracterize those results. Press Defendants deny the remaining allegations stated in Paragraph 23.

24.    Dr. Selzer's October poll was contrary to recent results in Iowa elections, other polling that cycle in Iowa, and other polling that cycle in similar states.

**ANSWER**: Press Defendants state they lack sufficient knowledge or information to form a belief as to the truth of the allegations stated in Paragraph 24 and, therefore, they deny them.

25.    In 2022, Republican Governor Kim Reynolds won reelection by a substantial margin, securing 58% of the vote to Democrat Deidre DeJear's 40%. Republicans also won six of seven statewide races that year. U.S. Senator Chuck Grassley secured reelection by twelve percentage points, earning 56% of the vote compared to 44% for his Democratic challenger, Michael Franken.

**ANSWER**: Press Defendants state that the results of the 2022 elections referenced in Paragraph 25 speak for themselves, and Press Defendants deny the allegations stated in Paragraph 25 to the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 25.

26.    In the 2020 election, President Trump won Iowa by eight percentage points, with 53% of the vote compared to (then titled) Vice President Biden's 45%.

**ANSWER**: Press Defendants state that the results of the 2020 presidential election speak for themselves, and Press Defendants deny the allegations stated in Paragraph 26 to the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 26.

27.     In the 2020 election, Republican U.S. Senator Joni Ernst won reelection by seven percentage points, securing 52% of the vote to Democrat Theresa Greenfield's 45%.

    **ANSWER**: Press Defendants state that the results of the 2020 U.S. senate election speak for themselves, and Press Defendants deny the allegations stated in Paragraph 27 to the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 27.

28.     In 2018, the Republican at the top of the ticket, Kim Reynolds, won 50 to 47 for an open seat over Democrat Fred Hubbell.

    **ANSWER**: Press Defendants state that the results of the 2018 Iowa gubernatorial election speak for themselves, and Press Defendants deny the allegations stated in Paragraph 28 to the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 28.

29.     In 2016, President Trump won Iowa by nine percentage points, securing 51% of the vote to former Secretary Hillary Clinton's 42%.

    **ANSWER**: Press Defendants state that the results of the 2016 presidential election speak for themselves, and Press Defendants deny the allegations stated in Paragraph 29 to the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 29.

30.     In other words, in every ticket-topping race—president, governor, senator—from 2016 to 2022, the Republican has won in Iowa and usually done so by a convincing margin. A three-point lead by a Democrat candidate for president would have been markedly out-of-place compared to election results in the prior four cycles.

**ANSWER**: Press Defendants state that the results from election held from 2016 to 2022 speak for themselves, and Press Defendants deny the allegations stated in Paragraph 30 to the extent they contradict or mischaracterize those results. Press Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations stated in Paragraph 30 and, therefore, deny them.

31.    That result was also out-of-place compared to other polling in Iowa in the 2024 cycle. A November 2-3 poll of likely voters by SoCal Strategies showed Trump up in Iowa by eight points, 52-44. A poll those same dates by InsiderAdvantage showed Trump up by seven points, 52-46. A poll November 1-2 by Emerson College showed Trump up nine points, 54-45. A poll a few weeks earlier by Cygnal showed Trump up about seven as well, 51.3 to 44.6%.

**ANSWER**: Press Defendants state that the results from SoCal Strategies, InsiderAdvantage, Emerson College, and Cygnal polls speak for themselves, and Press Defendants deny the allegations stated in Paragraph 31 to the extent they contradict or mischaracterize those results. Press Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations stated in Paragraph 31 and, therefore, deny them.

32.    Other pollsters who frequently work in swing states, like Quinnipiac University, did not even poll in Iowa in 2024, assuming it was a lock for Trump. When news outlets like the *New York Times*, *US News*, or *Forbes* reported on the "swing states" that would determine the election, Iowa was never even on the list.

**ANSWER**: Press Defendants state they lack sufficient knowledge or information to form a belief as to the truth of the allegations stated in Paragraph 32 and, therefore, they deny them.

33.    Another red flag should have been national and swing-state polling at the time, all of which showed the race moving in President Trump's direction in mid-October. NPR, reporting on the

swing state polling shortly before Dr. Selzer's poll, wrote, "Surveys in the past couple of weeks have moved in Trump's direction, and the leads Harris had in the most competitive and critical states have mostly evaporated. . . . the consistency of the change — and the fact that it's all in Trump's direction — has Democrats concerned."

**ANSWER**: Press Defendants deny that there were any "red flags" with respect to the 2024 Iowa Poll. Press Defendants state that NPR's reporting speaks for itself, and Press Defendants deny the allegations stated in Paragraph 33 to the extent they contradict or mischaracterize that reporting. Press Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations stated in Paragraph 33 and, therefore, deny them.

34.    A Suffolk University/*USA Today* poll of Arizona at the end of September showed Trump with a six-point lead. Trump went on to win Arizona by 5.5.

**ANSWER**: Press Defendants state that the results from the Suffolk University/*USA Today* poll of Arizona and the Arizona election results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 34 to the extent they contradict or mischaracterize those results.

35.    A Suffolk University/*USA Today* poll of Wisconsin at the end of October showed Trump with a one-point lead, 48-47. He went on to win Wisconsin by one point.

**ANSWER**: Press Defendants state that the results from the Suffolk University/*USA Today* poll of Wisconsin and the Wisconsin election results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 35 to the extent they contradict or mischaracterize those results.

36.    A Suffolk University/*USA Today* poll of Michigan at the end of October showed President Trump winning by 0.4%. He won Michigan by 1.4 percent.

**ANSWER**: Press Defendants state that the results from the Suffolk University/*USA Today* poll of Michigan and the Michigan election results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 36 to the extent they contradict or mischaracterize those results.

37.    A Suffolk University/*USA Today* poll of Pennsylvania at the end of October showed the two candidates tied at 48.6 percent. Trump won by 1.7 percent.

**ANSWER**: Press Defendants state that the results from the Suffolk University/*USA Today* poll of Pennsylvania and the Pennsylvania election results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 37 to the extent they contradict or mischaracterize those results.

38.    The foregoing battleground polls, all sponsored by Gannett's *USA Today* paper, all showed the momentum favoring President Trump in the final days. Dr. Selzer's poll was an obvious outlier compared to other publicly available polling in swing states.

**ANSWER**: Press Defendants state the results of the polls referred to in Paragraphs 34 through 37 and the 2024 Iowa Poll speak for themselves, and Press Defendants deny the allegations stated in Paragraph 38 to the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 38.

39.    PollFair, an online polling analyst that reweights polls based on historic exit poll data, took Dr. Selzer's October poll and reweighted it according to historical data. Dr. Selzer weighted her sample at R+2, while PollFair weighted its sample at R+10. Doing so moved the results from Harris +3 (47-44) to Trump +6 (50-44).

**ANSWER**: Press Defendants state that the actions of PollFair and Dr. Selzer's poll weighting speak for themselves, and Press Defendants deny the allegations stated in Paragraph 39

to the extent they contradict or mischaracterize those actions or that weighting. Press Defendants deny any remaining allegations stated in Paragraph 39.

40.     "'It's hard for anybody to say they saw this coming,' said pollster J. Ann Selzer, president of Selzer & Co.," in the *Register* story on Sunday, November 3, announcing the poll results.

    **ANSWER**: Press Defendants state that *The Register*'s November 3 article regarding the 2024 Iowa Poll speaks for itself, and Press Defendants deny the allegations stated in Paragraph 40 to the extent they contradict or mischaracterize that article. Press Defendants deny any remaining allegations stated in Paragraph 40.

41.     No one saw this coming because it wasn't coming. It was wrong. Flat-out, epically, recklessly wrong.

    **ANSWER**: Press Defendants deny the allegations stated in Paragraph 41.

42.     In the final event, President Trump won Iowa by thirteen points, meaning that Dr. Selzer's Iowa poll was off by sixteen points.

    **ANSWER**: Press Defendants state that Iowa's election results and the 2024 Iowa Poll results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 42 to the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 42.

43.     The Iowa Poll was also wrong in its polling of the First Congressional District. Dr. Selzer's poll found that "[b]y a 16-point margin, likely Iowa voters prefer a Democrat over a Republican in the 1st District, where Democrat Christina Bohannan and Republican U.S. Rep. Mariannette Miller-Meeks are competing."

    **ANSWER**: Press Defendants state that Iowa's election results and the 2024 Iowa Poll results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 43 to

the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 43.

44.    A poll from a few weeks earlier by the Democratic Party had shown Bohannan up only four points, 50-46.

**ANSWER**: Press Defendants state that the Democratic Party's poll results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 44 to the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 44.

45.    A poll from the end of August by Normington, Petts & Associates for the Bohannan campaign had showed the race tied, 47-47.

**ANSWER**: Press Defendants state that the Normington, Petts & Associates' poll results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 45 to the extent they contradict or mischaracterize those results. Press Defendants deny any remaining allegations stated in Paragraph 45.

46.    The Iowa First is an R+3 seat normally according to the Cook Political Report. President Trump had won it in 2020 by three points. Kim Reynolds won it in 2018 by three points.

**ANSWER**: Press Defendants state that the Cook Political Report and Iowa's 2020 and 2018 election results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 46 to the extent they contradict or mischaracterize that report or those results. Press Defendants deny any remaining allegations stated in Paragraph 46.

47.    The 2024 race was a rematch between Bohannan and incumbent Mariannette Miller-Meeks. Miller-Meeks had won in 2022 by 6.7 points.

**ANSWER**: Press Defendants state that Iowa's 2024 ballot and election results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 47 to the extent they contradict or mischaracterize that ballot or those election results. Press Defendants deny any remaining allegations stated in Paragraph 47.

48.     Thus, the idea that Bohannan was up sixteen, in an R+3 seat, when she had lost in 2022 by almost seven points, was a massive red flag that the Iowa Poll was wrong. But the Defendants ran with it anyway.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 48.

