**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| DENNIS DONNELLY, on behalf of himself and all others similarly situated, | |
| Plaintiff, | |
| v. | Case No. 4:25-cv-00150-RGE-WPK |
| DES MOINES REGISTER AND TRIBUNE CO., INC.; J. ANN SELZER; SELZER & COMPANY; and GANNETT CO., INC., | |
| Defendants. | |

**PLAINTIFF'S CONSOLIDATED RESPONSE BRIEF
IN OPPOSITION TO THE MOTIONS TO DISMISS**

Robert R. Anderson
P.O. Box 4
Atlantic, Iowa 50022
(515) 382-1278
bobandersoniowan@gmail.com

Daniel R. Suhr (pro hac vice)
Center for American Rights
1341 W. Fullerton Ave., Suite 170
Chicago, Illinois 60614
dsuhr@americanrights.org

June 27, 2025

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................................................................... **3**

**INTRODUCTION** ......................................................................................................... **5**

**ARGUMENT** ................................................................................................................. **7**

I. THE FIRST AMENDMENT IS NOT A BAR TO MR. DONNELLY'S ACTION. ........................... 7
    *A. The First Amendment does not protect Defendants from claims of fraud or other torts that injure private rights.* ...................................................................................... 8
    *B. Mr. Donnelly has pled the necessary information to support a finding that the Defendants acted with knowing or reckless disregard.* ............................................... 14
II. MR. DONNELLY HAS STATED VIABLE CLAIMS UNDER IOWA LAW. ............................... 23
    *A. Mr. Donnelly has stated a claim for Fraudulent Misrepresentation.* .................... 23
        1. Mr. Donnelly has pled the element of an actionable false representation. ....... 23
        2. Mr. Donnelly has pled justifiable reliance. ...................................................... 29
        3. Mr. Donnelly has pled a compensable injury. ................................................... 30
    *B. Mr. Donnelly has stated an alternative claim for negligent misrepresentation in a reckless degree.* ........................................................................................................... 30
        1. Defendants are in the business of supplying information. ................................. 31
        2. Mr. Donnelly has pled the proximate cause of his damage. ............................. 32
    *C. Mr. Donnelly has pled a claim under the Iowa Consumer Fraud Act.* ................. 32
        1. Defendants' conduct was deceptive. ................................................................. 34
        2. Defendants' conduct was unfair. ...................................................................... 35
        3. Defendants' conduct fits the other elements of the statute. ............................... 36
    *D. Mr. Donnelly has stated a claim for professional negligence.* ............................ 40
    *E. Mr. Donnelly has pled a claim for interference with voting.* ............................... 42
    *F. Mr. Donnelly has stated a claim for civil conspiracy.* .......................................... 43

**CONCLUSION** ........................................................................................................... **44**

# TABLE OF AUTHORITIES

<span style="text-align:center; display:block;">Cases</span>

*281 Care Comm. v. Arneson ("II")*, 766 F.3d 774, 783 n.8 (8th Cir. 2014) .................... 12

*281 Care Comm. v. Arneson*, 638 F.3d 621, 634 (8th Cir. 2011) ...................................... 12

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F.Supp.2d 155, 175 (S.D.N.Y. 2009)........................................................................................................... 10

*Bank of Oregon v. Ind. News, Inc.*, 670 P.2d 616, 628 (Or. App. 1983) ......................... 41

*Bass v. J.C. Penney Co., Inc.*, 880 N.W.2d 751, 764 (Iowa 2016)................................... 26

*Berry v. National Broadcasting Co.*, 480 F.2d 428, 431 (8th Cir. 1973) ......................... 10

*Birmingham v. Fodor's Travel Pubs.*, 73 Haw. 359 (1992) ............................................. 39

*BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 918 (8th Cir. 2007)..................... 28

*Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1042 (1986)............................................ 9

*Bose Corp. v. Consumers Union*, 466 U.S. 485, 487 (1984) ............................. 7, 9, 12, 22

*Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 252 (1971).............................. 7, 9, 12, 22

*Carreras v. Iowa DOT*, 977 N.W.2d 438, 448 (Iowa 2022)............................................. 38

*Cnty. of Orange v. McGraw-Hill Cos. (In re County of Orange)*, 245 B.R. 138, 151 (Cent. D. Cal. 1997)................................................................................................................. 14

*Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991) .................................................. 13

*Compuware Corp. v. Moody's Investors Servs.*, 499 F.3d 520, 531 (6th Cir. 2007) ......... 10

*Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 504 (1996) ........................................ 35, 36

*Daniele v. ABC*, 2011 U.S. Dist. LEXIS 81273, *4 (D.N.J. July 26, 2011) ....................11

*Deng v. White*, 2018 Iowa Dist. LEXIS 110, *14 (Polk Cty. Dist. Ct. Aug. 28, 2018), *aff'd* 941 N.W.2d 360 (table), 2019 Iowa App. LEXIS 1066................................................. 37, 39

*Dinsdale Constr., LLC v. Lumber Specialties, Ltd.*, 888 N.W.2d 644, 650 (Iowa 2016).. 31

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 783-84 (1985)........... 8

*Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of U.S., Inc.*, 233 F.3d 24, 28 (1st Cir. 2000) ............................................................................................................ 9

*First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 258 (S.D.N.Y. 1988) (Mukasey, J.)..............................................................................................................11, 22

*Garcia v. Bd. of Educ. of Socorro Consol. Sch. Dist.*, 777 F.2d 1403, 1410-11 (10th Cir. 1985) ............................................................................................................................. 14

*Gertz v. Robert Welch*, 418 U.S. 323, 341-42 (1974)....................................................... 8

*Gutter v. Dow Jones, Inc.*, 22 Ohio St. 3d 286, 287 (1986)..............................................11

*Hanberry v. Hearst Corp.*, 276 Cal. App. 2d 680, 81 Cal. Rptr. 519 (Cal. Ct. App. 1969) ......................................................................................................................................... 40, 41

*Hempstead v. General Fire Extinguisher Corp.*, 269 F. Supp. 109 (D. Del. 1967) .......... 40

*Herron v. E.W. Scripps Co.*, 776 Fed. Appx. 929, 930 (8th Cir. 2019) ............................ 10

*Hines v. Evergreen Cemetery Ass'n*, 865 S.W.2d 266, 269 (Tex. App. 1993) ................. 34

*Hollander v. CBS News, Inc.*, 2017 U.S. Dist. LEXIS 71445, *14 (May 10, 2017)......... 12

*Hollander v. Garrett*, 710 Fed. Appx. 35, 36 (2d Cir. 2018)............................................ 12

*Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988)................................. 7, 9, 12, 22, 23

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003)............ 7

*Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216, 1216 (D.Md. 1988) ............................. 40

*Lane v. Mitchell*, 133 N.W. 381 (Iowa 1911)............................................................. 41, 42

*Lewin v. McCreight*, 655 F. Supp. 282, 284 (E.D. Mich. 1987)........................................ 40

*Libertelli v. Hoffman-La Roche Inc.*, 1981 U.S. Dist. LEXIS 11049, *6 (S.D.N.Y. Feb. 23, 1981) ........................................................................................................................................11

*McAuslin v. Grinnell Corp.*, 1999 U.S. Dist. LEXIS 8659, *9 (E.D.La. June 8, 1999) ... 40

*McClanahan v. Anti-Defamation League*, 2023 U.S. Dist. LEXIS 223495, *19 (W.D. Mo. Dec. 15, 2023)............................................................................................................................ 20

*McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 187 (S.D.N.Y. 2020) ........ 20

*Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271 (1971)................................................... 9, 22

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020)15, 22

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).................................. 7, 8, 9, 10, 22

*Oakley v. Dolan*, No. 17-cv-6903, 2020 U.S. Dist. LEXIS 28267 (S.D.N.Y. Feb. 19, 2020) ..................................................................................................................................... 20

*Peoples Bank & Trust Co. v. Globe Int'l Pub., Inc.,* 978 F.2d 1065, 1068 (8th Cir. 1992) ...................................................................................................................................... 10, 20, 26

*State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 524 (Iowa 2005)......................................................................................... 33, 34, 35, 36, 38

*State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 621 (Iowa 1989)......... 33, 35, 39

*State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 34 (Iowa 2013) ................... 34, 35, 37

*Time, Inc. v. Hill*, 385 U.S. 374, 391 (1967) ....................................................... 7, 9, 12, 22

*Tumminello v. Bergen Evening Rec., Inc*., 454 F. Supp. 1156, 1159–60 (D.N.J. 1978).....11

*Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990) .................................. 10

*United States v. Alvarez,* 567 U.S. 709, 719 (2012)................................................... 12, 13

*Wash. League for Increased Transparency & Ethics v. Fox News*, 2021 Wash. App. LEXIS 2213, *9 (Aug. 30, 2021)                                                                                   11

<u>Other Authorities</u>

3d American Law of Products Liability, § 5:16 (1987) ...................................................... 40

5d. Prosser and Keeton on the Law of Torts, § 100, P5 (1984) ........................................ 40

*Consumer Protection Under the Iowa Consumer Fraud Act*, 54 Iowa L. Rev. 319, 325 (1968)................................................................................................................................... 33

<u>Rules</u>

Fed. R. Civ. Pro. 9(b) ................................................................................................ 14, 22

<u>Treatises</u>

Restat. (2d) of Torts 865 ................................................................................................. 42

<u>Codes</u>

Iowa Code § 714.16(1)(e) ................................................................................................ 37

Iowa Code § 714.16(1)(f) ................................................................................................. 34

Iowa Code § 714H.4(1)(c) ............................................................................................... 26

**INTRODUCTION**

When the *Des Moines Register* sold Mr. Donnelly a subscription for its product, it promised him "trustworthy, smart and engaging news and information" from "the state's premier source of information." FAC 1. Regarding the Iowa Poll specifically, the *Register* told its readers that "[t]he Iowa Poll is carefully constructed to ensure that it is accurate." FAC 56. That explanation continued, "The Des Moines Register and its polling partner, West Des Moines-based Selzer & Co., take great care in shaping each Iowa Poll. We pay careful attention to the design of the questions, when a poll will be in the field and even how we reach Iowans." FAC 57. The *Register* also promised to follow Gannett's principles of ethical news coverage: "Don't publish a story if it doesn't feel right. Check it further." "Watch carefully for red flags that give reason to be skeptical of news- gathering or editing conduct." And "[b]e especially careful with technical terms, statistics, mathematical computations, crowd estimates and poll results." FAC 3.

