# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

|  |  |
|---|---|
| DENNIS DONNELLY, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DES MOINES REGISTER AND TRIBUNE CO., INC.; J. ANN SELZER; SELZER & COMPANY; and GANNETT CO., INC.,<br><br>Defendants. | Civil Case No. 4:25-cv-00150-RGE-WPK<br><br>**DEFENDANTS J. ANN SELZER AND SELZER & COMPANY'S REPLY TO PLAINTIFF'S CONSOLIDATED RESPONSE BRIEF IN OPPOSITION TO THE MOTIONS TO DISMISS**<br><br>**ORAL ARGUMENT REQUESTED** |

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ..............................................................................................................1

ARGUMENT ......................................................................................................................2

I.     The First Amendment Bars Claims for "Fraudulent News." .............................................. 2

      A.     Donnelly's Case Is Based on a False Premise of Product Liability........................ 3

      B.     "Fake News" Is Not a Category of Unprotected Speech. ...................................... 5

      C.     Donnelly's Attempt to Import Out of Context Defamation Principles Is Wrong and Substitutes the Exception for the Rule. ........................................... 9

      D.     Donnelly's Theory of Liability Has No Limiting Principle................................. 10

II.    Donnelly Fails to State a Claim Against Selzer. ............................................................. 11

      A.     Donnelly's ICFA Claim Is Divorced from the Statute's Text and Purpose............................................................................................................... 11

      B.     Donnelly's Negligent Misrepresentation and Professional Negligence Claims Remain Defective Because Selzer Undertook No Obligation to Plaintiff. .................................................................................. 13

      C.     Donnelly's Fraudulent Misrepresentation Argument Ignores the Selzer Defendants, the Elements of the Claim, and Common Sense.................... 16

      D.     Donnelly's Claims for Voting Interference and Civil Conspiracy Likewise Fail...................................................................................................... 18

CONCLUSION..................................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*281 Care Comm. v. Arneson*,
   638 F.3d 621 (8th Cir. 2011) ............................................................. 10

*281 Care Comm. v. Arneson*,
   766 F.3d 774 (8th Cir. 2014) ............................................................... 8

*Absolute Essence LLC v. Pub. Consulting Group LLC*,
   117 F.4th 1044 (8th Cir. 2024) .......................................................... 18

*Alm v. Van Nostrand Reinhold Co.*,
   480 N.E.2d 1263 (Ill. App. 1985) ...................................................... 16

*Blatty v. New York Times Co.*,
   728 P.2d 1177 (Cal. 1986) .............................................................. 6, 7

*Bose Corp. v. Consumers Union*,
   466 U.S. 485 (1984) ............................................................................ 6

*Brandt v. Weather Channel, Inc.*,
   42 F. Supp. 2d 1344 (S.D. Fla. 1999) .......................................... 11, 15

*De Bardeleben Marine Corp. v. United States*,
   451 F.2d 140 (5th Cir. 1971) ............................................................. 15

*Demuth Dev. Corp. v. Merck & Co.*,
   432 F. Supp. 990 (E.D.N.Y. 1977) .................................................... 11

*Dinsdale Constr., LLC v. Lumber Specialties, Ltd.*,
   888 N.W.2d 644 (Iowa 2016) ............................................................ 13

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ....................................................................... 5, 15

*Hanberry v. Hearst Corp.*,
   276 Cal. App. 2d 680 (Cal. Ct. App. 1969) ...................................... 16

*Hempstead v. General Fire Extinguisher Corp.*,
   269 F. Supp. 109 (D. Del. 1967) ....................................................... 16

*Hollander v. CBS News, Inc.*,
   2017 WL 1957485 (S.D.N.Y. 2017) .................................................... 8

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
   538 U.S. 600 (2003) ............................................................................ 7

*James v. Meow Media, Inc.*,
   300 F.3d 683 (6th Cir. 2002) ......................................................... 4

*Jones v. J.B. Lippincott Co.*,
   694 F. Supp. 1216 (D. Md. 1988) ................................................ 15

*Kim v. State Farm Mut. Auto. Ins. Co.*,
   199 N.E.3d 737 (Ill. App. 2021) ................................................... 12

*Lafayette v. Abrami*,
   No. 25-CV-00624 (Vt. Super. Ct. May 20, 2025) ......................... 8

*Leopold v. CIA*,
   987 F.3d 163 (D.C. Cir. 2021) ....................................................... 3

*Lewin v. McCreight*,
   655 F. Supp. 282 (E.D. Mich. 1987) ....................................... 15, 16

*Monitor Patriot Co. v. Roy*,
   401 U.S. 265 (1971) ....................................................................... 5

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ..................................................................... 10

*Roppo v. Travelers Companies*,
   100 F. Supp. 3d 636 (N.D. Ill. 2015) ........................................... 13

*Sain v. Cedar Rapids Comm. Sch. Dist.*,
   626 N.W.2d 115 (Iowa 2001) ....................................................... 14

*Smith v. California*,
   361 U.S. 147 (1959) ....................................................................... 4

*Stancik v. CNBC*,
   420 F. Supp. 2d 800 (N.D. Ohio 2006) ....................................... 15

*Stender v. Blessum*,
   897 N.W.2d 491 (Iowa 2017) ....................................................... 14

*Thrasher-Lyon v. Illinois Farmers Ins. Co.*,
   861 F. Supp. 2d 898 (N.D. Ill. 2012) ........................................... 12