49.     Miller-Meeks ended up winning the 2024 race as well, by 0.2 points, meaning that Dr. Selzer's Iowa poll was off by a scandalous sixteen points.

**ANSWER**: Press Defendants state that Iowa's 2024 election results and Dr. Selzer's poll results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 49 to the extent they contradict or mischaracterize those results. Press Defendants deny the remaining allegations stated in Paragraph 49.

50.     A similar story could be told in Iowa's Third Congressional District. Dr. Selzer's poll predicted that the Democrat would win by seven in a district rated R+3 by the Cook Political Report. In the end the Republican incumbent won by four, meaning Dr. Selzer was off by eleven points.

**ANSWER**: Press Defendants state that Dr. Selzer's poll results, the Cook Political Report, and Iowa's election results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 50 to the extent they contradict or mischaracterize those poll results, that report, or those election results. Press Defendants deny any remaining allegations stated in Paragraph 50.

51.     The other two U.S. House seats were considered safe, but the Iowa Poll was still radically off. In the Second District, Dr. Selzer found a three-point lead for the Republican, 45-42. She ended up winning 57 to 41.5, off by over twelve points. In the Fourth District, Dr. Selzer found the Republican leading 53 to 47. The final result was 67 to 33, from a predicted six-point win to an actual 34-point blow-out. Put differently, Dr. Selzer was off by 28 points.

**ANSWER**: Press Defendants state they lack sufficient knowledge or information to form a belief as to the truth of the allegation that "[t]he other two U.S. House seats were considered safe" and, therefore, they deny it. Press Defendants state that Iowa's 2024 election results and the 2024 Iowa Poll results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 51 to the extent they contradict or mischaracterize those results. Press Defendants deny the remaining allegations stated in Paragraph 51.

52.     Off by 16 (presidential). Off by 16 (IA-1), 12.5 (IA-2), 11 (IA-3), and 28 (IA-4). In an industry where being off by five was the greatest miss in modern history.

**ANSWER**: Press Defendants state that Iowa's 2024 election results and the 2024 Iowa Poll results speak for themselves, and Press Defendants deny the allegations stated in Paragraph 52 to the extent they contradict or mischaracterize those results. Press Defendants deny the remaining allegations stated in Paragraph 52.

53.     The same point can be made another way: the margin of error.

**ANSWER**: Press Defendants deny there is a "point" to be made. Press Defendants deny any remaining allegations stated in Paragraph 53.

54.     The margin of error accounts for the potential inaccuracy of a polling due to limited sample size.

**ANSWER**: Press Defendants state that the margin of error and explanation thereof on the Iowa Poll results speaks for itself, and Press Defendants deny the allegations stated in Paragraph 54 to the extent they contradict or mischaracterize that explanation. Press Defendants deny any remaining allegations stated in Paragraph 54.

55.     The *Register's* story announcing the poll explains, "Questions based on the sample of 808 Iowa likely voters have a maximum margin of error of plus or minus 3.4 percentage points. This means that if this survey were repeated using the same questions and the same methodology, 19 times out of 20, the findings would not vary from the true population value by more than plus or minus 3.4 percentage points."

**ANSWER**: Press Defendants state that *The Register* article referenced in Paragraph 55 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 55 to the extent they contradict or mischaracterize that article. Press Defendants deny any remaining allegations stated in Paragraph 55.

56.     In a November 2021 Q&A with Brian Smith, the *Register* posed and answered this question from a reader's perspective: "**I see references to margin of error in articles about the Iowa Poll. Does that mean the data isn't accurate?** No. The Iowa Poll is carefully constructed to ensure that it is accurate. But, anytime you're using a representative sample, there is some room for error. The margin of error means that if the survey were repeated using the same questions and the same methodology, 19 out of 20 times, the findings would not vary from the true population value by more than plus or minus the listed margin of error."

**ANSWER**: Press Defendants state that the November 2021 Q&A with Brian Smith speaks for itself, and Press Defendants deny the allegations stated in Paragraph 56 to the extent they

contradict or mischaracterize that Q&A. Press Defendants deny any remaining allegations stated in Paragraph 56.

57.    The margin of error in the House races was plus or minus 7.2 percent.

**ANSWER**: Press Defendants state that the margin of error and explanation thereof on the Iowa Poll results speaks for itself, and Press Defendants deny the allegations stated in Paragraph 57 to the extent they contradict or mischaracterize that explanation. Press Defendants deny any remaining allegations stated in Paragraph 57.

58.    Again, with the margin of error, Dr. Selzer and the *Register* are telling their readers and subscribers, like Mr. Donnelly, that 19 out of 20 times, they will be accurate within 3.4 percent. Here they were off by 16 percent.

**ANSWER**: Press Defendants state that the margin of error and explanation thereof on the Iowa Poll results speaks for itself, and Press Defendants deny the allegations stated in Paragraph 58 to the extent they contradict or mischaracterize that explanation. Press Defendants deny any remaining allegations stated in Paragraph 58.

59.    According to James Piereson of the Manhattan Institute: "The Selzer Poll, with a margin of error of 3.4, missed the real outcome by 16 points, or by as many as five standard deviations from the true result as revealed on election day. What are the odds of drawing such a sample by legitimate means? Answer: roughly one time in 3.5 million trials. In other words, given these odds, the results in the Iowa poll likely did not come about by 'honest error.'"

**ANSWER**: Press Defendants state that James Piereson's statements speak for themselves, and Press Defendants deny the allegations stated in Paragraph 59 to the extent they contradict or mischaracterize those statements. Press Defendants deny any remaining allegations stated in Paragraph 59.

60.     They say close only counts in horseshoes and hand grenades. This wasn't even close to close. This was either intentionally fraudulent or recklessly irresponsible. Either way it is actionable.

**ANSWER**: Press Defendants admit that "close only counts in horseshoes and hand grenades" is a common aphorism. Press Defendants deny the remaining allegations stated in Paragraph 60.

## ALLEGATIONS ABOUT THE POLL LEAK

61.     As if all of this were not bad enough on its own, the Poll leaked prior to its public release.

**ANSWER**: Press Defendants admit that certain individuals claimed to have knowledge of the Iowa Poll results before the results were published in *The Register* but deny they have any knowledge of whether or how that happened. Press Defendants deny the remaining allegations stated in Paragraph 61.

62.     The poll originally ran in print on Sunday, November 3, immediately before the election.

**ANSWER**: Press Defendants admit the allegations stated in Paragraph 62. Press Defendants affirmatively state that there were multiple articles about the Iowa Poll published in *The Register*'s November 3 print edition.

63.     The story about the poll posted online on Saturday, November 2, on the Register's website.

**ANSWER**: Press Defendants admit the allegations stated in Paragraph 63. Press Defendants affirmatively state that there were multiple articles about the Iowa Poll published on *The Register*'s website on November 2.

64.     About an hour before the poll was online, a tweet reported that Illinois Governor J.B. Pritzker was publicly discussing the poll's findings at a College Democrats event at Duke University.

**ANSWER**: Press Defendants state that the tweet referred to in Paragraph 64 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 64 to the extent they contradict or mischaracterize it. Press Defendants deny any remaining allegations stated in Paragraph 64.

65.     It is unclear at this time how Pritzker knew of the poll, but somehow the information was in the hands of a major Democrat surrogate before the general public.

**ANSWER**: Press Defendants admit that certain individuals claimed to have knowledge of the Iowa Poll results before the results were published in *The Register* but deny they have any knowledge of whether or how that happened. Press Defendants deny the remaining allegations stated in Paragraph 65.

66.     The leak again is evidence of either an intent to defraud or a recklessness with the Poll.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 66.

## ALLEGATIONS SPECIFIC TO THE REGISTER

67.     "Carol Hunter, executive editor [of the Register], has been with the Register since 2004. She has supervised award-winning politics coverage in five presidential caucus cycles. A native of Kansas and a graduate of the University of Kansas School of Journalism, she previously was top editor of the Press-Gazette in Green Bay, Wisconsin, and the Courier-News in Bridgewater, New Jersey." She "guid[es] the Register newsroom."

**ANSWER**: Press Defendants state that the quote above speaks for itself, and Press Defendants deny the allegations stated in Paragraph 67 to the extent they contradict or mischaracterize that quote. Press Defendants deny that Carol Hunter currently "guides the Register newsroom" and affirmatively state that Carol Hunter has retired.

68.     "Hunter's duties also include oversight of the Register's sister papers, the Ames Tribune and the Iowa City Press-Citizen, as well as the Sioux Falls Argus Leader in South Dakota. At

various times her duties have encompassed supervision of editors at papers from Arkansas to Montana belonging to Register parent Gannett Co." This again shows the editorial management tie between Gannett papers and Gannett corporate.

**ANSWER**: Press Defendants state that the quote above speaks for itself, and Press Defendants deny the allegations stated in Paragraph 68 to the extent they contradict or mischaracterize that quote. Press Defendants state the last sentence of Paragraph 68 is a legal conclusion to which no response is required. To the extent a response is required, Press Defendants deny the allegations stated in the last sentence of Paragraph 68.

69.     "Hunter joined the Register in 2004 as editorial editor and later served as political editor and then news director, the newsroom's No. 2 leadership position."

**ANSWER**: Press Defendants admit the allegations stated in Paragraph 69.

70.     In mid-December 2024, Hunter announced her retirement from the *Register*.

**ANSWER**: Press Defendants admit the allegations stated in Paragraph 70.

71.     In a Gannett press release about an earlier iteration of the Iowa Poll, Ms. Hunter was the spokesperson for the company, showing the tie between Gannett and the *Register* specific to the poll.