But then the *Register* broke those promises to Mr. Donnelly and its other subscribers. It gave him a product that was fundamentally inaccurate and untrustworthy— trust was broken because the weekend before a national presidential election, the *Register* published a banner headline on the front page of its Sunday edition with a poll by its pollster, Dr. Ann Selzer. *See* ECF 30-4. That poll said Vice President Kamala Harris was leading in Iowa by three points. *See* ECF 30-2. Two days later, she lost Iowa by 13 points, meaning that the Selzer/*Register* Poll was off by 16. Sixteen. Given the margin of error and confidence level assigned to the poll by Dr. Selzer, the chances of an honest "miss" of that proportion are about 1 in 3.5 million. FAC 60.

If an oven salesman sells an oven asserting it will heat up to 400 degrees, when in fact he knows or should know that only one in 3.5 million times it will reach that temperature, the consumer is entirely correct to sue him for fraud.

The fact that Mr. Donnelly bought a subscription product rather than an immediate-use product does not matter. When HelloFresh sells a subscription box promising fresh food, and then months later sends out a box that it knows or should know has a 3,499,999 chance in 3,500,000 of containing rotten food, the consumer is again correct to sue for fraud: the consumer did not receive the product he was guaranteed, even if it arrived sometime later.

So Mr. Donnelly is not the one asking this Court to "recognize a new cause of action" for "fake news" Gannett Br. 11.[1] This case asserts long-standing, well-recognized causes of action under Iowa state law, like intentional or negligent misrepresentation and consumer fraud. In fact, it is the Defendants who are asking this Court to "create a new First Amendment exception" (*see* Selzer Br. 6) that exempts news publishers and their contractors from the basic principles of consumer protection and common-law fraud.

But this Court is not at liberty to create such an exception because the U.S. Supreme Court has already made quite clear that (1) fraud is not protected free speech, and (2) common-law torts and statutory claims involving public figures and public matters are not preempted by the First Amendment so long as the plaintiff can prove his claim to the heightened standard of knowing or reckless disregard for the truth ("actual malice").

---

[1] For clarity's sake, this brief refers to "Gannett" or "the Gannett brief" so as not to confuse the Court between the brief, the Des Moines Register and Tribune Co. (the corporation that publishes the *Register*), and "the *Register*" as in the newspaper itself. This is not a concession that Gannett is a primary as opposed to the secondary defendant but is only done for clarity's sake.

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("the First Amendment does not shield fraud"); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (tort of defamation available as long as plaintiff shows knowing or reckless disregard for the truth); *Time, Inc. v. Hill*, 385 U.S. 374 (1967) (same, as to action upon state statute protecting name/image/likeness); *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245 (1971) (same, as to tort of false light invasion of privacy); *Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984) (same, as to tort of product disparagement); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988) (same, as to tort of intentional infliction of emotional distress).

This case should be simple. The *Register* promised a particular product: trustworthy news and, in particular, accurate polling, and in greatest particular, an Iowa Poll with a margin of error of 3.4 percent. Mr. Donnelly subscribed to the *Register* because it sold itself as a *news*-paper, not a satire magazine. The *Register* then failed to fulfill its promise by running an obviously flawed story in one of its most important reports of the year. When a company promises a consumer a particular product and then delivers a materially flawed version of that product, the consumer can sue for his money back. And when the product is a newspaper, the consumer can proceed with his suit as long as he can show knowing or reckless disregard when it committed its bad acts.[2]

## ARGUMENT

### I. The First Amendment is not a bar to Mr. Donnelly's action.

---

[2] Mr. Donnelly's filing of this Opposition to the Motion to Dismiss does not represent a concession or acknowledgement of this Court's jurisdiction. He continues to believe that remand is the appropriate and necessary next step, as provided in his motion for remand or in the alternative for jurisdictional discovery.

**A. The First Amendment does not protect Defendants from claims of fraud or other torts that injure private rights.**

Gannett and Dr. Selzer both make sweeping statements of law that are obviously incorrect. Gannett asserts an "absolute immunity the First Amendment affords Press Defendants' speech." Gannett Br. 18. Both assert an extra-special level of protection for news reporting related to an election: "Press Defendants' Political Campaign Reporting Is Entitled to Absolute Protection Under the First Amendment." *Id*. at 19. *See* Selzer Br. 8-9. And both assert "[u]nder the First Amendment, claims for 'fake news' do not and cannot exist." Gannett Br. 22. *See* Selzer Br. 4 ("The First Amendment Does Not Permit Claims for 'Fraudulent News.'").

All three assertions are incorrect as a matter of law.

First, the First Amendment does not afford news outlets an "absolute immunity." *Gertz v. Robert Welch*, 418 U.S. 323, 341-42 (1974). Newspapers are not special; like all speakers, they are liable for their speech. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 783-84 (1985) (Brennan, J., dissenting) ("in the context of defamation law, the rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities."). And when newspapers defame or libel a public figure, they may be held accountable as long as the plaintiff can prove they published the defamation with knowledge of or reckless disregard for its falsehood. *New York Times Co.*, 376 U.S. at 279-280.

Second, speaking about an election does not create a special absolute immunity from liability for that speech: "That *New York Times* itself was intended to apply to candidates . . . is readily apparent from that opinion's text and citations to case law."

*Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271 (1971). In other words, the *Times* standard applies whether the topic is an election or an act of Congress, a candidate or an incumbent.

And third, what are claims for defamation and libel? They are claims that news outlets published fake news about a person, thus damaging their reputation. So, at a minimum, there can be some claims for "fake news" in a newspaper. In fact, *any* applicable civil claim can be asserted against a newspaper for "fake news," because what is important is not the type of claim asserted, but the standard applied to it. As the California Supreme Court has recognized, "Although the limitations that define the First Amendment's zone of protection for the press were established in defamation actions, they are not peculiar to such actions but apply to all claims whose gravamen is the alleged injurious falsehood of a statement: that constitutional protection does not depend on the label given the stated cause of action." *Blatty v. New York Times Co*., 42 Cal. 3d 1033, 1042 (1986) (cleaned up).

Indeed, "there exists ample precedent for applying *New York Times* requirements [of knowing or reckless publication] to falsehood claims beyond defamation." *Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of U.S., Inc*., 233 F.3d 24, 28 (1st Cir. 2000). That body of precedent starts with *Time v. Hill*, *Cantrell v. Forest City Pub. Co*., *Bose v. Consumers Union*, and *Hustler v. Falwell*, all of which are U.S. Supreme Court cases applying the *New York Times* standard to falsehood claims beyond defamation (namely a state statutory action, a false light tort, a product disparagement tort, and an intentional infliction of emotional distress tort).

That ample precedent includes the Eighth Circuit, which uses the *New York Times* standard to judge non-defamation claims about the falsity of news reports. *Peoples Bank & Trust Co. v. Globe Int'l Pub.,* 978 F.2d 1065, 1068 (8th Cir. 1992) (analyzing whether

plaintiff proved actual malice in false light and intentional infliction of emotional distress action against newspaper); *Berry v. National Broadcasting Co.*, 480 F.2d 428, 431 (8th Cir. 1973) ("The United States Supreme Court has consistently held that the First Amendment protection of the freedom of the press requires that 'false light' cases be subject to the same restraints as defamation cases."). *See Herron v. E.W. Scripps Co*., 776 Fed. Appx. 929, 930 (8th Cir. 2019) (Missouri "borrow[s]" actual malice standard for "false light" claim).

That ample precedent extends to the decisions of other courts as well. *See, e.g., Compuware Corp. v. Moody's Investors Servs*., 499 F.3d 520, 531 (6th Cir. 2007) ("We conclude that the actual-malice standard applies to the breach of contract claim here."); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990) (claims for product disparagement, trade libel, and tortious interference with business relationships "subject to the same first amendment requirements that govern actions for defamation"); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co*., 651 F.Supp.2d 155, 175 (S.D.N.Y. 2009) (fraud and contract claims barred by First Amendment "subject to an 'actual malice' exception").