*Tumminello v. Bergen Evening Rec., Inc.*,
   454 F. Supp. 1156 (D.N.J. 1978) ................................................ 15

*United States v. Alvarez*,
   567 U.S. 709 (2012) .............................................................. passim

*United States v. Kepler,*
    879 F. Supp. 2d 1006 (S.D. Iowa 2011) ................................................ 7

*Wash. League for Increased Transparency & Ethics v. Fox News,*
    2021 WL 3910574 (Wash. Ct. App. 2021) .................................... 8, 9, 11

*Winter v. G.P. Putnam's Sons,*
    938 F.2d 1033 (9th Cir. 1991) ............................................................ 3, 4

**Statutes**

Iowa Code
    § 714H.3........................................................................................... 11

**Other Authorities**

Michael Norwick,
    *The Empirical Reality of Contemporary Libel Litigation,* in *New York Times v.*
    *Sullivan*: The Case for Preserving an Essential Precedent (Mar. 2022) ................................... 2

*Representation*, Black's Law Dictionary (12th ed. 2024) ......................... 17

Sir Arthur Conan Doyle,
    *The Adventure of Silver Blaze* (1892), reprinted in *The Annotated Sherlock*
    *Holmes* 261, 277–80 (1967, Wm. S. Baring-Gould ed.) ......................... 3

**Rules**

Fed. R. Civ. P.
    11(a) ................................................................................................. 1

Fed. R. Civ. P.
    11(b)(2) ............................................................................................. 1

**Treatises**

Restatement (Second) of Torts
    § 538 (1977).................................................................................... 12

Restatement (Second) of Torts
    § 552 (Am. Law Inst. 1977).......................................................... 13, 14

## INTRODUCTION

After Defendant J. Ann Selzer's Motion to Dismiss explained that the First Amendment bars Donnelly's class action claims alleging "fake news" because they are antithetical to constitutional history and tradition, ignore decades of jurisprudence rejecting attempts to expand the limited categories of unprotected speech, and lack supporting precedent from any court in any jurisdiction, Selzer Defs.' Br. in Supp. Mot. to Dismiss ("Br."), ECF No. 33 at 4–12, Donnelly's response was to embrace the horror. *Of course* he can bring claims for "fake news" he huffs, just the same as if he were bringing a product liability action for a dead mouse in a can of Mountain Dew or rotten food from HelloFresh. Pl. Br. Opp. to Mots. to Dismiss ("Pl. Opp."), ECF No. 36 at 6, 30, 32, 38. But there is a problem. After filing both a copycat complaint and an amended complaint, a failed effort at an amicus brief in *Trump v. Selzer*, and now an overlength opposition to motions to dismiss, Donnelly remains unable to cite *a single case* that supports any of his theories of liability, while ignoring those that have rejected them. He is not even attempting to make "a nonfrivolous argument for extending, modifying, or reversing existing law," Fed. R. Civ. P. 11(b)(2), but insists his view *is* the law. [1] Sadly for him, there is no good faith argument for that proposition.

Donnelly tries to bolster his claims by overlooking holdings and reasoning in cases that explain why "fake news" has never been recognized as an unprotected speech category. *But see* Br. at 4–12. Instead, he concocts his theory by piecing together random dicta from cases involving other torts, Pl. Opp. at 6–8, arguing by negative implication from cases that *dismissed* claims, *e.g.*, Pl. Opp. at 10–11, 19, 40, and posing incredulous rhetorical questions meant to suggest the First

---

[1] Setting aside its substantive shortcomings, Donnelly's brief is also not signed by any attorney. *See* Fed. R. Civ. P. 11(a) (requiring every paper to be signed by an attorney or party).

Amendment can't possibly mean what it says or what multiple courts have held. *E.g.*, *id*. at 9, 21–22; *but see*, *e.g.*, *United States v. Alvarez*, 567 U.S. 709, 722 (2012). None of this adds up to a plausible argument for treating publishing an election poll as "fraud," no matter how much of an outlier its results may have been.

Donnelly's continuing inability to plead the statutory or common law elements of fraud means not just that his claims fail on their own terms; it has constitutional ramifications as well. Failure to satisfy those elements reinforces why the publication at issue here falls outside the unprotected category of fraud (or any other unprotected speech category). These categories are defined by "precise legal tests," Br. at 7–8, and Donnelly's mash-up of off-point authorities cannot transform a newspaper reader's frustration over a news story into claims for fraud or misrepresentation. Plaintiff's claims are barred by the First Amendment, as well as by statutory and common law standards, and this Court should dismiss them with prejudice.

## ARGUMENT

### I.     The First Amendment Bars Claims for "Fraudulent News."

Donnelly's argument that the First Amendment permits claims arising from "fake news" has a major problem: reality. If, as Plaintiff asserts, the law has always allowed lawsuits against fake news reporting and election coverage, then where are the cases? A Media Law Resource Center survey of case filings estimated that 1,871 libel cases were filed in federal courts between 1970 and 2020.[2] No doubt state courts saw thousands more during this period. And the number

---

[2] Michael Norwick, *The Empirical Reality of Contemporary Libel Litigation,* in *New York Times v. Sullivan*: The Case for Preserving an Essential Precedent, at 115 (Mar. 2022) (*available at* https://medialaw.org/issue/new-york-times-v-sullivan-the-case-for-preserving-an-essential-precedent [perma.cc/L335-6XKP]).

alleging fake news in that 50-year span? Nearly zero. The absence of cases alleging fraudulent news is the dog that didn't bark.[3]

This void is remarkable only if you accept Donnelly's reading of the law. Given that there is no such thing as a valid claim for "fake news," one should *expect* the number to be zero (or at least near zero, assuming the likely existence of a few clueless pro se litigants). But as Donnelly imagines the law, such claims are par for the course, so the cases should be out there. They are not, of course, because his argument is deeply flawed. News organizations are not subject to product liability claims for the information they publish, and "fake news" is a political slogan, not a category of unprotected speech any court has recognized. Donnelly's assumption that he can expand defamation principles to impose liability for general false statements has met only rejection in the Supreme Court. *Alvarez*, 567 U.S. at 721–22. And for good reason: his theory has no limiting principles or logical stopping point.