**ANSWER**: Press Defendants state the Gannett press release referred to in Paragraph 71 speaks for itself, and Defendants deny the allegations stated in Paragraph 71 to the extent they contradict or mischaracterize that press release. Press Defendants state that the allegation that there is a "tie between Gannett and the *Register*" with respect to the Iowa Poll is a legal conclusion to which no response is required. To the extent a response is required, Press Defendants deny that allegation.

72.    Mike Trautmann is "News Director/Politics Editor for the Des Moines Register. Former news director for the Louisville Courier Journal. Native South Dakotan who decided he had enough of the snow and cold and then reconsidered. Reporting and editing gigs in Aberdeen, Brookings, Sioux Falls, Des Moines and Louisville."

**ANSWER**: Press Defendants state the quote in Paragraph 72 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 72 to the extent it contradicts or misrepresents that quote.

73.    Brianne Pfannenstiel is the chief political correspondent for the *Register* and the author of the story reporting the Iowa Poll's presidential results. She has a degree in journalism from the University of Kansas. "After graduating from the University of Kansas, Pfannenstiel worked as a reporter for The Kansas City Star and Lawrence Journal-World, where she covered the 2010 United States elections. She joined the Kansas City Business Journal in 2013. In 2015, she relocated to Iowa to join The Des Moines Register. In the 2016 Iowa caucus cycle, Pfannenstiel initially covered the Scott Walker campaign, followed by the Donald Trump campaign."

**ANSWER**: Press Defendants state the quote in Paragraph 73 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 73 to the extent it contradicts or misrepresents that quote.

74.    Steven Gruber-Miller is a statehouse politics reporter for the *Register* who wrote the story on the congressional race results from Dr. Selzer's poll. A graduate of Grinnell College, he has worked for the *Register* for seven years, including six covering Iowa politics. He previously covered local politics for the *Iowa City Press-Citizen*, another Gannett paper.

**ANSWER**: Press Defendants state the quote in Paragraph 74 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 74 to the extent it contradicts or misrepresents that quote.

75. The *Register* exercises significant control over the way it reports Dr. Selzer's polling. "The Des Moines Register is legendarily careful with Selzer's polls."

**ANSWER**: With respect to the second sentence of Paragraph 75, Press Defendants do not know the source of the quote, the specific polls to which it refers, or what the speaker means when they say "legendarily" careful, and, therefore, Press Defendants deny the second sentence of Paragraph 75. Press Defendants the remaining allegations stated in Paragraph 75.

**ALLEGATIONS SPECIFIC TO SELZER & CO. AND DR. SELZER**

76. Dr. Selzer's company Selzer & Co. describes itself: "Selzer & Company, a Des Moines-based company founded by J. Ann Selzer, Ph.D., is a nationally recognized, industry leading polling and audience research firm. Since 1994, Selzer has worked with a wide variety of clients, including healthcare organizations, financial institutions, universities, advocacy groups and technology start-ups. Selzer & Company conducts the Iowa Poll, which is regarded by political insiders as the gold standard for its accuracy and insights about the Iowa caucuses."

**ANSWER**: Press Defendants state that the allegations stated in Paragraph 76 are directed to another Defendant, so no response is required. To the extent a response is required, Press Defendants state the quote in Paragraph 76 speaks for itself, and Press Defendants deny the allegations in Paragraph 76 to the extent they contradict or mischaracterize that quote.

77. On her website, next to a picture of J. Ann Selzer, Ph.D., she explains, "The best news I can give to any client is the truth. This informs the way I approach their problem, develop methods,

analyze data, and report results. It is a core value. Over the years, the accuracy of my work has won wide praise, and I'm humbled by the honors and kind words."

**ANSWER**: Press Defendants state the allegations in Paragraph 77 are directed to another Defendant, so no response is required. To the extent a response is required, Press Defendants state the quote in Paragraph 77 speaks for itself, and Press Defendants deny the allegations in Paragraph 77 to the extent they contradict or mischaracterize that quote.

78.    Her website continues, "What sets me apart from other creative minds who have a lot of ideas is the discipline of research. I am data-driven. And so, I have a good idea when to step away from an idea that cannot be supported by evidence."

**ANSWER**: Press Defendants state the allegations in Paragraph 78 are directed to another Defendant, so no response is required. To the extent a response is required, Press Defendants state the quote in Paragraph 78 speaks for itself, and Press Defendants deny the allegations in Paragraph 77 to the extent they contradict or mischaracterize that quote.

79.    "After working as the internal pollster for the *Register* in 1987, Selzer founded her own company in 1992 and began conducting polls for the paper through her firm."

**ANSWER**: Press Defendants state the allegations in Paragraph 79 are directed to another Defendant, so no response is required. To the extent a response is required, Press Defendants state the quote in Paragraph 79 speaks for itself, and Press Defendants deny the allegations in Paragraph 79 to the extent they contradict or mischaracterize that quote.

80.    "In 2016, she described the company's atmosphere to *FiveThirtyEight*, saying, 'Part of our culture in this office is we have the phrase, "I just want to say this out loud." It's a culture of overcommunication, and some day I will write a book called "Just Say It Out Loud."'" Whatever corporate culture Dr. Selzer has cultivated at her company, apparently no one had the temerity to

just say out loud what someone must have thought: these poll results can't be right. Or someone did, and got railroaded.

**ANSWER**: Press Defendants state the allegations in Paragraph 80 are directed to another Defendant, so no response is required. To the extent a response is required, Press Defendants state the quote in Paragraph 80 speaks for itself, and Press Defendants deny the allegations in Paragraph 77 to the extent they contradict or mischaracterize that quote.

81.    "In a 2016 interview with *Politico*, Selzer explained her approach and its success, saying, 'I think it has to do with being more of a traditionalist, science-based pollster. And because it has worked for me, I've not been tempted to go and try other methods. And because I have clients who are willing to pay the premium that it takes to do it this way, I've not had to cut corners.'"

**ANSWER**: Press Defendants state the allegations in Paragraph 81 are directed to another Defendant, so no response is required. To the extent a response is required, Press Defendants state the quote in Paragraph 81 speaks for itself, and Press Defendants deny the allegations in Paragraph 81 to the extent they contradict or mischaracterize that quote.

82.    Asked about this poll, Dr. Selzer responded after the poll's publication but prior to election day: "These are the kinds of comments seen for virtually any poll, including mine. *The Des Moines Register* includes a methodology statement with each story they publish. It's the same methodology used to show Trump winning Iowa in the final polls in 2016 and 2020. It would not be in my best interest, or that of my clients— The Des Moines Register and Mediacom—to conjure fake numbers."

**ANSWER**: Press Defendants state the allegations in Paragraph 82 are directed to another Defendant, so no response is required. To the extent a response is required, Press Defendants state

the quote in Paragraph 82 speaks for itself, and Press Defendants deny the allegations in Paragraph

82 to the extent they contradict or mischaracterize that quote.

## ALLEGATIONS SPECIFIC TO GANNETT CO.

83.     Gannett has owned the Des Moines Register and Tribune Co. since 1985.

**ANSWER**: Press Defendants admit the allegations stated in Paragraph 83.

84.     Gannett syndicates its content through the USA Today Network.

**ANSWER**: Press Defendants admit the allegations stated in Paragraph 84.

85.     Upon information and belief, Gannett exercises editorial control over its affiliates to an

extent unseen in other chain newspapers. As one academic study put it, "The comparison of the

editorial positions taken by the Gannett papers with those taken by the non-Gannett papers showed

a high level of homogeneity within the chain and significant differences between the Gannett and

non-Gannett papers." Roya Akhavan-Majid, Anita Rife, and Sheila Gopinath, *Chain Ownership*

*and Editorial Independence: A Case Study of Gannett Newspapers*, Mass Communication Faculty

Publications (1991).

**ANSWER**: Press Defendants state that the academic study referred to in Paragraph 85

speaks for itself, and Press Defendants deny the allegations stated in Paragraph 85 to the extent

they contradict or mischaracterize that study. Press Defendants deny any remaining allegations

stated in Paragraph 85.

86.     Gannett has a history of telling its newspapers what they can and cannot do while covering

politically sensitive issues. See, e.g., Rick Edmonds*, Gannett is scuttling daily editorial pages at*

*its regional papers*, Poynter (June 8, 2022); Irie Senter, *USA Today and its 200-plus local affiliates*

*punt on presidential endorsement*, Politico (Oct. 29, 2024) ("USA Today and the 200-plus local

publications under its umbrella will not endorse a presidential candidate, the latest in a slew of

non-endorsements among major national outlets that have left the media industry reeling. The Gannett-owned newspaper, which oversees a network of hundreds of local affiliates, announced late Monday that none of its publications would make an endorsement in this year's neck-and-neck presidential election.").

    **ANSWER**: Press Defendants deny the first sentence of Paragraph 86. Press Defendants state that the articles referred to in Paragraph 86 speak for themselves, and Press Defendants deny the allegations stated in Paragraph 86 to the extent they contradict or mischaracterize those articles.

87.    As one long-time Gannett editor, now at Middle Tennessee State University, wrote in October 2024: "It was about 45 years ago that Gannett adopted a new motto: 'A World of Different Voices Where Freedom Speaks.' It was a poetic way of saying that while the growing company was going to keep a close eye on business operations and profit margins, local newsrooms were going to be able to publish the news independently. . . A company culture can change pretty dramatically when a business is sold. New Media Investment Group (*nee* Gatehouse) acquired Gannett in 2019. It kept the name, but not the values or most of the employees. Maybe the new Gannett can dust off that circa-1980 motto to make its new standards clear. Perhaps 'A World of Different Properties Where No One Speaks Without Our Permission.'" Ken Paulson, *Gannett's gag order on local journalism*, MTSU (Oct. 29, 2024).

    **ANSWER**: Press Defendants state that the article referred to in Paragraph 87 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 87 to the extent they contradict or mischaracterize the article. Press Defendants admit that Ken Paulson a former Gannett editor and is now employed by Middle Tennessee State University. Press Defendants deny any remaining allegations stated in Paragraph 87.