Indeed, that ample precedent extends to many of the cases cited by Gannett and Dr. Selzer themselves, which indicate that a plaintiff can recover for claims other than defamation as long as they can prove those claims to the *New York Times* standard.[3] *First Equity*, for instance, cited by Gannett (Br. 17), rejects a fraud claim because the plaintiffs failed to meet the relevant First Amendment standard: "plaintiffs must show either that Standard & Poor's published the description with actual knowledge of its falsity or with

---

[3] To paraphrase Inigo Montoya from the movie *The Princess Bride*, Defendants keep citing those cases, but the cases do not hold what they think they hold. *See* Selzer Br. 7.

reckless disregard of its truth or falsity." *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 258 (S.D.N.Y. 1988) (Mukasey, J.). *See id*. ("well-established First Amendment principles requir[e] a plaintiff to demonstrate actual malice when seeking to impose liability on a newspaper for publication of a non-defamatory misstatement."). *Gutter,* similarly cited (Gannett Br. 17), quotes from *Tumminello* (cited at Selzer Br. 17), which held that a reader's claim was possible "at best only for knowing or reckless falsehood." *Gutter v. Dow Jones, Inc*., 22 Ohio St. 3d 286, 287 (1986) (quoting *Tumminello v. Bergen Evening Rec., Inc*., 454 F. Supp. 1156, 1159–60 (D.N.J. 1978)). *Accord Daniele v. ABC*, 2011 U.S. Dist. LEXIS 81273, *4 (D.N.J. July 26, 2011) (citing *Tumminello*, First Amendment bars action for false news report based on negligence, but not intentional or reckless false reporting); *Libertelli v. Hoffman-La Roche Inc.*, 1981 U.S. Dist. LEXIS 11049, *6 (S.D.N.Y. Feb. 23, 1981) (in a decision relied on by *First Equity*, the SDNY found "a publisher is not liable for false reports of matters of public interest absent knowledge of falsity or reckless disregard of the truth.").

This is the error made by Dr. Selzer and Gannett when relying on the Washington Court of Appeals' unpublished opinion in *Wash. League for Increased Transparency & Ethics v. Fox News*, 2021 Wash. App. LEXIS 2213, *9 (Aug. 30, 2021), and the Southern District of New York's vacated opinion in *Hollander v. CBS News, Inc*., 2017 U.S. Dist. LEXIS 71445, *14 (May 10, 2017), *vacated, Hollander v. Garrett*, 710 Fed. Appx. 35, 36 (2d Cir. 2018). *See* Gannett Br. 18 ("The Register's news coverage challenged by Plaintiff does not fall into any traditional category of unprotected speech."); Selzer Br. 4; *see* Selzer Br. 6 (adopting categorical approach). A rule limiting the actual-malice standard to only defamation, and barring all other types of claims for injurious false speech, is directly

contrary to the U.S. Supreme Court's decisions in *Time*, *Cantrell*, *Bose*, and *Hustler*, all of which applied the knowing or reckless disregard standard to different non-defamatory claims—a state name/image/likeness statute and the torts of false light, product disparagement, and intentional infliction of emotional distress. As the U.S. Supreme Court recently recognized in a case oft-cited by Defendants, *United States v. Alvarez*, although false speech is not categorically unprotected, private plaintiffs can bring claims for "defamation, fraud, or some other legally cognizable harm associated with a false statement, such as an invasion of privacy or the costs of vexatious litigation." 567 U.S. 709, 719 (2012). *Alvarez* recognizes, as it must from the earlier precedents, the First Amendment's exception for "defamation" is not a strict category but encompasses any action for "legally cognizable harm associated with a false statement."

The Eighth Circuit's decisions in *281 Care Committee I and II*, relied upon by Dr. Selzer (Br. 9) and Gannett (Br. 21) also does not bar Mr. Donnelly's claim, for much the same reason. There, though the Eighth Circuit did hold that knowingly or recklessly false campaign speech about a referendum could not be prosecuted; it distinguished defamation claims because of "the important private interests implicated by defamatory speech." *281 Care Comm. v. Arneson*, 638 F.3d 621, 634 (8th Cir. 2011). *Accord 281 Care Comm. v. Arneson ("II")*, 766 F.3d 774, 783 n.8 (8th Cir. 2014) ("defamation-law principles advance the importance of private interests"). *See Alvarez*, 567 U.S. at 719. *Contra* Gannett Br. 21; Selzer Br. 7. The same "important private interests" are present here and in other cases where private plaintiffs attempt to vindicate private rights, whether they are defamation, libel, false light, interference with business advantage, or consumer protection.

Indeed, at some point in both briefs the Defendants acknowledge legal reality—the First Amendment is not a stand-alone bar to Mr. Donnelly's claims but is only a bar if he cannot prove his claims on the merits. Gannett Br. 23, Selzer Br. 9.

Gannett, however, goes on trying to "create an exception" that protects the news media from common-law fraud or statutory consumer fraud by saying, "A claim of 'fraud' based on news reporting directly contravenes the First Amendment." Gannett Br. 23. Not so. Mr. Donnelly must actually plead the elements of each of his claims, but having done so, his case must be allowed to proceed. "[G]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991). "[E]nforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations." *Id.* at 670. A news outlet is subject to a general law regarding consumer protection just as a news outlet is subject to general laws regarding copyright, the National Labor Relations Act, the Fair Labor Standards Act, and antitrust law. *Id.* at 669-70 (collecting cases). The First Amendment does not provide a categorical exemption to all generally applicable laws because the speaker is a member of the news media; the First Amendment sets a standard (actual malice) that protects all speakers, media or non-media, when facing a falsehood-based claim. *Garcia v. Bd. of Educ. of Socorro Consol. Sch. Dist.*, 777 F.2d 1403, 1410-11 (10th Cir. 1985).

So the reality is that after a lot of huffing-and-puffing about the difference between fraud and false speech, Defendants end up where the law and Mr. Donnelly were at from the start: for Mr. Donnelly to survive the motion to dismiss his claims, he must plead actual,

legitimate claims, *i.e.*, he must show the elements and match his allegations to the elements, and he must plead enough facts to support a reasonable inference that the defendants acted with knowing or reckless disregard.[4] Having done so, he may proceed with his case.

**B. Mr. Donnelly has pled the necessary information to support a finding that the Defendants acted with knowing or reckless disregard.**

Gannett (but not Dr. Selzer) ends its First Amendment section with an argument that Mr. Donnelly has not pled enough to support a finding of actual malice but merely invoked certain buzzwords associated with it. Br. 25-26.

Of course, at the pleadings stage, a plaintiff cannot access the subjective knowledge or doubts of the defendant decision-maker; that only comes through depositions and discovery. *See* Fed. R. Civ. Pro. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Pled generally requires more than just a recitation of the elements, however; "to make out a plausible malice claim, a plaintiff must still lay out enough facts from which malice might reasonably be inferred." *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020) (cleaned up). Under Eighth Circuit law, the complaint "must allege enough facts to raise a reasonable expectation that discovery will reveal evidence that [the news outlet] published one or more statements with actual malice, that is, knowing they were false or with reckless disregard for whether they were false or not. This standard does not impose a probability requirement

---

[4] This is true not only of the negligent/intentional misrepresentation and consumer claims ("the fraud claims"), but of the professional negligence and interference with electoral engagement torts as well. *See Cnty. of Orange v. McGraw-Hill Cos. (In re County of Orange)*, 245 B.R. 138, 151 (Cent. D. Cal. 1997) (claim for professional negligence against publisher may go forward consistent with the First Amendment if the plaintiff pleads actual malice). *Contra* Gannett Br. 26 n.6. It's not that the First Amendment bars negligence-based theories—it is that negligence must be proven to a malicious (i.e., reckless) degree.

at the pleading stage. A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (cleaned up).

Mr. Donnelly has alleged plenty to "reasonably infer" that through discovery he can prove the standard. Start with the poll itself. The poll as run in the *Register* stated: "Questions based on the sample of 808 Iowa likely voters have a maximum margin of error of plus or minus 3.4 percentage points. This means that if this survey were repeated using the same questions and the same methodology, 19 times out of 20, the findings would not vary from the true population value by more than plus or minus 3.4 percentage points." FAC 55. Given the margin of error and confidence interval that the poll itself gave readers, there was a roughly 1 in 3.5 million chance that this was an "honest miss." FAC 60.

Next, consider how Dr. Selzer and the *Register* itself described the poll: a "stunning," "shocking," "surprise" Iowa Poll result. FAC 23. *See* FAC 40 ("'It's hard for anybody to say they saw this coming,' said pollster J. Ann Selzer, president of Selzer & Co.," in the *Register* story announcing the poll results.): A responsible pollster, reporter, or editor, given a "stunning, shocking, surprising" poll result "no one saw coming," would question that result rather than recklessly providing it to all their consumers (and the rest of the world) as accurate news. "Either literally everything we know about Iowa politics is wrong, or the Poll is wrong"—given the possibilities and probabilities, one should double-check in such circumstances.

Why was the result stunning, shocking, and surprising? Well, because Gannett and Dr. Selzer would know that in the last statewide election cycle in Iowa, the Republican gubernatorial candidate won by 18 points, and the Republican U.S. Senate candidate won

by 12 points. FAC 25. It's "shocking" at minimum to think that the Democratic presidential candidate was leading by three, representing a party-preference swing in the Iowa electorate of at least nine points in two years. Specific to President Trump, he won Iowa by nine points in 2016 (FAC 29) and by eight points in 2020 (FAC 26). Again, this would mean an 11-to-12 point swing in how the Iowa electorate feels about Donald Trump. Those sorts of numbers are unheard-of in politics.

It was also shocking because the four previous public polls taken in Iowa in fall 2024 showed Trump leading by 7, 7, 8, and 9 points. FAC 31. Then the Selzer poll shows Harris by 3? To quote Sesame Street, one of these things is not like the others.

It was shocking because no one—no one—thought Iowa was a swing state. Not the *New York Times*, *US News*, or *Forbes*, to pick three prominent examples of media outlets maintaining lists of swing states (FAC 32).

It was shocking because Gannett's own polling in other (actual) swing states (FAC 34-36) and other polling in swing states showed Trump with the momentum in the final days (FAC 33) (until the *Register* poll generated fake momentum for Harris at the end).