### A.  Donnelly's Case Is Based on a False Premise of Product Liability.

Donnelly's entire argument flows from the false premise that the Court can treat this case akin to a standard products liability action. Pl. Opp. at 40 ("This is a straightforward claim for a product defective on its face."). So desperate is he to frame the case this way that the term "product" appears more than thirty times in his opposition. *Id*. at 5, 6, 7, 9, 10, 12, 30, 31, 32, 33, 34, 37, 38, 39, 40, 41, 42, 43, 44. This argument is made—repetitively—entirely by confident assertion, without reference to any case law. This is because no such authority exists. As the Ninth Circuit observed in *Winter v. G.P. Putnam's Sons*: a "book containing Shakespeare's sonnets consists of two parts, the material and the print therein, and the ideas and expression thereof. The

---

[3] Sir Arthur Conan Doyle, *The Adventure of Silver Blaze* (1892), reprinted in *The Annotated Sherlock Holmes* 261, 277–80 (1967, Wm. S. Baring-Gould ed.); *see Leopold v. CIA*, 987 F.3d 163, 167 n.3 (D.C. Cir. 2021) (recounting the origin of the idiom).

first may be a product, but the second is not." 938 F.2d 1033, 1034 (9th Cir. 1991); *accord James v. Meow Media, Inc.*, 300 F.3d 683, 701 (6th Cir. 2002) ("The video game cartridges, movie cassette, and internet transmissions are not sufficiently 'tangible' to constitute products in the sense of their communicative content.").

In *Winter*, the Ninth Circuit held that the publisher of *The Encyclopedia of Mushrooms* could not be held liable for false statements in the book when purchasers became critically ill after ingesting poison mushrooms in reliance on its representations. 938 F.2d at 1034. The Ninth Circuit rejected various theories for imposing liability including products liability, breach of warranty, negligence, negligent misrepresentation, and false representation. *Id*. The court explained that products liability law is "focused on the tangible world and do[es] not take into consideration the unique characteristics of ideas and expression." *Id*. It declined "to expand products liability law to embrace the ideas and expression in a book," and could identify no other court "that has chosen the path to which the plaintiffs point." *Id*. at 1036; *see also id* n.6 (collecting cases). The court rejected plaintiff's other theories by holding the publisher had "no duty to investigate the accuracy of the contents of the books it publishes," adding "[w]ere we tempted to create this duty, the gentle tug of the First Amendment and the values embodied therein would remind us of the social costs." *Id*. at 1037; *see also id* n.8 (collecting numerous cases).

Donnelly's propensity to weave tales of Mountain Dew and HelloFresh is no match for the actual law that governs this area. As the Supreme Court observed in *Smith v. California*, 361 U.S. 147, 152–53 (1959), there is "no specific constitutional inhibition against making the distributors of [f]ood the strictest censors of their merchandise, but the constitutional guarantees of the freedom of speech and of the press stand in the way of imposing a similar requirement on the bookseller."

**B.     "Fake News" Is Not a Category of Unprotected Speech.**

There has been no cognizable claim for "false" news in American law since the Alien and Sedition Acts expired in 1800, and Plaintiff's claims fall within no recognized exception to the First Amendment. Br. at 4–6. Donnelly disputes this, claiming it is the Defendants who are asking this Court to "create a new First Amendment exception" because there exist "long-standing, well-recognized causes of action under Iowa state law, like intentional or negligent misrepresentation and consumer fraud." Pl. Opp. at 6–7. So there *must* be a recognized cause of action for "fake news," he insists, because, after all, "what are claims for defamation and libel?" *Id*. at 9. Answering his own rhetorical question, Donnelly concludes "[t]hey are claims that news outlets published fake news about a person, thus damaging their reputation. So, at a minimum, there can be some claims for 'fake news' in a newspaper." *Id*. at 9. And he generalizes the concept to assert that "*any* applicable civil claim can be asserted against a newspaper for 'fake news,' because what is important is not the type of claim asserted, but the standard applied to it." *Id*. (emphasis in original).

Donnelly misreads the law entirely. The "type of claim asserted" absolutely matters because if allegations fall outside a recognized First Amendment exception, there is no cognizable cause of action *at all*, and the Court never gets to the question of "the standard applied to it," whether reckless disregard or anything else. This is not a defamation action, and Donnelly could not have pled it as one. Nor is it for false light privacy or product disparagement. And, for reasons fully set forth in the motion to dismiss but never answered, it is not fraud, either. Br. at 7–11.