88.    Gannett has principles of ethical conduct for its newsrooms. They begin "**WE ARE COMMITTED TO: <u>Seeking and reporting the truth in a truthful way</u>** ." They continue: "We will dedicate ourselves to reporting the news accurately, thoroughly and in context." "We will be honest in the way we gather, report and present news." "We will seek to gain sufficient understanding of the communities, individuals and stories we cover to provide an informed account of activities." "We will provide the news and information that people need to function as effective citizens." "We will strive to include all sides relevant to a story and not take sides in news coverage." "We will explain to readers our journalistic processes."

**ANSWER**: Press Defendants admit the first sentence of Paragraph 88. Press Defendants state that Gannett's Principles of Ethical Conduct for Newsrooms speak for themselves, and Press Defendants deny the allegations stated in Paragraph 88 to the extent they contradict or mischaracterize those principles.

89.    The Gannett principles then explain further, "Editors are the gatekeepers who determine what will be published and what will not be. Their responsibility is to question and scrutinize, even when it is uncomfortable to do so." The "best practices" include, "When feasible, at least two editors should see stories before publication. Complex or controversial stories may require even more careful scrutiny." "Consider involving an in-house skeptic on major stories – a contrarian who can play the role of devil's advocate." "Heed their 'gut instinct.' Don't publish a story if it doesn't feel right. Check it further." "Consider how others – especially antagonists or skeptical readers – may view the story. What questions would they ask? What parts would they think are unfair? Will they believe it?" "Watch carefully for red flags that give reason to be skeptical of news-gathering or editing conduct." "Don't be stampeded by deadlines, unrealistic competitive concerns or peer pressure."

**ANSWER**: Press Defendants state that Gannett's Principles of Ethical Conduct for Newsrooms speak for themselves, and Press Defendants deny the allegations stated in Paragraph 89 to the extent they contradict or mischaracterize those principles.

90.     The Gannett principles go on in the next section, Ensuring Accuracy: "Dedication to the truth means accuracy itself is an ethical issue. Each news person has the responsibility to strive for accuracy at each step of the process." "Be especially careful with technical terms, statistics, mathematical computations, crowd estimates and poll results."

**ANSWER**: Press Defendants state that Gannett's Principles of Ethical Conduct for Newsrooms speak for themselves, and Press Defendants deny the allegations stated in Paragraph 90 to the extent they contradict or mischaracterize those principles.

91.     The Gannett principles close, "Because these Principles embody the highest standards of professional conduct, the Gannett Newspaper Division is committed to their adherence. They have been put in writing specifically so that members of every Gannett Newspaper Division newsroom know what the Division stands for and what is expected of them."

**ANSWER**: Press Defendants state that Gannett's Principles of Ethical Conduct for Newsrooms speak for themselves, and Press Defendants deny the allegations stated in Paragraph 91 to the extent they contradict or mischaracterize those principles.

92.     The *Register* promises on its website, "Our journalists adhere to the USA TODAY NETWORK Principles of Ethical Conduct For Newsrooms."

**ANSWER**: Press Defendants admit the statement quoted in Paragraph 92 appears on *The Register*'s website but deny that it constitutes a "promise."

93.     Gannett may be held liable for its influence over its local papers' newsroom decisions. *Sandmann v. Gannett Co.*, 2021 U.S. Dist. LEXIS 3792 (E.D.Ky. Jan. 8, 2021).

**ANSWER**: Press Defendants state that Paragraph 93 is a legal conclusion to which no response is required. To the extent a response is required, Press Defendants deny the allegations stated in Paragraph 93.

## FIRST AMENDMENT ANALYSIS

94.    In a lawsuit against a media outlet, "[f]actual error [ . . . is . . . ] insufficient for an award of damages for false statements unless actual malice -- knowledge that the statements are false or in reckless disregard of the truth -- is alleged and proved." *Time, Inc. v. Hill*, 385 U.S. 374, 387 (1967).

**ANSWER**: Press Defendants state that the case *Time, Inc. v. Hill* referenced in Paragraph 94 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 94 to the extent they contradict or mischaracterize that case.

95.    A court "could not, consistent with the requirements of the First Amendment, impose liability for a negligently untruthful new story. Recovery may be had at best only for knowing or reckless falsehood." *Tumminello v. Bergen Evening Record, Inc*., 454 F. Supp. 1156 (D.N.J. 1978).

**ANSWER**: Press Defendants state that the case *Tumminello v. Bergen Evening Record* referenced in Paragraph 95 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 95 to the extent they contradict or mischaracterize that case.

96.    Plaintiff alleges that the factual errors were made with knowledge that they presented a false description of the state of the electorate.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 96.

97.    Plaintiff alleges alternatively that the statements were made with reckless disregard for the truth. Dr. Seltzer is an experienced pollster in Iowa. The news editors and reporters at the *Des Moines Register* are also experienced observers of Iowa politics. Their Poll was not merely

wrong—it was obviously, patently wrong. And it was reckless to publish it when it was in significant contradiction with all other publicly available polling in Iowa, polling in other swing states, and election results in similar races in recent Iowa history.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 97.

98.    The Defendants' recklessness is seen when comparing their actions to industry customs and practices. *See* RESTATEMENT (SECOND) OF TORTS § 580B cmt. g (1977) ("The defendant, if a professional disseminator of news, such as a newspaper, a magazine or a broadcasting station, or an employee, such as a reporter, is held to the skill and experience normally possessed by members of that profession. Customs and practices within the profession are relevant in applying the negligence standard, which is, to a substantial degree, set by the profession itself, though a custom is not controlling. Evidence of custom within the profession of news dissemination would normally come from an expert who has been shown to be qualified on the subject. It may be testimony that the course of conduct followed by the defendant was or was not in accordance with recognized professional practices.").

**ANSWER**: Press Defendants state the Restatement (Second) of Torts speaks for itself, and Press Defendants deny the allegations stated in Paragraph 98 to the extent they contradict or mischaracterize it. Press Defendants deny the remaining allegations stated in Paragraph 98.

99.    Here, journalistic custom and practice would dictate that a poll that is wildly different from all other publicly available polling in Iowa, polling in other swing states, and election results in similar races in recent Iowa history would be held, subject to an outside second opinion, or re-run to ensure an accurate result.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 99.

100.   For instance, the American Association for Public Opinion Research, the main trade association for pollsters, has a professional code of ethics that includes, "We will not knowingly select research tools and methods of analysis that yield misleading conclusions." "We will not knowingly make interpretations of research results that are inconsistent with the data available, nor will we tacitly permit such interpretations. We will ensure that any findings we report, either privately or for public release, are a balanced and accurate portrayal of research results."

**ANSWER**: Press Defendants state they lack sufficient knowledge or information to form a belief as to the truth of the allegation that the American Association for Public Opinion Research is the "main trade association for pollsters" and, therefore, it denies that allegation. Press Defendants state the code of ethics referred to in Paragraph 100 speaks for itself, and Defendants deny the allegations stated in Paragraph 100 to the extent they contradict or mischaracterize that code of ethics. Press Defendants deny any remaining allegations stated in Paragraph 100.

101.   The AAPOR's best practices for survey research advise, "Odd patterns of responses may reflect a programming error or interviewer training issue that needs to be addressed immediately."

**ANSWER**: Press Defendants state that AAPOR's best practices for survey research speak for themselves, and Defendants deny the allegations stated in Paragraph 101 to the extent they contradict or mischaracterize those best practices.

102.   AAPOR's explanation of election-related polling notes, "Polls with misleading results often stem from methodological flaws like biased sampling, leading questions, or poor weighting."

**ANSWER**: Press Defendants state that AAPOR's explanation of election-related polling speaks for itself, and Defendants deny the allegations stated in Paragraph 102 to the extent they contradict or mischaracterize that explanation.

103.    The Defendants' actions here reflect a clear failure of AAPOR standards. These were obviously "odd patterns of responses," but rather than addressing these patterns immediately, as the AAPOR recommends, the Defendants completed the poll and published it as a ground-breaking revelation, when in fact it was just false misinformation.

**ANSWER**: Press Defendants deny that they are subject to AAPOR's standards and that AAPOR's best practices and election-related polling explanation constitute "recommendations." Press Defendants deny the remaining allegations stated in Paragraph 103.

104.    The same can be said of the Gannett ethics principles above. The principles demand that editors be skeptical, that red flags be taken seriously, that polling be subject to special scrutiny, and that accuracy is paramount. Those principles were all tossed by the wayside here.

**ANSWER**: Press Defendants state that Gannett's Principles of Ethical Conduct for Newsrooms speak for themselves, and Press Defendants deny the allegations stated in Paragraph 104 to the extent they contradict or mischaracterize those principles. Press Defendants deny the remaining allegations stated in Paragraph 104.

## PLAINTIFF CLASS ACTION CLAIM

105.    Iowa permits class actions for torts. Iowa R. Civ. P. 1.261.

**ANSWER**: Press Defendants state that Paragraph 105 is a legal conclusion to which no response is required. To the extent a response is required, Press Defendants deny the allegation stated in Paragraph 105.

106.    Class certification is appropriate where the class is so numerous that joinder of all members is impracticable.

**ANSWER**: Press Defendants state that Paragraph 106 is a legal conclusion to which no response is required. To the extent a response is required, Press Defendants deny the allegation

stated in Paragraph 106 but deny that it would be appropriate for the Court to certify the class alleged by Plaintiff in this lawsuit.

107.    Class certification also requires that there be a question of law or fact common to the class.

**ANSWER**: Press Defendants state that Paragraph 107 is a legal conclusion to which no response is required. To the extent a response is required, Press Defendants admit the allegation stated in Paragraph 107 but deny that there are any questions of law or fact common to the class alleged by Plaintiff in this lawsuit.