It was shocking because Dr. Selzer's own previous poll for the *Register* in June 2024 showed Trump leading then-candidate President Biden by 18 points. In other words, her second poll showed a breathtaking 21-point swing in the change from Biden to Harris.

If the presidential results were not shocking enough, then certainly the congressional race results were so shocking that someone somewhere should have pumped the breaks before running the poll as headline news. In the First District—an R+3 seat that was considered a close race by some analysts—Selzer's poll showed the Democrat ahead by a whopping 16 points. Again, there should have been alarm bells ringing all over.

On a higher plane, why would Dr. Selzer and the journalists at the *Register* know that a poll showing Harris ahead by three in Iowa was a shockingly surprising result? Well, Dr. Selzer has a Ph.D. in communications theory and research. FAC 10. She has been polling in Iowa for many years. *See* FAC 20. Similarly, the then-executive editor at the *Register* had two decades of experience covering Iowa politics. FAC 68. The news director (who doubled as the political editor), chief political correspondent, and statehouse political correspondent—all three of whom wrote or reviewed stories on the poll—also had significant experience as journalists covering politics. FAC 73-75. In other words, Dr. Selzer and all four of the *Register* journalists on the story had the requisite experience and expertise to have seen all the red flags about such an obviously discordant poll.

Next, the FAC lays out Gannett's own internal news principles, on which its presumably trains its journalists. Gannett's principles of ethical news coverage charge its staff: "Don't publish a story if it doesn't feel right. Check it further." "Watch carefully for red flags that give reason to be skeptical of news-gathering or editing conduct." And "[b]e especially careful with technical terms, statistics, mathematical computations, crowd estimates and poll results." FAC 3.

Did the *Register* staff or Dr. Selzer as a *Register* contractor see a "shocking, surprising, stunning" poll result and "check it further"? Did they ask a political science professor or another pollster to go over the polling methodology and sample weighting? No. All "red flags" were ignored. Gannett tells its journalists to be "extra careful" with "statistics" and "poll results." Clearly, they did not do that here. Again, these allegations reinforce a reasonable inference of knowing or reckless behavior if the defendants acted contrary to their employer's principles and training.

The FAC also points out another reason Dr. Selzer and the *Register* should have been skeptical: Dr. Selzer's track-record of underpolling Republicans. FAC 18-20. She missed a 2022 Republican victory for attorney general by 18 points. FAC 20. Given Dr. Selzer's series of recent past misses underestimating Republican turnout, she and the *Register* should have learned that lesson and made sure not to repeat the same mistake here.

The FAC also pleads the *Register's* attitude toward and explanation of the Iowa Poll in general. The *Register* had previously told its readers, "The Iowa Poll is carefully constructed to ensure that it is accurate." FAC 56. That explanation continued, "The Des Moines Register and its polling partner, West Des Moines-based Selzer & Co., take great care in shaping each Iowa Poll. We pay careful attention to the design of the questions, when a poll will be in the field and even how we reach Iowans." FAC 57. Those sentiments are echoed on Dr. Selzer's website, which proclaims her Iowa Poll "the gold standard for its accuracy and insights. . ." FAC 77. *See* FAC 78-82. Again, these allegations support a reasonable inference that the Defendants acted with knowing or reckless disregard: they had previously reiterated the diligent care given the Poll's results. This was not a mistake made haphazardly in a story (or tweet) written on the fly amidst a fast-moving news cycle.

The FAC also shows how the poll got it so massively wrong: "PollFair, an online polling analyst that reweights polls based on historic exit poll data, took Dr. Selzer's October poll and reweighted it according to historical data. Dr. Selzer weighted her sample at R+2, while PollFair weighted its sample at R+10. Doing so moved the results from Harris +3 (47-44) to Trump +6 (50-44)." (FAC 39). Another data point in support of knowing or reckless misbehavior is the gap between the weighting used and the historic exit poll data.

Take these allegations together. The poll was  . . .

- Clearly discordant with Trump's performance in Iowa in 2016 and 2020.

- Clearly discordant with the results in 2016, 2018, 2020, and 2022 Iowa races.

- Clearly discordant with historic exit polling data from Iowa.

- Clearly discordant with other publicly available polling of Iowa in the 2024 election cycle.

- Clearly discordant with Gannett's own polling of actual swing states in the 2024 election cycle.

- Clearly discordant with national news reporting on which states were in play.

- Clearly discordant with Dr. Selzer's own poll for the *Register* in June 2024.

No wonder the result was "shocking," "stunning," and a "surprise." Plus, keep in mind what else we know about the context around the poll:

- Dr. Selzer has a Ph.D. in communications theory and research.

- The four *Register* journalists reporting on the poll had decades of collective experience reporting on Iowa politics.

- The *Register* had previously told its readers that it takes extra special care to ensure that the Poll is accurate and trustworthy.

- The *Register* is part of a company that tells its employees to be extra careful when reporting on statistics and polling.

That should be more than enough to raise "a reasonable inference" that Dr. Selzer and the Register's leadership knew or "had serious doubts" about the veracity of the poll but ran it anyway, in spite of every possible red flag that should have been triggered.

That this pleading is sufficient is also clear from other cases that have granted motions to dismiss in similar cases. This is not a case based on allegations of "ill will

alone." *Oakley v. Dolan*, No. 17-cv-6903, 2020 U.S. Dist. LEXIS 28267 (S.D.N.Y. Feb. 19, 2020). Nor is it based only on allegations of "sheer political bias." *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 187 (S.D.N.Y. 2020). Nor does Mr. Donnelly allege Defendants lied to fit the facts into a "preconceived storyline." *McClanahan v. Anti-Defamation League*, 2023 U.S. Dist. LEXIS 223495, *19 (W.D. Mo. Dec. 15, 2023). Indeed, Mr. Donnelly has not pled <u>anything</u> yet about the motives of Dr. Selzer or the *Register*. Instead, he has stuck strictly to actual facts based in the public record.

Finally on this question of actual malice, the Eighth Circuit's decision involving a supermarket tabloid is instructive here. Globe Co., owners of the *Sun* tabloid, published a true picture of an elderly woman from Arkansas alongside a fictitious story suggesting a 101-year-old woman quit her job because she was pregnant. "The central issue on appeal is the existence of actual malice: whether Globe intended, or recklessly failed to anticipate, that readers would construe the story as conveying actual facts or events. . ." *Peoples Bank & Trust Co.*, 978 F.2d at 1068. The Eighth Circuit upheld the jury's finding of actual malice: "The circumstances of the instant case suggest the story in the *Sun* may well be believed by readers as conveying actual facts about Mitchell despite the apparent absurdity of a pregnant centenarian. Indeed, there is more than sufficient evidence to conclude that Globe intends its readers to believe the *Sun* generally. Although there is less evidence to conclude that Globe intended its readers to believe facts specifically about Mitchell, we conclude there is sufficient evidence to find that it recklessly failed to anticipate that result." *Id*. at 1069. The Court found that Globe "holds out the publication as factual and true. The format and style of the *Sun* suggest it is a factual newspaper. The Globe advertises the *Sun* as publishing 'the weird, the strange, and the outlandish *news* from around the globe,' and

nowhere in the publication does it suggest its stories are false or exaggerated." *Id*. at 1070 (emphasis original).

The Court acknowledged that "Globe's failure to investigate and confirm its assumption of Mitchell's death will not alone support a finding of actual malice," but then continued, "the purposeful avoidance of the truth is in a different category." *Id*. In that case, the jury "had sufficient evidence to determine that Globe purposefully avoided the truth about Mitchell." *Id*.

The *Des Moines Register* also holds itself out as reporting news. It also holds itself out as reporting news that is "factual and true." In this instance, it reported something blatantly untrue: that Kamala Harris was leading in Iowa by three points. This case has not yet reached a jury, but this Court can still consider the myriad allegations above to raise a reasonable inference that Dr. Selzer and the *Register* at minimum "purposely avoided the truth" that their poll was outrageously wrong and ran it anyway.

Just as in the case against the *Sun*, when a newspaper that holds itself out as reporting real news then reports knowingly or recklessly false news, "the First Amendment can tolerate sanctions without significant impairment of its function." *Id*. at 1070.

*Summary.* To recap on the First Amendment: The First Amendment does not confer an absolute immunity on news publishers reporting on public affairs. *New York Times* (SCOTUS 1964). It does not confer an absolute immunity on news publishers reporting specifically on elections and campaigns. *Monitor Patriot Co.* (SCOTUS 1971). It does not bar claims for fraud, even against news outlets. *See, e.g.*, *First Equity* (SDNY 1988). It does not bar all claims for false news other than defamation. *See, e.g., Time Inc.* (SCOTUS 1967), *Cantrell* (SCOTUS 1971), *Bose Corp.* (SCOTUS 1984), *Hustler Mag.* (SCOTUS

1987). Rather, it sets a standard: regardless of the specific type of civil claim, a plaintiff must prove the defendant(s) acted with actual malice, which means publishing a falsehood with knowledge of or reckless disregard for its falsity. At the pleading stage, that may be pled generally, but with at least enough facts to support a reasonable inference of knowing or reckless disregard. F.R.C.P. 9(b) and *Nelson* (8th Cir. 2020). Here, Mr. Donnelly has pled numerous facts that support such a reasonable inference, which can be collected under the headlines: (1) the Defendants were smart, educated, experienced people who knew Iowa politics inside-and-out, and (2) anyone familiar with even basic Iowa politics would have known or should have known that the Iowa Poll result was highly dubious. Thus, in all regards Mr. Donnelly can proceed to the merits of his claims.