Donnelly's main tactic is simply to raise strawman arguments, observing that newspapers do not receive "absolute immunity," nor does "speaking about an election." Pl. Opp. at 8–9. This is true, but *only* if the claims target (and prove up) a traditionally unprotected category of speech, as do *all* the cases Donnelly cites. *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341–42 (1974) (defamation); *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271 (1971) (defamation claim

involving a political candidate). As the Supreme Court stressed in *Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984)—another case Donnelly cites despite the fact it rejected the plaintiff's claims—it is vitally important "that the communication in issue is within one of the few classes of 'unprotected' speech," *id*. at 503, and courts conduct an independent review to ensure "that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited," *id*. at 505.

Thus, as explained in the motion, a plaintiff cannot evade the First Amendment by attempting to plead around it. Br. at 5–6, 9–11. In response, Donnelly cites *Blatty v. New York Times Co*., 728 P.2d 1177, 1182 (Cal. 1986), for the proposition that "constitutional protection does not depend on the label" in support of the startling assertion he may bring "any applicable civil claim" so long as he asserts "falsity," Pl. Opp. at 9. This gets *Blatty* backwards and illustrates Donnelly's root problem of trying to build a case based on a scattered collection of out-of-context one-liners.

In *Blatty*, the California Supreme Court rejected an author's claims for negligent interference with prospective economic advantage, intentional interference with prospective economic advantage, negligence, and trade libel based on an allegation the *Times* failed to include his novel on its best-seller list. *Blatty*, 728 P.2d at 1178. The court held that Blatty could not use "creative pleading" to avoid constitutional review: "Although the limitations that define the First Amendment's zone of protection for the press were established in defamation actions, they are not peculiar to such actions but apply to all claims whose gravamen is the alleged injurious falsehood of a statement." *Id*. at 1182, 1184. More to the point, because the *Times'* publication was not

unprotected speech, the court held the author failed to state claims on which relief could be granted, and that the federal and state constitutions "establish an absolute bar to liability." *Id*. at 1181.

Among other things, the court held the *Times'* book list was not a publication "of and concerning" the plaintiff, which is a constitutional threshold requirement for pleading defamation. *Id.* at 1182–85. This was just a matter of logic: a review that does not mention an author or his book cannot be "of and concerning" him. Accordingly, the claim failed at the threshold and could not be considered defamatory, so it was unnecessary even to consider whether the article might have been published with "actual malice" or fell within Blatty's other tort theories. *Id.* at 1182, 1184–85. The same is true here, where Donnelly's allegations cannot add up to fraud. Br. at 9–11. As the Supreme Court has made clear, "[s]imply labeling an action one for 'fraud' … will not carry the day," and any attempt to bring a fraud claim without satisfying its essential elements "would support swift dismissal." *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 617 (2003).

Contrary to Donnelly's generalized view, fraud has "[e]xacting" requirements in order "to provide sufficient breathing room for protected speech," so a "[f]alse statement alone" cannot trigger liability. *Id.* at 620; *see United States v. Kepler*, 879 F. Supp. 2d 1006, 1009 n.1 (S.D. Iowa 2011) (finding that "fraud is not mere lying," because lying, by itself, "lacks an essential element of a fraud claim: proof of detrimental reliance or actual harm to the plaintiff") (citing *Madigan*, 538 U.S. at 620–21). Fraud is confined to false claims made to "secure moneys or other valuable considerations [such as] offers of employment." *Alvarez*, 567 U.S. at 723. *See also id*. at 734 (Breyer, J., concurring) ("Fraud statutes … typically require proof of a misrepresentation that is material, upon which the victim relied, and which caused actual injury."). To extend fraud liability "absent any evidence that the speech was used to gain a material advantage" would unleash "a

broad censorial power unprecedented in this Court's cases or in our constitutional tradition." *Id*. at 723. And, as explained in detail, Donnelly fails even to plead the prerequisites for claims of fraud or misrepresentation. Br. at 12–21; *see infra* § II(A)-(C).

The Eighth Circuit has explained why fraud principles cannot be stretched, as Donnelly proposes here, to reach political speech and election commentary. *281 Care Comm. v. Arneson*, 766 F.3d 774, 784–85 (8th Cir. 2014) (invalidating Minnesota law prohibiting knowingly false statements about ballot measures). Donnelly very briefly acknowledges *Arneson's* holding that the First Amendment does not permit penalizing knowingly or recklessly false campaign speech but waves it away by claiming defamation law (and somehow by extension, his claims) serve "important private interests." Pl. Opp. at 12. This is both non-responsive and a mischaracterization of *Arneson*, which followed *Alvarez* and observed that "false statements, as a general proposition, are not beyond constitutional protection," and "there is no free pass around the First Amendment." *Arneson*, 766 F.3d at 783. The Minnesota law specifically sought to prevent a "fraud on the electorate," *id*. at 786, yet the court held it was subject to and failed strict scrutiny. *Id*. at 782–96. *See* Br. at 9 (collecting cases invalidating similar laws). *Arneson* is fatal to Donnelly's claims.