108.    The Iowa Poll ran on Sunday, November 3, immediately prior to the Tuesday election day.

**ANSWER**: Press Defendants admit the allegations stated in Paragraph 108.

109.    The *Des Moines Register* has a subscriber base of approximately 40,000 on Sundays. This class is too numerous to join individually.

**ANSWER**: Press Defendants state that they do not know what Plaintiff means by the term "subscriber base," and, therefore, they deny the first sentence of Paragraph 109. Press Defendants state the allegation in the second sentence of Paragraph 109 is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegation stated in the second sentence of Paragraph 109.

110.    There is a common question of law to the class:

a.    Do newspapers owe a duty of care to subscribers to exercise ordinary care? Or ordinary care according to journalistic practice and custom?

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 110.

111.    There are also common questions of fact to the class:

a.    Did the Defendants intentionally run a fraudulent poll?

b.    Did the Defendants recklessly run an obviously inaccurate poll?

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 111.

112.    This original complaint asserts a class on Count I and Counts III and IV.

**ANSWER**: Press Defendants admit that the original complaint purports to plead a class on Count I and Counts III and Count IV but deny that it would be appropriate for the Court to certify the class alleged by Plaintiff in this lawsuit with respect to any claims.

113.    The Plaintiff is providing a copy of this complaint to the Iowa Attorney General with a request to permit a class action claim be included in a first amended complaint on Count II, the consumer fraud claim, pursuant to Iowa Code 714H.7.

**ANSWER**: Press Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations stated in Paragraph 113 and, therefore, they deny them.

114.    The Plaintiff is a fair representative of the class and has hired competent counsel to represent the class.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 114.

115.    Thus, Plaintiff requests that this Court certify the following class: All digital and print subscribers to the Sunday edition of the Des Moines Register as of November 3, 2024.

**ANSWER**: Press Defendants admit that Paragraph 115 states Plaintiff's request but deny that it would be appropriate for the Court to certify the class alleged by Plaintiff in this lawsuit with respect to any claims.

116.    The contact information for the class can easily be extracted from the business records of the Defendants.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 116.

117.    To the extent that Plaintiff may be bound by a waiver of class action claims according to the adhesion contact he may have entered as a subscriber to the *Register*, that provision is

unconscionable and therefore unenforceable. *Webster v. State*, 2022 Iowa App. LEXIS 621, *7 (Aug. 17, 2022). *See Lima v. Gateway, Inc.*, 886 F. Supp. 2d 1170, 1176 (C.D.Cal. 2012) (discussing *Discover Bank v. Sup. Ct.*, 36 Cal. 4th 148, 165 (2005) (adhesion contracts with a class-action waiver provision unlawful as unconscionable in circumstances like this). *See also Lukken v. Fleischer*, 962 N.W.2d 71, 82 (Iowa 2021) (contract terms that protect against liability for intentional or reckless misconduct are disfavored).

      **ANSWER**: Press Defendants admit that subscribers to *The Register* are bound by a waiver of class action claims. Press Defendants deny the remaining allegations stated in Paragraph 117.

118.    In all events, that adhesion contract applies only to Plaintiff and the *Register*, not to any other defendant.

      **ANSWER**: Press Defendants deny the allegations stated in Paragraph 118.

## CLAIMS

119.    At the end of the day, the Defendants acted with intentional fraud or reckless disregard on two separate inflection points. First, when Dr. Selzer, her team at Selzer & Co., and the *Register* editorial leadership designed the poll, they did so in a way that the methodology resulted in a radically flawed result. At this point, the Poll designers failed basic journalist and polling practices to construct a reasonably accurate estimate of the Iowa electorate.

      **ANSWER**: Press Defendants deny the allegations stated in Paragraph 119.

120.    Second, when the poll results came back, the Defendants acted with either intentional deceit or reckless disregard by choosing to publish the Poll results as a banner headline rather than conducting any due diligence on such wildly unbelievable results.

      **ANSWER**: Press Defendants deny the allegations stated in Paragraph 119.

## COUNT I – Fraudulent Misrepresentation

121.    The elements of fraudulent misrepresentation are: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) justifiable reliance; and (7) resulting injury. *Gibson v. ITT Hartford Ins. Co*., 621 N.W.2d 388, 391 (Iowa 2001).

**ANSWER**: Press Defendants state that the case *Gibson v. ITT Hartford Ins. Co.* speaks for itself, and Press Defendants deny the allegations stated in Paragraph 121 to the extent they contradict or mischaracterize that case. Press Defendants state that the substance of Paragraph 121 is a legal conclusion to which no response is required. To the extent a response is required, Press Defendants deny the allegations stated in Paragraph 121. Press Defendants deny that Plaintiff has adequately pleaded a claim for fraudulent misrepresentation.

122.    The Poll was a misrepresentation of the state of the race at the time it was taken. It was more than an outlier—it was egregiously incorrect.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 122.

123.    The Poll was a *false* misrepresentation of the state of the race. It was not even close to accurate.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 123.

124.    The Poll was a *material* misrepresentation—it was long regarded as the standard in Iowa politics, and it was the banner headline story for the day that it ran. Numerous news stories from other in-state, national, and global news outlets subsequently rereported the Poll.

**ANSWER**: Press Defendants deny that the 2024 Iowa Poll was a "material" misrepresentation for purposes of a fraudulent misrepresentation claim. Press Defendants admit that the 2024 Iowa Poll results were the "banner headline story" of the November 2 and 3 digital

editions and November 3 print edition of the *Register*. Press Defendants admit the last sentence of Paragraph 124. Press Defendants deny any remaining allegations stated in Paragraph 124.

125.    The Poll was *knowingly* a false misrepresentation of the race. Any responsible pollster or journalist with experience in Iowa politics would recognize the clear inaccuracy of the Poll, yet Dr. Selzer and the *Register* chose to publish the poll anyway. Statistically, it was a 1 in 3,500,000 chance of an honest error.

**ANSWER**: Press Defendants deny that the 2024 Iowa Poll was a knowingly false misrepresentation of the race. Press Defendants admit that the 2024 Iowa Poll results were published in the November 2 and 3 digital editions and November 3 print edition of *The Register*. Press Defendants deny the remaining allegations stated in Paragraph 125.

126.    The Poll was an *intentionally deceptive* misrepresentation. Dr. Selzer and Gannett's senior staff at the *Des Moines Register* knew that the Iowa Poll was considered an accurate representation of the Iowa electorate and that this poll was inaccurate, and yet they decided to publish it anyway, showing their intent to deceive their readers and the broader electorate with a false poll.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 126.

127.    Given the Iowa Poll's historic accuracy and the *Register's* general reputation for accuracy, the Plaintiff and Plaintiff Class *justifiably relied* on the poll.

**ANSWER**: Press Defendants deny that the 2024 Iowa Poll is a representation upon which Plaintiff and the Plaintiff Class could "justifiably rely."

128.    The Plaintiff and the Plaintiff Class were *injured* by the Poll's fraudulence: they pay good money to subscribe to the *Register* to read accurate and important news, not to be misled by fraudulent misrepresentations.

**ANSWER**: Press Defendants deny that Plaintiff and the Plaintiff Class were injured by publication of the 2024 Iowa Poll. Press Defendants state they are without sufficient knowledge or information to form a belief as to the truth of the allegations that Plaintiff and the Plaintiff Class "pay good money to subscribe to the *Register*" and that their purpose for subscribing is to "read accurate and important news" and, therefore, Press Defendants deny those allegations. Press Defendants deny any remaining allegations stated in Paragraph 127.

129.     Dr. Selzer and Selzer & Co. are liable for presenting a false poll, the Register is liable for presenting this false poll to its subscribers including Mr. Donnelly, and Gannett is liable based on its editorial control of the *Register* and its failure to ensure the *Register* staff acted in line with its ethical principles.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 129.

### ALTERNATE COUNT I – Reckless Negligent Misrepresentation

130.     If the Court finds that the misrepresentation was not intentional, then in the alternative plaintiff pleads the tort of reckless negligent misrepresentation.

**ANSWER**: Press Defendants deny that they made any misrepresentations, intentional or otherwise, but admit that Paragraph 130 is a statement of what Plaintiff pleads.

131.     Negligent misrepresentation is also sometimes described as "the tort of negligently giving misinformation. *Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 123 (2001).

**ANSWER**: Press Defendants admit the allegations stated in Paragraph 131 but deny that they made any misrepresentations, negligently or otherwise.

132.     "[P]rofessionals such as accountants, abstractors, and attorneys owe a duty of care in supplying information to foreseeable third parties as members of a limited class of persons who would be contemplated to use and rely upon the information." *Id*.

**ANSWER**: Press Defendants state that the case *Sain v. Cedar Rapids Cmty. Sch. Dist.* quoted in Paragraph 132 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 132 to the extent they contradict or mischaracterize that case.

133.    The "duty [of care for negligent misrepresentation] arises only when the information is provided by persons in the business or profession of supplying information to others." *Id*.

**ANSWER**: Press Defendants state that the case *Sain v. Cedar Rapids Cmty. Sch. Dist.* quoted in Paragraph 133 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 133 to the extent they contradict or mischaracterize that case.

134.    "[T]he foreseeability of harm helps support the imposition of a duty of care." *Id*.

**ANSWER**: Press Defendants state that the case *Sain v. Cedar Rapids Cmty. Sch. Dist.* quoted in Paragraph 134 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 134 to the extent they contradict or mischaracterize that case.

135.    "[T]he pecuniary interest which a person has in a business, profession, or employment which supplies information serves as an additional basis for imposing a duty of care." *Id*.

**ANSWER**: Press Defendants state that the case *Sain v. Cedar Rapids Cmty. Sch. Dist.* quoted in Paragraph 135 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 135 to the extent they contradict or mischaracterize that case.