Two final, high-level thoughts on the First Amendment before reaching the elements, however: First, consider the practical implications of the Defendants' position. They believe that the First Amendment protects the *Register* with a constitutional right to print lies—blatant, obvious, knowing lies—without any repercussions whatsoever as long as the lies are not defamatory of a specific person. It can print fake stories about global events. It can print incorrect stories about politics. It can basically run itself like the *Onion* or the *Babylon Bee*, while holding itself out to its subscribers and the world as a real, legitimate, trustworthy, factual newspaper and Iowa's premier source of information, and no one has any legal recourse whatsoever. It can knowingly, intentionally, print all the lies and fake news and wrong stories it wants, and as long as it does not defame a specific person, it has a constitutional right to do so. That is not the law. If a tabloid like the *Sun* can be held liable for running a true picture next to a fake story as "news" without violating

the First Amendment, then certainly these Defendants can be liable for a cover like ECF 30-4.

Second, both sets of defendants seek to wrap themselves in the flag and the First Amendment, saying for instance that Mr. Donnelly's "claims amount to a frontal assault on the First Amendment," Gannett Br. 19, and an "obvious affront to basic constitutional values." Selzer Br. 5. Actually, quite the opposite is true. Intentional falsehoods injected into the democratic conversation distort and undermine democracy. As the Supreme Court has said, "False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas . . . " *Hustler Mag.*, 485 U.S. at 52. When Dr. Selzer provided the *Register* with an obviously wrong poll, and when the *Register* ran it as front-page news (*see* ECF 30-4), they were the ones distorting democracy by pushing blatant misinformation the weekend before the election, causing a fake burst of momentum that led donors to open their wallets, volunteers to spend extra time knocking doors, and voters to turn out because their candidate was no longer a lost cause. Distorting the election in its final days was an assault on the Constitution, but what is actionable is that the *Register*, a company that promised to provide real, reliable news and polling, instead provided fake news on this most material of topics. It is to those claims for that damage that Mr. Donnelly now turns.

## II. Mr. Donnelly has stated viable claims under Iowa law.

### A. Mr. Donnelly has stated a claim for Fraudulent Misrepresentation.

### 1. Mr. Donnelly has pled the element of an actionable false representation.

The fraud here is not hard to understand. Gannett and the Des Moines Register & Tribune Co. made certain promises to their subscribers. Promises—not puffery.

These start with promises to provide "trustworthy, smart and engaging news and information" from a "venerable source of information and current news for the heart of Iowa" from "the state's premier source of information." FAC 1.[5]

Gannett and the *Register* made more specific promises about how the newsroom would run: "WE ARE COMMITTED TO: Seeking and reporting the truth in a truthful way." FAC 89. They continue: "We will dedicate ourselves to reporting the news accurately, thoroughly and in context." "We will be honest in the way we gather, report and present news." "We will provide the news and information that people need to function as effective citizens." FAC 89. "Dedication to the truth means accuracy itself is an ethical issue. Each news person has the responsibility to strive for accuracy at each step of the process." "Be especially careful with technical terms, statistics, mathematical

---

[5] Gannett notes that the FAC does not specify the source of the statements in paragraph 1. Gannett Br. 30. Several are from the Des Moines Register's LinkedIn page: "The Des Moines Register stands as a venerable source of information and current news for the heart of Iowa. Since its founding, our commitment has transcended the mere delivery of news; we've been a pillar of support for our communities while steadfastly supplying news in both the traditional print medium and the dynamic digital realm." https://www.linkedin.com/company/des-moines-register/. Others were on the Register's own webpage. *See* https://journalists.feedspot.com/des_moines_news_websites/.
Mr. Donnelly could have cited other sources too, like a column from Carol Hunter (until recently executive editor) and Mike Trautmann (news director), *How our journalism made a difference* (March 13, 2025): "The Des Moines Register news staff is dedicated to providing accurate, trustworthy reporting, whether a story is about the opening of a new restaurant in your neighborhood, a high school basketball game or a bill in the Iowa Legislature. . . We and the rest of the Des Moines Register staff are honored that you count on us to deliver trustworthy journalism. . ." Or the opening to the Newsroom Directory on the Register's webpage: "Inherent to our mission of empowering communities, we are dedicated to delivering essential and trusted content with a commitment to unbiased journalism." Or the Register's long-standing tagline: "The News Iowa Depends Upon."
In this case, Iowa could not depend on the Register's reporting. In all events, if the Court finds that the First Amended Complaint failed to sufficiently identify the sources of the statements made in the FAC, Mr. Donnelly asks for leave to amend to specify the exact sources of these statements.

computations, crowd estimates and poll results." FAC 91. The *Register* pledges to its readers to operate on these principles. FAC 93.

The *Register* also made representations specific to the Iowa Poll: "The Iowa Poll is carefully constructed to ensure that it is accurate." FAC 56. "The Des Moines Register and its polling partner, West Des Moines-based Selzer & Co., take great care in shaping each Iowa Poll. We pay careful attention to the design of the questions, when a poll will be in the field and even how we reach Iowans." FAC 57.

The *Register* and Dr. Selzer also made representations specific to this particular poll: "Questions based on the sample of 808 Iowa likely voters have a maximum margin of error of plus or minus 3.4 percentage points. This means that if this survey were repeated using the same questions and the same methodology, 19 times out of 20, the findings would not vary from the true population value by more than plus or minus 3.4 percentage points." FAC 55. *See* ECF 30-3 (polling memorandum from Selzer & Co.).

These representations were the basis upon which the *Des Moines Register* induced Mr. Donnelly and everyone else in the putative class to subscribe: to get the news.[6] This is not a lawsuit based on an unenforceable indeterminate slogan, like promising news that is "fair and balanced." Whether a station is fair and balanced is primarily a question of opinion that a jury cannot determine because it is not a falsifiable statement. Whether the

---

[6] Gannett misunderstands Iowa's exceptions for advertisements. Gannett Br. 42 n.10. Iowa law says that the advertiser, not the newspaper publisher, is responsible for the content of the advertisement. If Subaru runs an advertisement in the *Register* promising a five-star crash test rating, when in fact it got three stars, a consumer has to sue Subaru for that offense—Iowa law says you cannot sue the *Register* as the publisher of the advertisement for failing to check on the veracity of the ad before running it. Iowa Code § 714H.4(1)(c). That obviously does not mean that the newspaper, when advertising itself, whether in its own pages or anywhere else, is not responsible for the content of and promises made in its own advertisements.

*Register* reported "trustworthy news," whether it was "true" and "accurate," whether it was "careful with poll results," whether this Iowa Poll was "carefully constructed to ensure that it is accurate," whether this Iowa Poll was constructed to a margin of error of 3.4% as a matter of statistical science—these are falsifiable statements that a jury can hear, consider, and decide. *See Peoples Bank & Trust Co.*, 978 F.2d at 1069 (jury entitled to hear and decide issue that was "not an opinion" but "could be proved either true or false."). As with the *Sun*, when a newspaper holds itself out as publishing "news," and then publishes "fake news," it can be liable for the gap between its promise and its publication. *Id.* at 1068-71.

This case is not like a case where the plaintiff simply failed to read the fine print. *Contra* Gannett Br. 29 (discussing *Bass v. J.C. Penney Co., Inc.*, 880 N.W.2d 751, 764 (Iowa 2016)). The plaintiff read the story, and the story was all wrong (ECF 30-2). The headline: "Iowa Poll: Kamala Harris leapfrogs Donald Trump to take lead near Election Day." Wrong. From the sub-head: "The nationally recognized Iowa Poll shows Kamala Harris picking up support from women to surpass Donald Trump in a ruby-red state he has won twice." Wrong again—she clearly had not surpassed Donald Trump, and the fact that Iowa is a "ruby-red state he has won twice" should have raised the red flags. From the "key points" atop the story: "A victory for Harris would be a shocking development after Iowa has swung aggressively to the right in recent elections, delivering Trump solid victories in 2016 and 2020." The examples abound further from there, but the points are evident: (1) The *Register* reported to its readers that Harris was leading in Iowa by three and (2) the *Register* knew that everything about Iowa politics indicated that report was not credible. Gannett's answer—that if Mr. Donnelly had just read the fine print, he could have concluded that the *Register's* report was totally unbelievable—is in itself quite incredible:

"Yes, we're a newspaper, but it's on our readers to read the hyperlinked footnotes in our stories and then decide for themselves if our news reporting is accurate."

Moreover, even if Mr. Donnelly had read Gannett's Exhibit B (ECF 30-3), it would not have helped. Exhibit B asserts that Selzer & Co. surveyed 1,038 contacts, of whom Selzer found 808 likely voters. Exhibit B also includes the validation: "Questions based on the sample of 808 Iowa likely voters have a maximum margin of error of plus or minus 3.4 percentage points. This means that if this survey were repeated using the same questions and the same methodology, 19 times out of 20, the findings would not vary from the true population value by more than plus or minus 3.4 percentage points." Statistically, that means a roughly 1 in 3.5 million chance of an honest mistake. FAC 60.

Moreover, Exhibit B does not contain the information key to determining whether the pollster had misjudged the electorate: it says simply "contacts weighted by age, sex, and congressional district." But, as the FAC points out, if Dr. Selzer had weighed in line with historic exit poll data, she would have found Trump substantially ahead. FAC 39. So, Exhibit B did not disclose the relevant fine print, but rather it gave readers all the more reason to be confident in the poll.