This is why courts have promptly dismissed those few cases where plaintiffs filed fraud or misrepresentation claims against media organizations because of their news reports. *E.g.*, *Hollander v. CBS News, Inc.*, 2017 WL 1957485 (S.D.N.Y. 2017), *vacated and aff'd on other grounds sub nom. Hollander v. Garrett*, 710 Fed. Appx. 35 (2d Cir. 2018); *Wash. League for Increased Transparency & Ethics v. Fox News*, 2021 WL 3910574 (Wash. Ct. App. 2021); *Lafayette v. Abrami*, No. 25-CV-00624 (Vt. Super. Ct. May 20, 2025). Donnelly insists these decisions cannot be right, asserting they are inconsistent with other cases that have applied the actual malice standard to non-defamation torts, Pl. Opp. at 11–12, but this misses the point. No

one has disputed that certain narrowly-defined categories of unprotected speech exist, or that courts have applied an actual malice standard in those cases to avoid evasions of the First Amendment. The point is that "fake news" does not fall into an unprotected category, and Donnelly cannot shoehorn his allegations into the specifically limited category of "fraud." *Wash. League for Increased Transparency & Ethics*, 2021 WL 3910574 at *4–5 (rejecting analogies to defamation and fraud and holding "none of the limited exceptions to the First Amendment apply to the false statements made by Fox hosts and guest commentators") (citing *Alvarez*, 567 U.S. at 717).

### C. Donnelly's Attempt to Import Out of Context Defamation Principles Is Wrong and Substitutes the Exception for the Rule.

No case law supports Donnelly's argument that "any applicable civil claim can be asserted against a newspaper for 'fake news'" so long as he pleads actual malice, Pl. Opp. at 9, and it is foreclosed by *Alvarez*, which held there is no general First Amendment exception for "false speech," *Alvarez*, 567 U.S. at 721–22. In *Alvarez*, the Supreme Court explained why it is illegitimate to mix and match theories involving different unprotected categories, *id.* at 722, but Donnelly misreads *Alvarez* as standing for the proposition that "the First Amendment's exception for 'defamation' is not a strict category but encompasses any action for 'legally cognizable harm associated with a false statement,'" Pl. Opp. at 12. This is the *opposite* of what the Court held.

The *Alvarez* Court reviewed various decisions involving defamation, intentional infliction of emotional distress, and false commercial speech, and observed that the Court "has never endorsed the categorical rule … that false statements receive no First Amendment protection." *Alvarez*, 567 U.S. at 719. More importantly, the Court explained why reasoning from the defamation context was inappropriate to create a general exception, as Donnelly seeks to do here. It observed the "knowing falsity and reckless disregard" standard drawn from defamation law exists to ensure the *narrowness* of that exception. *Id.* at 719–20. It refused to extend defamation

liability rules to false statements generally because doing so would "expand[] liability in a different, far greater realm of discourse and expression." *Id*. at 719. Doing so "inverts the rationale for the exception" and, as the Court concluded, "[a] rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it." *Id*. at 719–20.[4]

Donnelly's generalized approach to falsity, if accepted, would have far-reaching adverse consequences. Had it been the law in the era of *New York Times v. Sullivan,* the Southern officials who tried to use defamation law to crush the civil rights movement would have been able simply to recast their claim as some other available cause of action involving falsity. Since that case arose from an editorial advertisement that included some erroneous statements, the officials might have shifted their assault by using Alabama's deceptive practices law or some common law equivalent as Donnelly is attempting in this case. *See generally N.Y. Times Co. v. Sullivan,* 376 U.S. 254 (1964). And, just as here, they likely would have employed causes of action that require only a showing of negligence, undermining the *Sullivan* rule entirely. This hypothetical serves both as an explanation for why Donnelly's theory of the case is wrong and as a cautionary warning against accepting it.

### D. Donnelly's Theory of Liability Has No Limiting Principle.

If Donnelly's view of the law were correct, Iowa farmers would have a cause of action against the local weatherman after an unexpected freeze damages crops. Iowa sports betters would have a cause of action against the local sports columnist whose "Lock of the Week" fumbles an overtime touchdown. And, in 1948, millions of Chicagoans would have had a class action against

---

[4] Relevant here, the Eighth Circuit pointedly rejected applying defamation principles to "false" political speech because it would create "an unprecedented and vast" First Amendment exception. *281 Care Committee v. Arneson*, 638 F.3d 621, 634–35 (8th Cir. 2011) (quotation omitted).

the *Chicago Tribune* after it mistakenly projected Thomas Dewey would defeat Harry Truman. The potential litigation opportunities for political bandwagon-chasing lawyers would be endless.

But Plaintiff's theory is not the law. *See, e.g.*, *Brandt v. Weather Channel, Inc.*, 42 F. Supp. 2d 1344, 1345–46 (S.D. Fla. 1999), *aff'd*, 204 F.3d 1123 (11th Cir. 1999) (rejecting a "novel and unprecedented expansion of the scope of tort law" seeking to hold the Weather Channel liable for damage caused by an incorrect forecast); *Demuth Dev. Corp. v. Merck & Co.*, 432 F. Supp. 990 (E.D.N.Y. 1977) (rejecting "novel claim" against chemical encyclopedia publisher for "willful misrepresentation" of the toxicity of a chemical used in purchaser's equipment that it alleged scared away customers); *Wash. League for Increased Transparency & Ethics*, 2021 WL 3910574 (dismissing consumer fraud claims against Fox News for COVID-19 coverage). No court, anywhere, has accepted Donnelly's view. The First Amendment is why.