136.    Newspaper journalists and pollsters are professionals with white-collar jobs that expect at least a bachelor's degree and some years of experience, if not advanced degrees in journalism, political science, or statistics. (Dr. Selzer has a Ph.D.)

**ANSWER**: Press Defendants state that Paragraph 136 is a legal conclusion to which no response is required. To the extent a response is required, Press Defendants deny the allegations stated in Paragraph 136.

137.    Newspaper subscribers are a limited class of foreseeable third parties who rely on the information provided by these professionals.

**ANSWER**: Press Defendants deny Paragraph 137.

138.    Newspaper journalists and pollsters are in the business of supplying accurate, reliable information to others.

**ANSWER**: Press Defendants deny Paragraph 138.

139.    Newspaper journalists and pollsters do not provide information to their readers in a setting that is arms-length or adversarial.

**ANSWER**: Press Defendants deny Paragraph 139.

140.    The Defendants could foresee that reporting obviously inaccurate polling results would harm their readers by delivering a product other than the one they purchased. *Register* subscribers purchase a product—accurate news—not the recklessly negligent reporting of inaccurate news.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 140.

141.    The *Register* and the Seltzer Company have a pecuniary interest in their business of supplying information—this is how the *Register* gets and keeps readers and how the Seltzer Company gets and keeps clients.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 141 but affirmatively state they are in the business of reporting news that informs the public.

142.    The inaccurate information supplied by Defendants harmed the Plaintiff in his relationship to third parties—it gave him a false impression of the state of the world as he thought about voting and discussed voting and politics with friends and neighbors.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 142.

143.    The information supplied by the Defendants was a false estimate of the facts, not a statement of personal opinion or future intentions.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 143.

144.    The decision of Defendants to publish this information was not reasonable. In fact, given the Defendants' knowledge of previous elections in Iowa and other polling data on Iowa at the time, it was downright reckless.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 144.

145.    Defendants' negligence created an ascertainable pecuniary loss: the value of a subscription to the *Des Moines Register*, as Mr. Donnelly and others can no longer trust what they have read or will read in the paper.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 145.

### COUNT II – Consumer Fraud

146.    "A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes. For the purposes of this chapter, a claimant alleging an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation must prove that the prohibited practice related to a material fact or facts." Iowa Statutes 714H.3(1).

**ANSWER**: Press Defendants state that the Iowa Code speaks for itself, and Press Defendants deny the allegations stated in Paragraph 146 to the extent they contradict or mischaracterize the Iowa Code.

147.    "A consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act in violation of this chapter may bring an action at law to recover actual damages. The court may order such equitable relief as it deems necessary to protect the public from further violations, including temporary and permanent injunctive relief." Iowa Statutes 714H.5(1).

**ANSWER**: Press Defendants state that the Iowa Code speaks for itself, and Press Defendants deny the allegations stated in Paragraph 147 to the extent they contradict or mischaracterize the Iowa Code.

148.    "A class action lawsuit alleging a violation of this chapter shall not be filed with a court unless it has been approved by the attorney general. The attorney general shall approve the filing of a class action lawsuit alleging a violation of this chapter unless the attorney general determines that the lawsuit is frivolous." Iowa Statutes 714H.7.

**ANSWER**: Press Defendants state that the Iowa Code speaks for itself, and Press Defendants deny the allegations stated in Paragraph 148 to the extent they contradict or mischaracterize the Iowa Code.

149.    A newspaper is consumer merchandise—it is a service (news reporting) sold primarily for personal, family, or household usage. Iowa Statutes 714H.2.

**ANSWER**: Press Defendants state that Paragraph 149 is a legal conclusion to which no response is required. To the extent a response is required, Press Defendants deny the allegations stated in Paragraph 149.

150.    The decision by Dr. Selzer and the Register to report the poll as an accurate news item when in fact it was obviously inaccurate constituted an unfair practice, deception, fraud, misrepresentation of a material fact. It was either known or reasonably should have been known to be so.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 150.

151.    The decision to publish was made with the intent that others, at minimum subscribers like Plaintiff, would rely on the misinformation as accurate.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 151.

152.    The misinformation was published and pushed as a banner headline with the intention to sell newspapers, sell digital passes and subscriptions, and generate "clicks" that resulted in ad revenue for the *Register*.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 152.

153.    The Plaintiff suffered an ascertainable loss—the cost of his subscription to the *Des Moines Register*, which he can no longer rely on to provide trustworthy and accurate information. For his digital subscription, that is $69.99.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 153.

### COUNT III – Professional Malpractice

154.    "In professional negligence actions, as in other negligence actions, the plaintiff must prove a duty of care was owed to him or her, breach of that duty, and damages caused by the breach of duty." *McGraw v. Wachovia Sec., L.L.C.*, 756 F. Supp. 2d 1053, 1070 (N.D. Iowa 2010) (applying state law).

**ANSWER**: Press Defendants state that the case *McGraw v. Wachovia Sec., L.L.C.* quoted in Paragraph 154 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 154 to the extent they contradict or mischaracterize that case.

155.     "Persons engaged in the practice of a profession or trade are held to the standard of the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." *Id*. (citation omitted).

**ANSWER**: Press Defendants state that the case *McGraw v. Wachovia Sec., L.L.C.* quoted in Paragraph 155 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 155 to the extent they contradict or mischaracterize that case.

156.     "Unless a professional's lack of care is so obvious as to be within the comprehension of a layperson, the standard of care and its breach must ordinarily be established through expert testimony." *Id*. (citation omitted).

**ANSWER**: Press Defendants state that the case *McGraw v. Wachovia Sec., L.L.C.* quoted in Paragraph 156 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 156 to the extent they contradict or mischaracterize that case.

157.     A journalist is engaged in a profession or trade. *Bank of Oregon v. Ind. News, Inc*., 65 Ore. App. 29, 670 P.2d 616, 628 (Or. App. 1983) (holding that "when negligence is alleged against a media defendant, there should be a professional standard of care"). *See also* Restatement (Second) of Torts § 580B cmt. g (1977) (industry practice and custom for news outlets to ensure accuracy of news reports).

**ANSWER**: Press Defendants state that the case *Bank of Oregon v. Ind. News, Inc*. and the Restatement section referenced in Paragraph 157 speak for themselves, and Press Defendants deny the allegations stated in Paragraph 157 to the extent they contradict or mischaracterize that case or

Restatement section. Press Defendants state that the remaining allegations in Paragraph 157 are legal conclusions to which no response is required. To the extent a response is required, Press Defendants deny the remaining allegations stated in Paragraph 157.

158.    A pollster is engaged in a profession or trade. As one piece of evidence that polling is a profession, it generally requires an advanced degree—Dr. Selzer holds a Ph.D.

**ANSWER**: Press Defendants admit that Dr. Selzer earned a Ph.D. Press Defendants state the remaining allegations in Paragraph 158 are legal conclusions to which no response is required. To the extent a response is required, Press Defendants deny the remaining allegations stated in Paragraph 158.

159.    Industry standards can be seen in this instance in the AAPOR and Gannett statements of principles and best practices.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 159.

160.    A professional's duty arises when "'[r]ed flags' that would alert a" professional to the existence of a problem. *McGraw*, 756 F. Supp. 2d at 1075.

**ANSWER**: Press Defendants state that the case *McGraw v. Wachovia Sec., L.L.C.* quoted in Paragraph 160 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 160 to the extent they contradict or mischaracterize that case. Press Defendants state the remaining allegations in Paragraph 160 are legal conclusions to which no response is required. To the extent a response is required, Press Defendants deny the remaining allegations stated in Paragraph 160.

161.    Here, numerous "red flags" would notify a responsible pollster or a responsible journalist that the Iowa Poll was deeply flawed.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 161.

162.    In spite of these "red flags," the Defendants decided to recklessly proceed with publication.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 162.

163.    A professional's duty also arises to a customer—here, Mr. Donnelly and the other members of the Plaintiff Class who are customers, i.e., subscribers, of the *Register*. *McGraw*, 756 F. Supp. 2d at 1073-75.

**ANSWER**: Press Defendants state that the case *McGraw v. Wachovia Sec., L.L.C.* referenced in Paragraph 163 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 163 to the extent they contradict or mischaracterize that case. Press Defendants deny the remaining allegations stated in Paragraph 163.

164.    To the extent that Mr. Donnelly is an indirect customer of Dr. Selzer and Selzer & Co., Iowa recognizes that a professional may be liable to a third-party or non-customer. *See J.A.H. by R.M.H v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 260 (Iowa 1999) and *McGraw*, 756 F. Supp. 2d at 1072.

**ANSWER**: Press Defendants deny that Mr. Donnelly is an "indirect customer of Dr. Selzer and Selzer & Co." Press Defendants state that the cases *J.A.H. by R.M.H v. Wadle & Assocs., P.C.* and *McGraw v. Wachovia Sec., L.L.C.* referenced in Paragraph 164 speak for themselves, and Press Defendants deny the allegations stated in Paragraph 164 to the extent they contradict or mischaracterize those cases. Press Defendants state the remaining allegations in Paragraph 164 are legal conclusions to which no response is required. To the extent a response is required, Press Defendants deny the remaining allegations stated in Paragraph 164.

165.    A newspaper has a duty of care for information that it authors or approves (but not for advertisements it merely prints on behalf of others). *See Birmingham v. Fodor's Travel Publications*, 73 Haw. 359, 366 (1992).

**ANSWER**: Press Defendants state that the case *Birmingham v. Fodor's Travel Publications* referenced in Paragraph 165 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 165 to the extent they contradict or mischaracterize that case. Press Defendants state the remaining allegations in Paragraph 165 are legal conclusions to which no response is required. To the extent a response is required, Press Defendants deny the remaining allegations stated in Paragraph 165.

166.    Here, the duty of care to exercise the ordinary care of a journalist or pollster required the Defendants to recognize the obvious problems with the Iowa Poll and not publish it without additional investigation or verification.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 166.