And it's still unfair to assert that readers—who are neither polling Ph.D.s or experienced political journalists—are responsible for reading the fine print and then deciding for themselves whether people who are polling Ph.D.s and experienced political journalists got it right or wrong. This reinforces why it is a consumer fraud: Mr. Donnelly pays money to get "trustworthy," "accurate" news from people who are experienced in gathering and reporting news because he, an everyday citizen, lacks the capacity to do so. Gannett's response is like saying, "It's on the car buyer to look under the hood and

determine for themselves whether the wear-and-tear on the engine looks right for the number of miles on the odometer." No. That's one reason society places the burden on the car shop to be truthful—because they're the experts in cars, and consumers usually aren't.

Gannett's second argument is that Mr. Donnelly's claim fails to plead intentional misrepresentation where the complaint "expresses disagreement with [a] conclusion . . . , but it does not specify where and how the analysis falls short." Gannett Br. 29, quoting *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 918 (8th Cir. 2007). First off, the very next line of the *BJC* opinion reads, "Although such specificity may not be warranted in other cases, we believe that more detail was called for here." The allegedly fraudulent actuarial study in that case was provided to sophisticated customers: a health system and a health-insurance company, both of which presumably have armies of in-house number-crunchers to evaluate the actuarial data that is key to their business. Mr. Donnelly, by contrast, is an everyday citizen and subscriber to a newspaper who is not a sophisticated political polling expert, so this is perhaps one of those cases where such specificity may not be warranted. Second, the *BJC* decision was rendered on summary judgment, after discovery, depositions, and an expert witness—in other words, after the plaintiffs had time to see under the hood and amend their complaint to be specific. Mr. Donnelly has not yet had the opportunity to depose anyone, put forward a polling expert of his own, or see any internal documents that could inform his specific allegations of the fraud. *See* Fed. R. Civ. Pro. 9(b). Third, Mr. Donnelly's complaint does point to at least one place "where and how the analysis falls short," namely in the weighting of the poll respondents. FAC 39.

Next, Gannett says "the Iowa Poll, and indeed all opinion polls in general, are not intended to be—and self-evidently cannot be—a factual representation that guarantees a

future election outcome." Gannett Br. 29. Gannett reminds us that polls have "margins of error", and campaigns are "dynamic." *Id*. Ok, fine. First, the misrepresentation was not that Kamala Harris would win on Election Day by three (though that was the obvious implication of a poll published two days before the election, see ECF 30-4). The misrepresentation was that Kamala Harris was ahead by three at the time of the poll. That was obviously inaccurate. That is not a speculation of a future outcome, but a factual statement of the present reality at the time the poll was taking.

Second, Gannett told its readers the poll had a margin of error of 3.4%—if Gannett had told its readers that the poll had a margin of error of 17 percent, we would not be here (then again, if a poll had a margin of error of 17 percent, no one would have published it). But Gannett and Dr. Selzer certified the poll's accuracy within 3.4 points; the chances of an honest miss on that basis are 1 in 3.5 million or so. FAC 60. And though campaigns are dynamic, nothing about this campaign in the 48 hours from Sunday to Tuesday indicates a swing in Iowans' presidential preferences by 16 points (which is, in all events, a fact question for a jury). Gannett is grasping at straws.

### 2. Mr. Donnelly has pled justifiable reliance.

Gannett can only seek its way out of a sticky wicket by misdefining the fraud. Mr. Donnelly is not alleging that he relied on the November 2024 Iowa Poll when he purchased a subscription—as Gannett points out, how could he rely on a poll that had yet to be run and reported? The fraud is that Gannett promised to deliver "trustworthy, accurate news," to adhere to the Gannett principles of ethical news coverage, and to take good care that all editions of the Iowa Poll were carefully designed to ensure accuracy, and then utterly failed to fulfill those promises. He subscribed because the *Register* promised the news that Iowa

depends upon—he could justifiably rely on that promise when deciding to give it his money, given the *Register's* general track record and its representation to him that it was a real, legitimate, serious news outlet. *See Peoples Bank & Trust Co.*, 978 F.2d at 1070.

### 3. Mr. Donnelly has pled a compensable injury.

For the same reason, Mr. Donnelly has pled a compensable injury. The compensable injury is the subscription fee. He paid $69.99 on the promise of trustworthy, accurate, news that Iowans can depend on. He didn't get what Gannett represented it would provide him. Again, return to the example above of a non-news subscription product, like a HelloFresh box. Imagine a company, HelloFresh, promised at the point of sale to deliver delicious, fresh, ready-to-cook meals, a consumer relied on that promise, paid $69.99 for a subscription, and then three months later, received a box full of rotten food. HelloFresh could hardly get out of that by saying "subscription costs paid *before* the [food box shipped], those costs could not have been 'suffered as a result of his reliance upon' the [food box's quality], because they were paid before Plaintiff saw or could have relied on the [food]." *See* Gannett Br. 33.[7] Under Gannett's theory, no purchaser of a subscription product could recover for fraud if the company promised one thing, the person bought it, and then the person received something different months after the sale.

### B. Mr. Donnelly has stated an alternative claim for negligent misrepresentation in a reckless degree.

---

[7] The example also illustrates the difference between an opinion—you can't sue someone for promising "delicious" meals you end up not liking—and a fact—promising "fresh" food. Similarly, this is not a lawsuit over whether news is "fair and balanced," but whether the Defendants actually acted with great care to construct an accurate Iowa poll, and then delivered a poll with a 3.4% margin of error.

Mr. Donnelly recognizes that he must show actual malice, which means either knowing falsehood or reckless disregard. He does not know at this point which to plead because he lacks a window into the Defendants' minds. However, he has not "made up" a tort or crossed a constitutional line—he has pled "negligent misrepresentation to a reckless degree" to acknowledge that he must prove the traditional elements of negligent misrepresentation *and* recklessness. *Contra* Gannett Br. 34 n.8. *See* Selzer Br. 16.

### 1. Defendants are in the business of supplying information.

Gannett has a heavy burden to begin with: to say that the words at issue do not have their ordinary and obvious meaning. The tort of negligent misrepresentation is available because "those in the business of supplying information to others owe a duty to ensure that information is correct, accurate, and thorough." *Dinsdale Constr., LLC v. Lumber Specialties, Ltd.*, 888 N.W.2d 644, 650 (Iowa 2016). Gannett must show that a newspaper, the quintessential business supplying information to others, is not in fact such a business. To escape the obvious import of the language, Gannett argues this is in fact a term of art, and it only applies to professional advisors like doctors or accountants. Not so. *Dinsdale Construction* lays out the principles that "frame the parameters of the tort":

> We seek to distinguish advisory relationships from relationships that are adversarial and at arm's length. We seek to distinguish the sale of information as a product from information given incidentally as part of another transaction. We distinguish professional purveyors of information from those who work in another capacity. Finally, we seek to capture the concept of foreseeability within those circumstances that impose a duty of care.

*Id*. at 650-51.

Consider briefly each of those factors. Is a newspaper subscriber in an adversarial relationship with the newspaper, negotiating a tough business deal against one another, with each party responsible to ensure the other party isn't cutting corners or engaging in sharp dealing? No. Does Gannett sell information as a product or is the information incidental to its business? Yes; accurate, timely information is its core product—its why people subscribe. Does Gannett operate as a professional purvey of information? Yes, that's its reason for being, to provide information, and it hires experienced, college-educated, white-collar professionals to do that work for it. Is it foreseeable that others would rely on Gannett's information? Yes, the *Register invites* Iowans to depend on it for their news. Across the factors laid out by the Iowa Supreme Court, Gannett fits within the tort.

### 2. Mr. Donnelly has pled the proximate cause of his damage.

Once again, Gannett misconstrues Mr. Donnelly's theory to avoid liability. Br. 36. Mr. Donnelly paid $69.99 for a subscription for "trustworthy, accurate news." Then the Register ran the Iowa Poll, which was clearly untrustworthy, inaccurate news. Now Mr. Donnelly cannot have "confidence in the paper overall such that any past or future reporting can no longer be trusted." FAC 181. Mr. Donnelly has lost the overall value of his subscription because he has lost trust in the product. It's like buying a can of Mountain Dew after you read a news report that someone found a dead mouse in a can—you cringe every time you pop the can open, worried your can will be next, even if your rational brain tells you the chances are one in a million (not to be confused with the chances that Dr. Selzer's poll was an honest mistake, 1 in 3.5 million).

### C. Mr. Donnelly has pled a claim under the Iowa Consumer Fraud Act.

"[T]he Consumer Fraud Act was enacted in order to better protect consumers from fraud." *State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 621 (Iowa 1989). "The Iowa Consumer Fraud Act deems a variety of bad business practices unlawful." *State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 524 (Iowa 2005).

Here, the consumer fraud happened in the newspaper industry, but the fundamental principle is no different from other contexts: Gannett promised Mr. Donnelly one product when he purchased his subscription ("trustworthy, accurate news"—and in particular, trustworthy, accurate polling—and in even greater particular, accurate Iowa Polls—and in the highest particularity, this Iowa Poll with a 3.4 percent margin of error), and then they either knowingly or recklessly failed to deliver that product in a material way, blowing their biggest story of the year.

Gannett tries to nit-pick each element of the ICFA but loses the forest by focusing on each specific tree. The Iowa Supreme Court has emphasized that the ICFA is "a statute that serves a remedial purpose and must be interpreted liberally." *Cutty's*, 694 N.W.2d at 527. "The definitions presented in the Iowa Consumer Fraud Act are broad and comprehensive in order to effect the wide application of the Act." *Id*. at 526.[8] And in a similar case, "As a consumer protection statute, the terms of the [ICFA] should be interpreted liberally in favor of the consumer." *See Poller v. Okoboji Classic Cars, LLC*, 960 N.W.2d 496, 510 (Iowa 2021) (discussing motor vehicle consumer protection act).