## II.   Donnelly Fails to State a Claim Against Selzer.

### A.   Donnelly's ICFA Claim Is Divorced from the Statute's Text and Purpose.

Donnelly fails to support an ICFA claim against Selzer because he still does not allege he purchased or leased anything from Selzer. The ICFA is a consumer fraud statute providing a cause of action for "consumers" who are victims of "deception" and "fraud" "in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3. Donnelly points to no "deception" or "fraud" directed by Selzer to him "*in connection*" with an advertisement, sale, or lease, which is what the statute requires. Nor could he. Plaintiff alleges he subscribed to the Des Moines Register long before the November 2024 poll. Am. Compl. ¶ 8, ECF No. 22.

Donnelly fares no better with IFCA's other elements. Regarding the requirement to plead a fraudulent "material fact," he does not mention Selzer *at all*. Pl. Opp. at 36. And even then, all he offers is that "what constitutes a 'material fact' is a question for the jury." *Id.* But materiality relates to whether the asserted representation is sufficiently important to the transaction that it

would induce a buyer into making a purchase, not whether the representation *exists*. *See* Restatement (Second) of Torts § 538 (1977). And Donnelly points to no representation by Selzer to him related to the advertisement, sale, or lease of consumer merchandise, much less a material one.

Next, Donnelly does not explain how a political opinion poll commissioned by a newspaper—and never sold to consumers—can qualify as "consumer merchandise." As he frankly admits, the "Iowa Poll is not the merchandise—the newspaper is." Pl. Opp. at 37. That necessarily concedes the ICFA claim against Selzer, because he does not allege Selzer made representations to him *about the newspaper*—the product he purchased.

Unable to allege he was a "consumer" with respect to any advertisement, sale, or lease by Selzer, Donnelly points the Court to Illinois' consumer fraud statute which, he says, allows "'non-consumer[s]' to bring a claim when there is a sufficient 'consumer nexus.'" *Id.* at 38–39. But he does not supply, and we cannot find, any instance of an Iowa state or federal court expanding the ICFA's reach by using the "consumer nexus test" or a similar theory. And the sole case Donnelly cites, *Kim v. State Farm Mut. Auto. Ins. Co.*, held the plaintiff there *lacked* standing because she was a "third-party beneficiary of an insurance policy … and courts interpreting Illinois law have consistently rejected this theory of standing." 199 N.E.3d 737, 751 (Ill. App. 2021) (collecting cases). Plaintiff offers nothing more than a bank-shot suggestion he was a third-party beneficiary of an opinion poll the *Register* commissioned from Selzer.

What is more, though Donnelly professes to invoke the consumer nexus test, he neglects to set out its four factors, much less explain how he satisfies them. *See Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 861 F. Supp. 2d 898, 912 (N.D. Ill. 2012) (explaining a plaintiff must show how his actions were "akin to a consumer's actions," how the "defendant's representations …

concerned consumers other than" the plaintiff, how the defendant's action "involved consumer protection concerns," and "how the requested relief would serve the interests of consumers."). The Court should not have to craft Donnelly's argument for him. In any event, the consumer nexus test is a narrow exception applicable when a third party's representations fraudulently induce the plaintiff into a transaction or otherwise cause tangible financial harm. *See, e.g.*, *Roppo v. Travelers Companies*, 100 F. Supp. 3d 636, 651 (N.D. Ill. 2015) (collecting cases). It has no application here.

The lack of a nexus between Donnelly and Selzer is highlighted in Plaintiff's discussion of "deception" and "unfairness." Donnelly argues (in opposing the Press Defendants' dismissal motion) that, "Deception occurs primarily (though not exclusively) at the formation stage of the contract." Pl. Opp. at 34. He does not even *mention* Selzer in this argument—nor could he, because Plaintiff does not plead a contract with Selzer. Likewise with "unfair" conduct. Donnelly acknowledges "unfairness occurs primarily (though not exclusively) with respect to the substance or performance of a contract," *id.* at 35, again demonstrating he has no ICFA claim against Selzer with whom he has no contract.

**B.**   **Donnelly's Negligent Misrepresentation and Professional Negligence Claims Remain Defective Because Selzer Undertook No Obligation to Plaintiff.**

Donnelly's response likewise does not fix the fundamental deficiencies with his negligent misrepresentation and professional negligence claims. On the first element of negligent representation (duty of care), Donnelly assumes his own premise: that Selzer and her company are in the "business of supplying information" within the meaning of Iowa law. Pl. Opp. at 31–32 (citing *Dinsdale Constr., LLC v. Lumber Specialties, Ltd.*, 888 N.W.2d 644, 649 (Iowa 2016)). They are not. The Iowa Supreme Court case on which Donnelly relies explained (on the same page Plaintiff cited) the tort covers only those who "suppl[y] false information *for the guidance of others in their business transactions*." *Id.* (quoting Restatement (Second) of Torts § 552, at 126–27 (Am.

Law Inst. 1977)) (emphasis added). Donnelly does not allege (nor could he) that Selzer supplied its opinion poll "for the guidance of others in their business transactions." Pl. Opp. at 31–32. His focus on the difference between "advisory" and "adversarial" relationships is therefore irrelevant. *Id.* Donnelly had *no relationship* with Selzer—advisory, adversarial, or otherwise.

Selzer's motion explained Donnelly's claim also fails on negligent misrepresentation elements (2), (4), (5), and (6), because he does not allege that: Selzer supplied information to Plaintiff for the purpose of informing a decision (2), Selzer supplied *him* information she reasonably should have known to be false (4), he relied on Selzer's poll to determine a course of action (5), or that he suffered damages due his reliance on Selzer to pursue that action (6). Br. at 19. His response *ignores every element* as to Selzer in apparent hope the Court will not notice.