167.    Instead, the Defendants recklessly charged ahead and published the poll, providing inaccurate information to Mr. Donnelly and other subscribers. This denied him and other subscribers of the value of their newspaper subscription. Not only did they receive bad information that one day, but it undermined their confidence in the paper overall such that any past or future reporting can no longer be trusted.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 167.

168.    The value of that newspaper is an annual subscription cost--$69.99 for Mr. Donnelly, and a print or digital subscription cost for the Plaintiff Class.

**ANSWER**: Press Defendants state that the allegation that the "value" of a newspaper is an annual subscription cost is a legal conclusion to which no response is required. To the extent a response is required, Press Defendants deny that allegation. Press Defendants admit that readers can purchase annual print and digital subscriptions to *The Register*. Press Defendants deny the remaining allegations stated in Paragraph 168.

169.    To the extent that the subscription terms that Mr. Donnelly or plaintiff class members may have accepted purports to limit damages to the value of one month of subscription cost, that is an unconscionable and unenforceable provision of an adhesion contract. *See, e.g., Mannion v. Manor Care, Inc*., 4 Pa. D. & C.5th 321, 33334 (2006) (damages limitation in adhesion contract unenforceable)

**ANSWER**: Press Defendants admit that *The Register*'s subscription terms include a limitation of remedy provision to which its subscribers are bound. Press Defendants state the case *Mannion v. Manor Care, Inc.* speaks for itself, and Press Defendants deny any allegations stated in Paragraph 169 to the extent they contradict or mischaracterize that case. Answering further, Press Defendants deny the remaining allegations stated in Paragraph 169.

## COUNT IV – Interference with the Right to Vote

170.    Iowa recognizes a tort for interference with the right to vote. *Lane v. Mitchell*, 153 Iowa 139, 143 (1911).

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 170.

171.    The tort is also recognized in the Restatement (Second) of Torts, Section 865, and the Restatement (First) of Torts, also section 865.

**ANSWER**: Press Defendants state that the Restatement (Second) of Torts and Restatement (First) of Torts speak for themselves, and Press Defendants deny the allegations stated in Paragraph 171 to the extent they contradict or mischaracterize those treatises.

172.    *Lane* recognizes an after-the-fact cause for actual and nominal damages for interference with the right to vote.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 172.

173.    The Restatement defines the tort to include engaging in "fraud" "with knowledge that his act is substantially certain to result in the failure of the other to exercise the right."

**ANSWER**: Press Defendants state that the Restatement speaks for itself, and Press Defendants deny the allegations stated in Paragraph 173 to the extent they contradict or mischaracterize the Restatement.

174.    *Lane* says "the jury would have been warranted in awarding the plaintiff a substantial recovery" in such a case where actual damages are difficult to calculate.

**ANSWER**: Press Defendants state that the case *Lane v. Mitchell* speaks for itself, and Press Defendants deny the allegations stated in Paragraph 174 to the extent they contradict or mischaracterize that case.

175.    Academic studies show that polling data of a race affects voter choices and voter turnout. Such polling may also change the candidates that voters select based on their assessment of their viability (for instance, a voter may cast a third-party protest vote in a race that he thinks won't be close). *See generally* Andre Blais, et al., *Do Polls Influence the Vote?,* chapter in Henry E. Brady & Richard G. C. Johnston, eds., CAPTURING CAMPAIGN EFFECTS (U. Mich. Press 2009).

**ANSWER**: Press Defendants state the academic studies referred to in Paragraph 175 speak for themselves, and Press Defendants deny the allegations stated in Paragraph 175 to the extent they contradict or mischaracterize those studies. Press Defendants deny any remaining allegations stated in Paragraph 175.

176.    "Besides receiving national news coverage, this poll had a significant impact on the expectations of Iowans themselves. Such dramatic public findings, which this Iowa Poll represents, can mislead voters and undermine trust in the polling enterprise itself." Samantha J. DeRagon,

Tracy Osborn, and Michael S. Lewis-Beck, *The 2024 Iowa Poll for President: A Cautionary Tale*, Univ. of Virginia (Dec. 12, 2024).

**ANSWER**: Press Defendants state the article quoted in Paragraph 176 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 176 to the extent they contradict or mischaracterize that article.

177.    "The notion that published vote intention polls influence voter behavior expresses an hypothesis of long standing. Normally, it would be difficult to trace out the effect of this last minute, single poll on would-be voters in a single state. However, we had in the field our own poll of Iowa voters, namely a sample of 214 University of Iowa students. . . . The results show a statistically significant 9-percentage-point rise (p < .05, one-tailed) in expectations of a Harris victory among those who said Iowa was their home state (150 respondents). While these data are observational, they are nevertheless highly suggestive. It looks like the *Iowa Poll* did, in fact, increase Iowa public opinion favoring Harris to win the state." *Id*.

**ANSWER**: Press Defendants state the article quoted in Paragraph 177 speaks for itself, and Press Defendants deny the allegations stated in Paragraph 177 to the extent they contradict or mischaracterize that article.

## PUNITIVE DAMAGES

178.    Pursuant to Iowa Code 668A.1(1)(a), Plaintiff pleads that he can show by a preponderance of clear, convincing, and satisfactory evidence that the conduct of the Defendant from which the claims arose constituted willful, wanton, or reckless disregard for the rights of others.

**ANSWER**: Press Defendants deny that Plaintiff can show by a preponderance of clear, convincing, and satisfactory evidence that the conduct of the Press Defendants from which

Plaintiff's claims arose constituted willful, wanton, or reckless disregard for the rights of others. Press Defendants admit that Paragraph 178 is a statement of what Plaintiff pleads.

179.    Punitive damages are appropriate here where deterrence is necessary. The American people do not trust the news media—according to the Pew Research Center, only 31 percent of the American people have a great deal or fair amount of faith in the news media. That loss of faith in these important institutions is because news outlets like the *Register* publish obviously incorrect information and then trumpet it to get "clicks." Deterrence is necessary to restore faith in the media by providing a strong disincentive to intentionally or recklessly push stories that are inaccurate but would generate significant public attention and coverage from other media. *See Beeman v. Manville Corp. Asbestos Disease Comp. Fund*, 496 N.W.2d 247, 255 (Iowa 1993).

**ANSWER**: Press Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations stated in the first sentence of Paragraph 179 and, therefore, they deny them. Press Defendants state the information from the Pew Research Center and the case *Beeman v. Manville Corp. Asbestos Disease Comp. Fund* speak for themselves, and Press Defendants deny the allegations stated in Paragraph 179 to the extent they contradict or mischaracterize that information or that case. Press Defendants deny the remaining allegations stated in Paragraph 179.

180.    Punitive damages are appropriate in cases of intentional or reckless misconduct. *Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005).

**ANSWER**: Press Defendants deny that they engaged in intentional or reckless misconduct and that Plaintiff or the putative class is entitled to punitive damages. Press Defendants state the case *Wolf v. Wolf* speaks for itself, and they deny the allegations stated in Paragraph 180 to the extent they contradict or mischaracterize that case.

181.    In this case, Plaintiff has pled that Defendants acted to undertake an intentional fraud or at minimum acted with reckless disregard for the truth.

**ANSWER**: Press Defendants state that Paragraph 181 is a statement of what Plaintiff has pled, but they deny that they "acted to undertake an intentional fraud or at minimum acted with reckless disregard for the truth."

182.    Counts I, III, and IV are the predicate torts, any of which would justify punitive damages.

**ANSWER**: Press Defendants state that Paragraph 182 is a legal conclusion to which no response is required. To the extent a response is required, Press Defendants deny the allegations stated in 182. Press Defendants affirmatively state they have committed no predicate torts which would justify the imposition of punitive damages.

183.    Separately, Count II specifically authorizes punitive damages when "the finder of fact finds by a preponderance of clear, convincing, and satisfactory evidence that a prohibited practice or act in violation of this chapter constitutes willful and wanton disregard for the rights or safety of another." Iowa Code 714H.5(4).

**ANSWER**: Press Defendants state that the Iowa Code speaks for itself, and Press Defendants deny the allegations stated in Paragraph 183 to the extent they contradict or mischaracterize the Iowa Code. Press Defendants deny that they there is "a preponderance of clear, convincing, and satisfactory evidence" that they committed "a prohibited practice or act in violation of" the Iowa Code that "constitutes willful and wanton disregard for the rights or safety of another."

184.    Again, the Defendants acted with either intentional or reckless disregard for the accuracy of the poll.

**ANSWER**: Press Defendants deny the allegations stated in Paragraph 184.

185.    To the extent that Mr. Donnelly's subscription contract with the *Register* may have included a waiver of punitive damages, that is an adhesion contract term that is unconscionable. *See Daniels v. Va. College at Jackson*, 478 Fed. Appx. 892, 894 (5th Cir. 2012). *See also Lukken v. Fleischer*, 962 N.W.2d 71, 82 (Iowa 2021) (contract terms that protect against liability for intentional or reckless misconduct are disfavored). It also only protects the *Register*, not the other Defendants.

**ANSWER**: Press Defendants admit that subscribers to *The Register* are bound by a waiver of punitive damages. Press Defendants state that the cases referred to in Paragraph 185 speak for themselves, and Press Defendants deny the allegations stated in Paragraph 185 to the extent they contradict or mischaracterize those cases. Press Defendants deny the remaining allegations stated in Paragraph 185.

## CONCLUSION AND PRAYER

Therefore, Plaintiff prays that the Court:

186.    Certify the Plaintiff Class.

**ANSWER**: Press Defendants deny that certification of the Plaintiff class is warranted or appropriate.

187.    Declare that the Defendants engaged in intentional misrepresentation, or alternatively that they engaged in recklessly negligent misrepresentation.