Gannett begins by asserting Mr. Donnelly has not pled Gannett's practice was "deceptive" or "unfair." "Deceptive and unfair practices are distinct lines of inquiry . . . .

---

[8] Quoting approvingly from Note, *Consumer Protection Under the Iowa Consumer Fraud Act*, 54 Iowa L. Rev. 319, 325 (1968).

While a practice may be both deceptive and unfair, it may be unfair without being deceptive." *Cutty's*, 694 N.W.2d at 527 (internal citation omitted). Mr. Donnelly has pled both, but he only needs to state a viable theory under one to proceed: "The disjunctive language of the Iowa Act clearly requires proof of only one, not both, sorts of conduct." *Id.*

### 1. Defendants' conduct was deceptive.

"[D]eception occurs primarily (though not exclusively) at the formation stage of the contract." *Id.*[9] In other words, deceptive conduct generally describes how a company goes about selling its product. The ICFA defines deception as "an act or practice which has the tendency or capacity to mislead a substantial number of consumers as to a material fact or facts." Iowa Code § 714.16(1)(f). "To ascertain whether a practice is likely to mislead in the consumer protection context, courts typically evaluate the overall or 'net impression' created by the representation." *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 34 (Iowa 2013). Conduct may be deceptive prior to the individual plaintiff's purchase but revealed as such afterwards; the deceptive practices "statute applies to post-sale conduct when [a] sale gives rise to ongoing rights and obligations in the future." *Cutty's*, 694 N.W.2d at 529 (approvingly summarizing holding of *Hines v. Evergreen Cemetery Ass'n*, 865 S.W.2d 266, 269 (Tex. App. 1993)).

Here, Gannett promised Mr. Donnelly and all the other members of the putative class that "[t]he Iowa Poll is carefully constructed to ensure that it is accurate." FAC 56. That explanation continued, "The Des Moines Register and its polling partner, West Des Moines-based Selzer & Co., take great care in shaping each Iowa Poll. We pay careful

---

[9]  Quoting Michael M. Greenfield, *Consumer Law: A Guide for Those Who Represent Sellers, Lenders and Consumers* § 4.1, at 161 (1995).

attention to the design of the questions, when a poll will be in the field and even how we reach Iowans." FAC 57. When a company makes these kinds of claims to current and potential customers, and then fails to meet them, that is the basis for a deceptive-practices claim. *See Connick v. Suzuki Motor Co.,* 174 Ill. 2d 482, 504 (1996).[10]

### 2. Defendants' conduct was unfair.

"[U]nfairness occurs primarily (though not exclusively) with respect to the substance or performance of a contract." *Vertrue, Inc*., 834 N.W.2d at 34 (citations omitted). The term "unfair" is "dizzying in its generality." *Cutty's*, 694 N.W.2d at 525. For purposes of Iowa law, "an unfair practice is nothing more than conduct a court of equity would consider unfair." *Id*. (cleaned up). The term is "designed to infuse flexible equitable principles into consumer protection law so that it may respond to the myriad of unscrupulous business practices modern consumers face." *Id*. "A course of conduct contrary to what an ordinary consumer would anticipate contributes to a finding of an unfair practice." *Vertrue, Inc.*, 834 N.W.2d at 37.

"Determining what constitutes an unfair practice is a highly fact-specific inquiry that will depend upon the circumstances of each case." *Cutty's* at 525. (cleaned up). "In cases such as this one where the facts are disputed and open to different interpretations, a court should be especially wary to grant a motion for summary judgment," *id*., little less a motion to dismiss. In other words, what constitutes an "unfair" business practice is a question for a jury. *See Cutty's* at 528 ("A trier of fact may view this as unfair and in connection with the sale.").

---

[10] Illinois caselaw is especially persuasive authority because "[t]he Iowa Consumer Fraud Act was patterned after the Illinois Consumer Fraud Act." *State ex rel. Miller v. Hydro Mag, Ltd*., 436 N.W.2d 617, 621 (Iowa 1989).

### 3. Defendants' conduct fits the other elements of the statute.

Similarly, what constitutes a "material fact" is a question for the jury. *Contra* Gannett Br. 40, Selzer Br. 14. "A material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Connick*, 174 Ill. 2d at 505. Only a jury can determine whether the promises of accurate, trustworthy news was material to Mr. Donnelly or the putative class. *See Lucas v. Downtown Greenville Investors Ltd. Pshp.*, 248. Ill. App. 3d 37, 49 (2d Dist. 1996). On a motion to dismiss, it is reasonable to think that Mr. Donnelly and the putative class would act differently if they knew the *Register* would knowingly or recklessly publish a front-page story on its most important exclusive political news story of the year. Put differently, a subscriber would expect to rely on the newspaper's reputation for trustworthy, accurate reporting when deciding to subscribe. Again, materiality is a classic question that should go to a jury.

In sum, a jury could easily find it "unfair," "unscrupulous," and "contrary to what an ordinary consumer would anticipate" for a newspaper to publish news that it either knew or substantially expected to be inaccurate.

Gannett next argues the injury was not "unavoidable" by trying to shift the responsibility onto the consumer to avoid the alleged injury: "Plaintiff was free to read the poll and its underlying data and reach his own conclusion. . ." Br. 38. That is turning the inquiry (and purpose of the statute) on its head—as above, its blaming the consumer for failing to look under the hood to compare the engine wear-and-tear to the odometer reading. In many instances consumers could avoid being misled or treated unfairly if they read all the small print, hired a lawyer to explain the situation to them precisely, or listened more

closely to the script of the telemarketing call. But that is not the rule for consumer fraud. *See Vertrue, Inc.*, 834 N.W.2d at 36 (rejecting a similar argument). Instead, damage is unavoidable unless the consumer has a meaningful and direct opportunity to seek correction of the damage. *See Deng v. White*, 2018 Iowa Dist. LEXIS 110, *14 (Polk Cty. Dist. Ct. Aug. 28, 2018), *aff'd* 941 N.W.2d 360 (table), 2019 Iowa App. LEXIS 1066 (damage from disputed business practice was not unavoidable—in that case, the eviction "notice advises the recipient of the date, time, and location for a hearing to dispute the notice" in district court, including the charges and fees included in the notice).

Gannett continues on this theme for a while, misunderstanding Mr. Donnelly's argument. To be clear: the publication of the poll was not the deception. The deception was the promise to be accurate, and, in particular, accurate with polling in general and this poll especially. Alternatively, the unfair practice was to provide Mr. Donnelly and other subscribers a knowingly or recklessly flawed product. The statement of "fact" that is testable is whether the Poll was "accurate," and in particular accurate to within 3.4 percent. And the Poll is not an "opinion" about future election results—it is a factual statement based on statistical science of the here-and-now state of the electorate. The *Register's* statement was not "Kamala will win Iowa." It was "As of today, Kamala is leading in Iowa." The first statement is speculation. The second is a falsifiable statement of fact.

Dr. Selzer commits a similar mistake when defining the "merchandise" at issue. Selzer Br. 13-14. The Iowa Poll is not the merchandise—the newspaper is. And a newspaper fits within the capacious definition of "merchandise" in the statute: "any objects, wares, goods, commodities, intangibles, securities, bonds, debentures, stocks, real estate or services." Iowa Code § 714.16(1)(e). A newspaper is exactly one of "the everyday

goods Iowans purchase." Selzer Br. 13. Mr. Donnelly did not purchase the Poll—he purchased a subscription a newspaper which promised him trustworthy and accurate news.

Gannett is also wrong in its understanding of the nexus between the sale and the conduct. The "nexus" required by Iowa law is simply some connection between the way the product is advertised and the way it is provided in reality. The Iowa Supreme Court has made quite clear that "post-sale conduct may constitute an unfair practice." *Cutty's*, 649 N.W.2d at 526. *Accord Carreras v. Iowa DOT*, 977 N.W.2d 438, 448 (Iowa 2022).

In this case, the *Register* is "sold" as "trustworthy, accurate news" and the connection here is that the Register failed to provide "trustworthy, accurate news." Again, the Iowa Supreme Court has stressed that the "in connection with" statutory concept is supple and capacious and must be read in light of the overall purpose of the statutory scheme. *Id*. This Court would gut the statute—and act contrary to the Iowa Supreme Court's opinion in *Cutty's*—to impose a strict version of the "in connection with" concept to dismiss the claim here. As much as Defendants keep trying to argue that newspapers are somehow special, this Court must see this case like any consumer protection case. Any company that sold a product as one thing ("Fresh food from HelloFresh") and months later provided a flawed product (food that was rotten) would commit consumer fraud—it engaged in an unfair practice by providing the consumer something other than it promised publicly when it advertised and sold the consumer on the subscription.

Dr. Selzer tries to escape liability under the ICFA by arguing that Mr. Donnelly was not a "consumer" in any transaction with her. Br. 12. However, Illinois has interpreted its consumer protection statute (which was the model for Iowa's statute) to permit a "non-consumer" to bring a claim when there is a sufficient "consumer nexus," *i.e.*, conduct

"which otherwise implicates consumer protection concerns." *Kim v. State Farm Mut. Auto. Ins. Co.*, 2021 IL App (1st) 200135, P44. Here, there is obviously a consumer nexus—Dr. Selzer's work was provided to consumers by the *Register* as part of her longstanding partnership with the *Register*, and she knew her work would go to consumers (indeed, that was the point of the project; it's not like the *Register* paid for the poll and then made a decision on its own to provide the poll to its subscribers). Dr. Selzer's conduct here clearly "implicates consumer protection concerns"—she was a vital part of the decision to provide and publish a flawed product that misled consumers about the news.