Donnelly's professional negligence claim fares no better. As an initial matter, negligent misrepresentation and professional negligence differ only in the type of duty (reasonable care for negligent misrepresentation versus the standard of care of a similarly situated professional for professional negligence). *Compare Sain v. Cedar Rapids Comm. Sch. Dist.*, 626 N.W.2d 115, 122–25 (Iowa 2001), *with Stender v. Blessum*, 897 N.W.2d 491, 502–06 (Iowa 2017). Donnelly's failure to discuss and defend the *elements* of his negligent misrepresentation claim likewise dooms his professional negligence claim because he ignores the elements for that, too.

For both claims, Donnelly still confuses the concept of duty and how it is created. Newspapers (and their vendors) do not owe a legal duty to members of the general public, like Plaintiff, simply because he purchased a newspaper with a "flawed story." Pl. Opp. at 7. As the Fifth Circuit explained: "If a newspaper prints incorrect information, if a scientist publishes careless statements in a treatise, or if an oil company prints an inaccurate road map, they cannot be 'liable' to those of the general public who read their works absent some special relationship

between [the] writer and reader." *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 148 (5th Cir. 1971); *see also Stancik v. CNBC*, 420 F. Supp. 2d 800, 808 (N.D. Ohio 2006) ("[N]ews broadcasters do not owe the general public a heightened duty of care."); *Brandt*, 42 F. Supp. 2d at 1345–46 (refusing to "impose on a television broadcaster of weather forecasts a general duty to viewers"). As another federal court explained, "[a]ccuracy in news reporting is certainly a desideratum, but the chilling effect of imposing a high duty of care on those in the business of news dissemination and making that duty run to a wide range of readers or TV viewers would have a chilling effect which is unacceptable under our Constitution." *Tumminello v. Bergen Evening Rec., Inc.*, 454 F. Supp. 1156, 1159–60 (D.N.J. 1978). Without duty, there is no liability, professional or otherwise.

The cases Donnelly cites (Pl. Opp. at 40) fall into two inapposite buckets: specialty periodicals and companies that independently test and certify consumer products. In *Jones v. J.B. Lippincott Co.*, the district court held the publisher of a medical textbook was not liable to a nursing student who used advice in the book contributed by a third-party author to self-treat. 694 F. Supp. 1216, 1217 (D. Md. 1988). Far from helping Donnelly, the *Jones* court explained that "no case has extended [strict product liability] to the dissemination of an idea or knowledge in books or other published material," and doing so "could chill expression and publication," a result "inconsistent with fundamental free speech principles." *Id.* (citing *Gertz*, 418 U.S. at 323). Likewise in *Lewin v. McCreight*, the court held a publisher of a metalworks book was not liable when mordant mixing instructions contributed by a third-party caused an explosion. 655 F. Supp. 282, 284 (E.D. Mich. 1987). Though *Lewin* deferred addressing the First Amendment issues (because the plaintiff could not establish the elements of their claim), it pointed to an Illinois Court of Appeals decision

warning of the danger to free expression presented by imposing liability on newsgatherers. *Id.* at 284 n.2 (citing *Alm v. Van Nostrand Reinhold Co.*, 480 N.E.2d 1263 (Ill. App. 1985)).

Donnelly then relies on cases standing for the unremarkable proposition that when a company's business is independently testing and *guaranteeing* consumer products, they are held to an ordinary duty of care if a consumer buys the product relying directly upon the guarantee and suffers harm. Pl. Opp. at 41–42. In *Hanberry v. Hearst Corp.*, the plaintiff purchased shoes after *Good Housekeeping* gave them its "Consumers' Guaranty Seal" warranting that "the advertising claims made for [products] in our magazine are truthful" and promising "[i]f the product or performance is defective, Good Housekeeping guarantees replacement or refund to consumer." 276 Cal. App. 2d 680, 682 (Cal. Ct. App. 1969). The court found the publisher liable, explaining that "in voluntarily assuming" a business relationship with the plaintiff by independently testing and guaranteeing products, "public policy imposes upon it the duty to use ordinary care." *Id.* at 684. Donnelly's second case, *Hempstead v. General Fire Extinguisher Corp.*, is even further afield because it addressed the liability of a company that independently tested and certified the design of fire extinguishers. 269 F. Supp. 109 (D. Del. 1967).

Donnelly tries to transform out-of-state, irrelevant, decades-old cases involving independent warranties of consumer products into a blowtorch to the First Amendment's protection for a free press. That this is the best he can provide the Court speaks volumes.

### C. Donnelly's Fraudulent Misrepresentation Argument Ignores the Selzer Defendants, the Elements of the Claim, and Common Sense.

Donnelly's resistance functionally concedes his fraudulent misrepresentation claim against Selzer. Despite devoting seven pages to contesting the Press Defendants' arguments, it mentions Selzer with respect to the elements of the claim exactly once, with the conclusory allegation that Selzer "made representations specific to this particular poll." Pl. Opp. at 25. First, this confuses

what a "representation" is in the context of a fraud claim. A representation is not "something someone said," but rather a statement *to the plaintiff* by the defendant in the context of attempting to persuade the plaintiff to enter a transaction. *See* Black's Law Dictionary (12th ed. 2024) (Representation: "A presentation of fact – either by words or by conduct – made to induce someone to act, esp. to enter into a contract.") Donnelly was a pre-existing subscriber to the *Register* in November 2024, Am. Compl. ¶ 8, ECF No. 22, and *never* bought anything from Selzer. He, therefore, cannot explain how Selzer released the poll results to *subsequently* "induce" him into a contract. So Donnelly's "fraud" claim fails at the starting gate because it is not a fraud claim; it has nothing to do with a false representation designed to induce a transaction.