**ANSWER**: Press Defendants deny that the Court should make any such declaration.

188.    Declare that the Defendants engaged in consumer fraud under the Iowa Consumer Fraud statute.

**ANSWER**: Press Defendants deny that the Court should make any such declaration.

189.    Declare that the Defendants engaged in professional malpractice.

    **ANSWER**: Press Defendants deny that the Court should make any such declaration.

190.    Declare that the Defendants interfered with the right to vote.

    **ANSWER**: Press Defendants deny that the Court should make any such declaration.

191.    Award Mr. Donnelly and every Plaintiff Class member actual damages equivalent to one year's subscription, whether digital or print.

    **ANSWER**: Press Defendants deny that Plaintiff and every Plaintiff Class member sustained or should be awarded actual damages.

192.    Award Mr. Donnelly and every Plaintiff Class member nominal damages.

    **ANSWER**: Press Defendants deny that Plaintiff and every Plaintiff Class member sustained or should be awarded nominal damages.

193.    Award Mr. Donnelly and every Plaintiff Class member punitive damages.

    **ANSWER**: Press Defendants deny that Plaintiff and every Plaintiff Class member should be awarded punitive damages.

194.    Award Mr. Donnelly and the Class attorneys' fees. *See* Iowa Code 714H.5(2).

    **ANSWER**: Press Defendants deny that Plaintiff should be awarded attorneys' fees.

195.    Award any other relief the Court awards just and appropriate.

    **ANSWER**: Press Defendants deny that the Court should award any relief whatsoever.

196.    The Plaintiff demands a trial by jury on all issues so triable.

    **ANSWER**: Press Defendants admit that Paragraph 196 is a statement of Plaintiff's demands.

## AFFIRMATIVE AND OTHER DEFENSES

For its affirmative and other defenses, and without assuming any burdens of proof or persuasion that would otherwise rest on Plaintiff, Press Defendants state the following:

A.    Plaintiff's Petition fails to state facts sufficient to constitute any cause of action upon which relief can be granted.

B.    Plaintiff's claims and/or the claims of putative class members are barred, in whole or in part, by the doctrines of waiver and/or ratification.

C.    Plaintiff's claims and/or the claims of putative class members are barred, in whole or in part, because any award would constitute unjust enrichment.

D.    Plaintiff's claims and/or the claims of putative class members are barred, in whole or in part, by the doctrines of estoppel and equitable estoppel.

E.    Plaintiff's claims and/or the claims of putative class members are barred, in whole or in part, for lack of any actual injury or standing to assert a claim.

F.    If Plaintiff is seeking actual damages on behalf of himself or putative class members, Plaintiff's claims or the claims of putative class members are barred, in whole or in part, because they failed to mitigate their damages, if any.

G.    Plaintiff's alleged damages on behalf of himself and putative class members are barred because they were proximately caused in whole or in part by the acts or omissions of Plaintiff and putative class members.

H.    Plaintiff's claims on behalf of the putative class are barred because this case is not maintainable as a class action under Federal Rule of Civil Procedure 23 because the proposed class does not satisfy the requirements described therein including, but not limited to, class definition, ascertainability, numerosity, commonality, typicality, predominance, adequacy of representation, superiority, and manageability.

I.    Plaintiff's claims on behalf of the putative class are barred because Plaintiff is not a proper representative to bring this action on behalf of any proposed class.

J.      Plaintiff's claims and/or the claims of putative class members are barred, in whole or in part, by the applicable statutes of limitations.

K.      Plaintiff's claims and/or the claims of putative class members are barred, in whole or in part, by the doctrine of laches.

L.      Plaintiff's claims and/or the claims of putative class members are barred, in whole or in part, by the doctrine of unclean hands.

M.      To the extent that Plaintiff or the putative class may seek recovery of attorneys' fees, such fees are not recoverable under Iowa law.

N.      Plaintiff's claims and/or the claims of putative class members are barred, in whole or in part, by the voluntary payment doctrine.

O.      Plaintiff's claims and/or the claims of putative class members are barred, in whole or in part, by accord and satisfaction.

P.      Plaintiff's and any putative class member's claims are barred to the extent they have been released or settled.

Q.      Any claims for equitable relief are barred because Plaintiff and putative class members have adequate remedies at law.

R.      Press Defendants acted reasonably and in good faith at all material times based on all relevant facts and circumstances known by them at they time they acted.

S.      Plaintiff's claims and/or the claims of putative class members are subject to a mandatory arbitration provision pursuant to the terms of the agreement governing Plaintiff's and/or putative class members' subscriptions with Press Defendants.

T.      Plaintiff and/or putative class members have waived their right to proceed with class claims pursuant to a class action waiver in the terms of the agreement governing Plaintiff's and/or putative class members' subscriptions with Press Defendants.

U.      Plaintiff's and/or putative class members' claim for damages (including punitive damages) is subject to the limitation of remedy provision in the terms of the agreement governing Plaintiff's and/or putative class members' subscriptions with Press Defendants.

V.     Plaintiff's claims and/or the claims of any putative class members premised on alleged "fake news" consisting of Press Defendants' political campaign reporting are categorically prohibited by the First Amendment to the United States Constitution.

W.     Plaintiff's claims and/or the claims of any putative class members are barred to the extent the allegedly actionable statements are substantially true.

X.     Plaintiff's claims and/or the claims of any putative class members are barred to the extent the allegedly actionable news reporting is not actionable as unverifiable expressions of opinion and/or estimates of future voting behavior.

Y.     Plaintiff's claims and/or the claims of any putative class members are barred because they cannot carry their burden of proving the falsity of the allegedly actionable statements.

Z.     Plaintiff's claims and/or the claims of any putative class members are barred because the news reports complained of were published in good faith without actual malice, meaning knowledge of falsity or reckless disregard of probable falsity.

AA.     Plaintiff's claims and/or the claims of any putative class members are barred because the subject matter of the alleged injurious falsehoods involved a matter of public interest, and the news reports complained of were published with due regard for the standards of information gathering and dissemination ordinarily followed by responsible parties, and are therefore not actionable.

BB.     Press Defendants at all times relevant hereto exercised reasonable care and diligence in the course of preparing and publishing the matters complained of.

CC.     Plaintiff's claims and/or the claims of any putative class members are barred because the news reporting complained of addressed matters within the sphere of legitimate public interest and/or was reasonably related to matters warranting public exposition.

DD.     Plaintiff's claims and/or the claims of any putative class members are barred because Press Defendants acted without fault as required by the Iowa State and federal Constitutions in all of their speech and conduct.

EE.    Plaintiff's claims and/or the claims of any putative class members are barred because Press Defendants acted without the requisite *scienter*, both in the constitutional sense and in the common law sense, in all of their speech and conduct.

FF.    Plaintiff's claims and/or the claims of any putative class members are prohibited, in whole or in part, by the First and Fourteenth Amendments to the United States Constitution and by applicable law.

GG.    Press Defendants owe no duty in law or equity to Plaintiff or to any putative class member.

HH.    Plaintiff and/or any putative class members have not suffered any actual harm or damages as a result or proximate cause of the acts alleged in the Complaint, or as a result or proximate cause of the allegedly actionable news reports on which their claims are predicated.

II.    Upon information and belief, Plaintiff and/or any putative class members are precluded from recovering exemplary or punitive damages as a matter of law.

JJ.    The news reports complained of in the Complaint cannot be the basis for a claim of exemplary or punitive damages as a matter of law because they were not published with both knowledge of falsity or reckless disregard of probable falsity, and common law malice.

KK.    Plaintiff's and/or any putative class member's claims for punitive damages are barred by the Constitution of the United States, the Constitution of the State of Iowa and the common law.

LL.    Plaintiff's and/or any putative class member's claims for punitive damages cannot be sustained because they fail to allege facts sufficient to warrant the imposition of punitive damages.

Press Defendants specifically reserve all additional or affirmative defenses that they may have against each Plaintiff and putative class member which may arise, and which are not identified above. At this time, it is not possible for Press Defendants to delineate all such defenses against the putative class members or the class members against whom such defenses may apply,

because no putative class members have been identified, no classes have been certified (if any can be, which Press Defendants deny) and the putative class members are not parties to the litigation.

Press Defendants also expressly reserve and assert all affirmative defenses available under any applicable law. Press Defendants reserve their right to supplement their Answer and to assert additional defenses in the event that discovery or other means indicate that such additional defenses would be applicable.

**WHEREFORE**, Press Defendants respectfully request that the Court:

A.    Dismiss all of Plaintiff's claims against Press Defendants with prejudice and on the merits;

B.    Award Press Defendants all costs, disbursements, and reasonable attorneys' fees allowed by law; and

C.    Grant Press Defendants such other further relief the Court deems just and appropriate.

D.    Press Defendants demand a trial by jury on all issues so triable.

Dated: April 24, 2025

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Nick Klinefeldt*
Nick Klinefeldt, AT0008771
*nick.klinefeldt@faegredrinker.com*
David Yoshimura, AT0012422
*david.yoshimura@faegredrinker.com*
801 Grand Avenue, 33rd Floor
Des Moines, Iowa 50309
Telephone: (515) 248-9000
Facsimile: (515) 248-9010

**ATTORNEYS FOR DEFENDANTS DES MOINES REGISTER AND TRIBUNE COMPANY AND GANNETT CO., INC.**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true copy of **Defendants Des Moines Register and Tribune Co., Inc. and Gannett Co., Inc.'s Answer to Petition** was served upon all parties of record through the court's CM/ECF electronic filing system with copies to the below named individuals by electronic mail on April 24, 2025.

/s/ Elizabeth Collins

Copy to:

ROBERT R. ANDERSON
P.O. Box 4
Atlantic, Iowa 50022
(515) 382-1278

*bobandersoniowan@gmail.com*

DANIEL R. SUHR
Center for American Rights
727 N. LaSalle Street, Suite 210
Chicago, Illinois 60654
*dsuhr@americanrights.org*

*Attorneys for Plaintiff*