Finally, Gannett misunderstands Iowa law regarding reliance and proximate cause. First, the original version of the ICFA explicitly removed the common-law requirement of reliance to broaden the scope of the Act to combat all sorts of bad behavior, even when consumers did not directly rely on the deceptive statement. *Hydro Mag, Ltd.*, 436 N.W.2d at 621. Second, Iowa uses a "but-for" definition for proximate cause under the ICFA: "To determine whether the defendant in fact caused the plaintiff's harm, we apply a but-for test. The but-for test implies a negative. If the plaintiff would have suffered the same harm had the defendant not acted negligently, the defendant's conduct is not a cause in fact of the harm. However, if the harm would not have occurred but-for the defendant's conduct, that conduct is a cause in fact of the plaintiff's harm." *Deng v. White*, 941 N.W.2d 360 (table), 2019 Iowa App. LEXIS 1066, *12-13 (Nov. 27, 2019) (cleaned up).

Here, the but-for cause of the damage to Mr. Donnelly and the putative class is clear: the *Register* delivered a materially defective product by failing to deliver the "trustworthy, accurate news" that they were promised. This is not a case where a jury must determine whether a broken car part was the "but for" cause of an accident that could also

have resulted from negligent driving. This is a straightforward claim for a product defective on its face as to every single consumer.

### D. Mr. Donnelly has stated a claim for professional negligence.

Gannett and Dr. Selzer completely misunderstand the *Birmingham* case on duty, the only element of Mr. Donnelly's professional negligence claim that Defendants contest. Gannett Br. 44; Selzer Br. 19 (discussing *Birmingham v. Fodor's Travel Pubs.*, 73 Haw. 359 (1992)). The *Birmingham* Court said that general circulation publications did not have a duty in negligence "unless the publisher authored or guaranteed the information." *Id*. at 367. The idea in *Birmingham* is that a publisher does not have an independent duty to readers to investigate the materials provided by its authors—the duty lies with the authors not to author dangerous materials. *See id*. at 370 (no duty for publisher "absent authorship or warranty of the publication's contents").[11] Other courts draw a similar line. *See, e.g., Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216, 1216 (D.Md. 1988); *Lewin v. McCreight*, 655 F. Supp. 282, 284 (E.D. Mich. 1987). The point here is that the *Register* is not the third-party vessel of information, but rather the first-party, directly responsible author of information, and thus the bearer of the duty to exercise ordinary care as to the information.

Seen in a slightly different light, when the *Register* chose to put its brand, its reputation, its "good housekeeping seal of approval" behind Dr. Selzer's work by running the Iowa Poll as the Register's official poll, it voluntarily assumed a duty of ordinary care for that product. "Most jurisdictions that have considered the issue find that an endorser

---

[11] In this sense, the principle is just like Iowa's law on publishers and advertisers. Third-party publishers do not have a duty to check the veracity of the documents authored by others that they publish, just like third-party newspapers do not have a duty to check the veracity of advertisements authored by others that they publish. *See supra* note 6.

voluntarily assumes a duty to use ordinary care in certifying a product. *See, e.g., Hanberry v. Hearst Corp.*, 276 Cal. App. 2d 680, 81 Cal. Rptr. 519 (Cal. Ct. App. 1969); *Hempstead v. General Fire Extinguisher Corp.*, 269 F. Supp. 109 (D. Del. 1967). Commentators agree that endorsers are subject to liability for negligence. *See, e.g.*, 5d. Prosser and Keeton on the Law of Torts, § 100, P5 (1984); 3d American Law of Products Liability, § 5:16 (1987)." *McAuslin v. Grinnell Corp.*, 1999 U.S. Dist. LEXIS 8659, *9 (E.D.La. June 8, 1999).

Here, the *Register* is not the publisher but the author—its contractor did the poll, its reporters authored the story about the poll, and it provided the poll not as a third-party publisher but as a first-party publisher. Thus, it has a duty of care as recognized in *Birmingham* and other cases.

Alternatively, the *Register* guaranteed or warrantied the poll's veracity both beforehand (FAC 56-57) and in the specific margin of error statement associated with the poll (FAC 55, 60). The *Register's* decision to "endorse" and "warranty" Dr. Selzer's work as its own constituted a voluntary assumption of ordinary care to those who rely on the Register's good opinion to guide their own views. *See Hanberry*, 276 Cal. App. 2d 680 (Good Housekeeping magazine as a publisher voluntarily adopted a duty of care by publishing its seal of approval in an article on a product). Under either conception, it has a duty to exercise ordinary care, which Mr. Donnelly alleges it failed to do here.

Gannett entirely misses the point of Mr. Donnelly's citation to the *Bank of Oregon v. Ind. News, Inc.*, 670 P.2d 616, 628 (Or. App. 1983) and its reliance on the Restatement of Torts. Gannett Br. 44-45. They are not cited to establish a duty (one element of the tort) but to establish that journalists are professionals with a knowable professional standard of care (FAC 171), which is another element of the tort. The fact that the Restatement made

that observation in the context of defamation does not change the import of the observation—that that journalists are professionals and have a knowable professional standard of care. Again, Mr. Donnelly has pled the elements and supporting factual allegations such that he can proceed with his claim for professional negligence.

The same arguments apply to Dr. Selzer's argument against duty on both Alternate Count I (negligent misrepresentation) and Count III (professional negligence). Dr. Selzer argues that she does not owe a duty to 8 billion people on planet Earth, Br. 18. Fair enough. Mr. Donnelly does not argue for an unlimited duty to the entire populace of the planet. He is asking for a limited duty to a specific class of persons, namely people who have paid to purchase a subscription to the *Des Moines Register*. As to those persons, Dr. Selzer voluntarily assumed a duty when she warrantied the accuracy of her poll, just as *Good Housekeeping* owed a duty to its subscribers when it warrantied particular products. *Hanberry*, 276 Cal. App. 2d 680. Such consumers are exactly the "limited but foreseeable class of users" (Selzer Br. 18, quoting *Burbach v. Radon Analytical Lab'ys, Inc.*, 652 N.W.2d 135, 138 (Iowa 2002)) who it is reasonable for the law to protect—Dr. Selzer knew her poll would be provided to the *Register's* subscribers and voluntarily assumed a duty as not to provide them a recklessly or intentionally flawed product, especially she put her reputation as a professional pollster and Ph.D. behind the margin-of-error statement.

### E. Mr. Donnelly has pled a claim for interference with voting.

Once again, Gannett misunderstands the law by asserting, "Iowa Law Does Not Recognize a Common Law Claim Against Defendants for 'Interference with the Right to Vote.'" Br. 45. Quite the opposite. *Lane v. Mitchell*, 133 N.W. 381 (Iowa 1911), permitted a plaintiff to go forward with an "action to recover damages, alleging malice on the part of

the defendants," for interfering with his right to vote. *Id*. at 382. Later, the Court says that the plaintiff was not limited to nominal damages; if he could prove his case, "the jury would have been warranted in awarding the plaintiff a substantial recovery." *Id*. at 143.

The Reporter of the Restatement reads *Lane* the same way: as establishing a tort in Iowa for interference with the political process. The Reporter's Notes to Section 865 of both the First and Second Restatement of Torts include *Lane* on the list of decisions "in support of this Section as to the right to vote and engage in the political process." This section, by the way, "describes a tort existing at common law." Restat. (2d) of Torts 865, cmt. a. It includes the use of "fraud" to discourage another from voting, even if the person does indeed end up voting. *Id*. Mr. Donnelly does not cite the Restatement as setting the rule for Iowa, but rather because the Restatement recognizes the rule Iowa has set for itself.

### F. Mr. Donnelly has stated a claim for civil conspiracy.

Because Mr. Donnelly has stated claims for the predicate torts, his claim for civil conspiracy and his request for punitive damages must also be permitted to proceed. In particular on civil conspiracy, he has pled the who (Dr. Selzer, the two journalists at the *Register* who wrote the poll stories, and the two editors who approved the stories, FAC 68-75 & 196), the what (a collective decision to publish a knowingly or recklessly false poll despite promises to consumers to provide accurate polling), and the when (approximately October 28 – November 2, 2024, FAC 197). These parties, he has alleged, had an agreement amongst themselves to publish a knowingly false product to mislead (harm) subscribers, including Mr. Donnelly, as to the accuracy of the news they were reporting (FAC 195 & 198). To the extent that the earlier torts fail specifically as to Dr. Selzer because the Court

disagrees with Mr. Donnelly about duty and privity, there can be no doubt she provided crucial assistance to the Gannett Defendants' tortious behavior.

## CONCLUSION

Dr. Selzer retired in the wake of the biggest miss in American polling history. Carolyn Hunter, executive editor of the *Register*, also retired in the weeks after the election. And the *Register* has apologized and promised to "do better" next time. That is all fine, but it is insufficient. If any company could evade a consumer-protection claim after selling a busted product by promising to "do better next time," we'd have no consumer protection cases. The *Register* should do better next time—and Mr. Donnelly wants a refund for the materially mistaken product he was already sold.

Robert R. Anderson
P.O. Box 4
Atlantic, Iowa 50022
(515) 382-1278
bobandersoniowan@gmail.com

Daniel R. Suhr (pro hac vice)
Center for American Rights
1341 W. Fullerton Ave., Suite 170
Chicago, Illinois 60614
dsuhr@americanrights.org

June 26, 2025