Selzer's motion explained how Donnelly's Complaint also failed to plead elements (3), (5), (6), (7), and (8) of fraudulent misrepresentation against Selzer. Br. at 15–16. Plaintiff's response? Silence. He does not address Selzer's arguments at all. He still fails to allege that: Selzer's "representation" to him was "material" to a transaction he otherwise would not have entered (3), Selzer intended to deceive Donnelly into entering a transaction with that "representation" (5), Donnelly "acted in reliance on the truth of the representation and was justified in relying on the representation" (6), or that Selzer's "representation" caused him harm (7 and 8).

Briefly setting aside that Donnelly failed to address seven out of the eight fraudulent misrepresentation elements as to Selzer, his primary complaint with Selzer's poll appears to be that it did not weight results "in line with historic exit poll data." Pl. Opp. at 27. Had it done so, Donnelly alleges, Selzer "would have found Trump substantially ahead." *Id.* But he acknowledges that Selzer's poll stated "contacts weighted by age, sex, and congressional district" with no mention of historic exit poll data. *Id.* Plaintiff cannot profess confusion (much less intentional fraud) related to Selzer's poll not weighting based on historic exit poll data when the poll clearly

stated what it *did* weight on, and "historic exit poll data" was not there. Donnelly is suing not upon what Selzer represented this poll to be, but what he, as Monday-morning quarterback, believes it *should* have included to reach the "right" result. That is not how fraud works.

### D. Donnelly's Claims for Voting Interference and Civil Conspiracy Likewise Fail.

Selzer's motion explained that Iowa's narrow common law claim for voting interference is limited to instances when someone actively and intentionally prevents (or tries to prevent) a voter from casting a ballot. Br. at 20–21. In response, Donnelly ignores Selzer's brief entirely. He focuses his energy solely on contesting the Press Defendants' position that Iowa does not recognize the claim. Pl. Opp. 42–43. This fails to address, much less rebut, Selzer's explanation that, to the extent the Iowa Supreme Court's 1911 *Lane* decision recognized the tort at all, Plaintiff's allegations are nowhere near satisfying it or the Restatement's definition of the claim. Br. at 20–21.

Finally, Donnelly's civil conspiracy claim is defective, if for no other reason than he has not plead a predicate tort, as explained above. *See Absolute Essence LLC v. Pub. Consulting Group LLC*, 117 F.4th 1044, 1048 (8th Cir. 2024) ("Without an underlying tort, there can be no conspiracy.") What is more, Donnelly's attempt to support the necessary conspiracy contradicts his own brief. He insists Defendants "had an agreement amongst themselves to publish a knowingly false product to mislead (harm) subscribers." Pl. Opp. at 43. But 23 pages earlier, he insists, "Mr. Donnelly has not pled <u>anything</u> yet about the motives of Dr. Selzer or the *Register*." *Id.* at 20 (emphasis in original). The Court should accordingly dismiss the claim.

### CONCLUSION

Donnelly's resistance contains one statement that is undeniably true: "This case should be simple." Pl. Opp. at 7. Indeed it should be, as he pleads claims no court has ever upheld and which

the First Amendment does not permit, and he fails even to allege the necessary elements thereof.

Defendants J. Ann Selzer and Selzer & Company respectfully request this Court dismiss Plaintiff's

Complaint with prejudice and without leave to refile.


Dated: July 7, 2025                                    Respectfully Submitted,

                                                       /s/ *Robert Corn-Revere*                        .
                                                       Robert Corn-Revere*†
                                                          (DC Bar No. 375415)
                                                       Conor T. Fitzpatrick*
                                                          (Mich. Bar No. P78981)
                                                       FOUNDATION FOR INDIVIDUAL
                                                          RIGHTS AND EXPRESSION (FIRE)
                                                       700 Pennsylvania Ave., SE; Suite 340
                                                       Washington, DC 20003
                                                       (215) 717-3473
                                                       bob.corn-revere@thefire.org
                                                       conor.fitzpatrick@thefire.org

                                                       Greg Greubel
                                                          (Iowa Bar No. AT0015474)
                                                       Adam Steinbaugh*
                                                          (Cal. Bar No. 304829)
                                                       FOUNDATION FOR INDIVIDUAL
                                                          RIGHTS AND EXPRESSION (FIRE)
                                                       510 Walnut St.; Suite 900
                                                       Philadelphia, PA 19106
                                                       (215) 717-3473
                                                       greg.greubel@thefire.org
                                                       adam@thefire.org

                                                       Matthew A. McGuire
                                                          (Iowa Bar No. AT0011932)
                                                       NYEMASTER GOODE, P.C.
                                                       700 Walnut St., Suite 1300
                                                       Des Moines, IA 50309
                                                       (515) 283-8014
                                                       mmcguire@nyemaster.com

                                                       *Attorneys for Defendants J. Ann Selzer and*
                                                       *Selzer & Company*

*\* Admitted pro hac vice.*
*† Lead counsel*

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true copy of the foregoing document was served upon all parties of record through the Court's CM/ECF electronic filing system on July 7, 2025.

/s/ *Robert Corn-Revere*