**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Repeal of the News Distortion Policy | ) |

## PETITION FOR SPECIAL RELIEF

**Andrew C. Barrett, Rachelle B. Chong, Ervin S. Duggan, Mark S. Fowler, Dennis R. Patrick, Alfred C. Sikes, Thomas E. Wheeler, Christopher J. Wright, Kathryn C. Brown, Jerald N. Fritz, Peter Pitsch,**

*Petitioners*

**Protect Democracy Project**
Conor S. Gaffney
201 St. Charles Avenue, Suite 114
New Orleans, LA 70170
conor.gaffney@protectdemocracy.org
(202) 579-4582

Rachel E. Goodman
82 Nassau Street, # 601
New York, NY 10038
rachel.goodman@protectdemocracy.org
(202) 579-4582

**TechFreedom**
Berin Szóka
1500 K Street NW, Floor 2
Washington DC, 20005
bszoka@techfreedom.org

**G Squared Strategies, LLC**
Gigi Sohn
3503 Alton Place, NW
Washington, DC 20008
gbsohn@gmail.com

**Andrew Jay Schwartzman, PLLC**
Andrew Jay Schwartzman
525 9th Street NW, Seventh Floor
Washington, DC, 20004
andyschwartzman@gmail.com

*Counsel for Petitioners*

November 13, 2025

## SUMMARY

The petitioners request that the FCC repeal the news distortion policy in full. In *Moody v. NetChoice, LLC*, the Supreme Court, applying the First Amendment, reaffirmed that the government has no role in "un-biasing" the media. In direct contradiction to that decision, the news distortion policy seeks to mold the speech of private broadcasters to the FCC's own view of what is correct, complete, and accurate news. The First Amendment forbids the government from embarking on such a project.

Furthermore, the application of the news distortion policy is constitutionally problematic. The vast scope and vague language of the news distortion policy cast an omnipresent shadow over broadcasters' freedom of expression while leaving the policy open to partisan weaponization. Wielding the news distortion policy, the FCC has already opened or threatened to open investigations against private broadcasters due to disagreements with editorial decisions or statements made in a comedic monologue. Even if the FCC never tries to take enforcement action in these cases, the specter of government interference alone chills broadcasters' speech and suppresses their message.

Because the FCC has no legitimate interest in correcting or punishing what it considers to be slanted news coverage, the news distortion policy lacks a meaningful function. Over a period of 60 years, the FCC only enforced the policy eight times, typically in cases involving an intentional hoax. However, such cases are now covered by the FCC's broadcast hoax role, rendering the news distortion policy a vestigial organ. In light of its redundancy and obsolescence, as well as its actively harmful effects, amply demonstrated as of late, the petitioners respectfully request the repeal of the news distortion policy.

**TABLE OF CONTENTS**

I.      Introduction ................................................................................................ 1

II.     Background on the News Distortion Policy ................................................ 2

III.    Interests of Petitioners ............................................................................... 5

IV.     Reasons for Repealing the News Distortion Policy .................................... 6

        A.      The news distortion policy's purpose—to eliminate bias in the news—is not a legitimate government interest ................................................................... 6

        B.      The policy has chilled broadcasters' speech ...................................... 8

        C.      The policy has been weaponized for partisan purposes ................... 10

        D.      The policy is overly vague ............................................................... 12

        E.      The policy is unnecessary, particularly in light of the rule against broadcast hoaxes .............................................................................. 13

V.      Conclusion ............................................................................................... 15

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

In the Matter of                                )
                                                )
Repeal of the News Distortion Policy            )

**<u>PETITION FOR SPECIAL RELIEF</u>**

To:    **The Commission**[1]

**I.    Introduction**

The Supreme Court has "many times held, in many contexts, that it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences."[2] Nor does government have any "power to restrict expression because of its message, its ideas, its subject matter, or its content."[3] Even false speech is protected by the First Amendment.[4] The Communications Act similarly denies "the Commission the power of censorship" or the ability to

---

[1] Because the relief requested requires repealing and revising established Commission policy and precedent, this petition must be decided by the full Commission. Section 0.283(c) of the Commission's rules stipulates that the Chief of the Media Bureau "shall … refer[] to the Commission en banc for disposition … [m]atters that present novel questions of law, fact or policy that cannot be resolved under existing precedents and guidelines." *See also* Section 0.5(c) ("[T]he Commission has delegated authority to its staff to act on matters which are minor or routine or settled in nature.").

[2] *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024).

[3] *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (plurality opinion).

[4] *Id*.

1

"interfere with the right of free speech."[5] Yet the current FCC Chairman has asserted the power to do precisely what the Supreme Court and Congress have forbidden, and what former FCC general counsel declared the agency could not do: "act as a self-appointed, free-roving arbiter of truth in journalism."[6]

To achieve this, Chairman Carr has invoked the news distortion policy and the public interest obligations of broadcasters. We ask the Commission to rescind the news distortion policy and affirm that the agency cannot police broadcaster licensees' speech for bias or the falsity of the speech they carry, except under the exceedingly narrow circumstances of the broadcast hoax rule.

## II.    Background on the News Distortion Policy

In 1949, the Commission declared that, by requiring broadcast licensees to operate in the "public interest, convenience and necessity," Congress implicitly forbade any licensee to "exercise his authority over the selection of program material to distort or suppress the basic factual information upon which any truly fair and free discussion of public issues must necessarily depend."[7] This policy was a corollary of the now-defunct fairness doctrine, motivated by the Commission's sense that broadcasters must "maintain" the public airwaves as a source of "reasonably balanced" discussions of news.[8] While the fairness doctrine explicitly involved balancing certain broadcast media coverage, the news distortion policy did the same implicitly. Both concepts required the Commission to assess the objectivity of news.

---

[5] 47 U.S.C. § 326.

[6] *Letter to Jessica J. Gonzalez*, 35 FCC Rcd. 3032, 3033 (MB & OGC 2020).

[7] *See Report on Editorializing by Broadcast Licensees*, 13 F.C.C. 1246, 1254 (1949).

[8] *Id.* at 1257–58.

The policy remained largely dormant until the late 1960s and 1970s, when several high-profile allegations of news staging and falsification drew the attention of Congress and the public.[9] In this period, the Commission articulated the contemporary policy, which imposes a high threshold for even considering news distortion complaints. First, there must be "deliberate distortion," as distinct from "mere inaccuracy or difference of opinion."[10] Second, there must be extrinsic evidence (i.e., beyond the broadcast itself) demonstrating that the broadcaster deliberately distorted or staged the news.[11] Third, the distortion must apply to a "significant event," rather than minor inaccuracies or incidental aspects of the report.[12] And finally, extrinsic evidence must show that the distortion involved the "principals, top management, or news management" of the licensee, as opposed to other employees.[13]

These procedural safeguards around the use of the news distortion policy reflect the Commission's recognition that embroiling the government in reviewing the accuracy of news broadcasts presents grave risks to a free press and free expression. The agency has recognized that journalism "necessarily involves selection and editorial judgment,"[14] that any government efforts to "authenticate the news" would "cast the chill of omnipresent government censorship over the newsmen's independence,"[15] and that it would be "unwise and probably impossible" for a

---

[9] Lili Levi, *Reporting the Official Truth: The Revival of the FCC's News Distortion Policy*, 78 Wash. U. L. Q. 1005, 1016–17 (2000).

[10] *Galloway v. FCC*, 778 F.2d 16, 20 (D.C. Cir. 1985).

[11] *See Hunger in Am.*, 20 F.C.C.2d 143, 150–51 (1969).

[12] *Galloway*, 778 F.2d at 20.

[13] *Hunger in Am.*, 20 F.C.C.2d at 150.

[14] *The Selling of the Pentagon*, 30 F.C.C.2d 150, 152 (1971).

[15] *Mrs. J.R. Paul*, 26 F.C.C.2d 591, 592 (1969).

3

government agency to judge the "accuracy" of broadcasts.[16] That would require the Commission to "sit as a review body of the 'truth' concerning news events"—a subjective role that is plainly "not appropriate" for a government licensing agency.[17] The Commission thus repeatedly stated that it "cannot properly investigate . . . whether an account or analysis of a news commentator is 'biased' or 'true.'"[18]

Despite these concerns, the Commission retained its news distortion policy because it considered broadcasting critical to ensuring "an informed public."[19] But while the safeguards the Commission erected around the news distortion policy ensured its sparing and judicious use for several decades,[20] the policy's existence has left the door open for the Commission to do exactly what the Supreme Court has said the First Amendment prohibits: police media "bias."

This possibility has become reality lately. The current leadership of the Commission is using the news distortion policy to directly advance the interests of the White House. As discussed in greater detail below, the Commission has reopened and threatened to open news distortion investigations into broadcasters simply because the Chairman disapproves of their coverage as biased or allegedly "false." This pattern of escalating attacks demonstrates just how sweeping and dangerous the expansive powers claimed under the news distortion policy are.

---

[16] *The Selling of the Pentagon*, 30 F.C.C.2d at 152.

[17] *Network Coverage of the Democratic Nat'l Convention*, 16 F.C.C.2d 650, 655 (1969).

[18] *Mrs. J.R. Paul*, 26 F.C.C.2d at 592.

[19] *Selling of the Pentagon*, 30 F.C.C.2d at 153; Levi, *supra* note 9, at 1099–1100.

[20] The Commission issued findings of liability in just eight cases between 1969 and 2019— including only one between 1985 and 2019. Joel Timmer, *Potential FCC Actions Against "Fake News": The News Distortion Policy and the Broadcast Hoax Rule*, 24 Commc'n L. & Pol'y 1, 20 (2019); Chad Raphael, *The FCC's Broadcast News Distortion Rules: Regulation by Drooping Eyelid*, 6 Commc'n L. & Pol'y 485, 501 (2001).

### III.    Interests of Petitioners

Petitioners include seven former commissioners and chairs of the Federal Communications Commission and other former Commission senior leadership. Throughout their service, these petitioners balanced pursuing the agency's regulatory mandate with the limitations of the Constitution and the Communications Act.

**Andrew C. Barrett** served as a Republican commissioner on the Federal Communications Commission from 1989 to 1996. He was appointed by President George H.W. Bush.

**Rachelle B. Chong** served as a Republican commissioner on the Federal Communications Commission from 1994 to 1997. She was appointed by President Bill Clinton.

**Ervin S. Duggan** served as a Democratic commissioner on the Federal Communications Commission from 1990 to 1994. He was appointed by President George H.W. Bush.

**Mark S. Fowler** served as a Republican commissioner and chairman of the Federal Communications Commission from 1981 to 1987. He was appointed by President Ronald Reagan.

**Dennis R. Patrick** served as Republican commissioner and chairman of the Federal Communications Commission from 1987 to 1989. He was appointed by President Ronald Reagan.

**Alfred C. Sikes** served as a Republican commissioner and chairman of the Federal Communications Commission from 1989 to 1993. He was appointed by President George H.W. Bush.

**Thomas E. Wheeler** served as a Democratic commissioner and chairman of the Federal Communications Commission from 2013 to 2017. He was appointed by President Barack Obama.

**Christopher J. Wright** served as general counsel of the Federal Communications Commission from 1997 to 2001.

**Kathryn C. Brown** served as chief of staff to Chairman William E. Kennard from 1998 until 2001.

**Jerald N. Fritz** served as legal advisor and chief of staff to Chairman Mark Fowler from 1981 to 1987.

**Peter Pitsch** served as chief of staff to Chairman Dennis Patrick from 1987 to 1989, and as Chief of Office of Plans and Policy at the Federal Communications Commission from 1981 to 1987.

## IV.     Reasons for Repealing the News Distortion Policy

This petition presents five independent reasons for repealing the news distortion policy in full. *First*, despite the Commission's efforts to narrow the policy and prevent abuse, it remains inherently dangerous; it necessarily embroils the government in trying to police media bias, which the Supreme Court has emphatically rejected as a legitimate government interest. *Second*, the news distortion policy has significantly chilled and otherwise altered the content of broadcasters' speech, undermining First Amendment values. *Third*, the news distortion policy has recently shown itself to be vulnerable to partisan weaponization, as recent investigations and public statements of the Chairman have demonstrated. *Fourth*, the news distortion policy remains overly vague, exacerbating its chilling effects and leading to confusion for broadcasters and the public at large. And *finally*, the Commission's narrowly tailored rule against broadcasting hoaxes adequately serves any remaining justifiable interest the agency has in the news distortion policy. The policy should be abandoned in full.

### A.     The news distortion policy's purpose—to eliminate bias in the news—is not a legitimate government interest.

Since the 1960s, courts have become increasingly clear that the First Amendment bars government efforts to "balance" the marketplace of ideas. Last Term, the Supreme Court

decisively rejected government efforts "to decide what counts as the right balance of private expression—to 'un-bias' what it thinks is biased."[21] Making clear that the point applied to all media, the Court added: "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana."[22] The Court said nothing to suggest that this danger was any less great regarding broadcasters.[23]

This principle applies just as readily to broadcast news coverage as it does to other types of speech. The *Moody* Court relied heavily on *Miami Herald Company v. Tornillo*, which held that a newspaper's content decisions—"whether fair or unfair"—amounted to a protected exercise of "editorial control and judgment."[24] Therefore, the government could not compel newspapers to offer so-called balanced coverage of a particular issue by requiring papers to provide space for candidates who had been criticized to respond.[25] Justice White, concurring in *Miami Herald*, warned that any system that "would supplant private control of the press with the heavy hand of government intrusion" would "make the government the censor of what the people may read and know."[26] The Commission similarly applied these principles in its decision ending the fairness doctrine. The agency expressly "repudiated the notion that it was proper for a governmental authority to intervene actively in the marketplace of ideas," particularly since enforcement of the

---

[21] *Moody*, 603 U.S. at 719.

[22] *Id.* at 741–42.

[23] *See id.* at 742 n.10 (distinguishing cases upholding FCC content regulation authority as not involving exercises of that authority to "balance" or alter expressive content).

[24] *Miami Herald Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

[25] *Id.*

[26] *Id.* at 260 (White, J., concurring).

doctrine required the Commission to "make subjective and vague value judgments" about "the manner and balance of coverage."[27]

These developments directly undermine the Commission's asserted interest in maintaining any news distortion policy. This policy, too, requires the Commission to assess whether an outlet's coverage is "slanted." News outlets that depart from the Government's official narrative will be systematically driven from the marketplace in an effort to "un-bias" the news—exactly what the First Amendment forbids.[28] "The First Amendment," then-Judge Kavanaugh proclaimed, "protects an independent media and an independent communications marketplace against takeover efforts by the Legislative and Executive Branches."[29]

### B.      The policy has chilled broadcasters' speech.

The Supreme Court has also recognized that "serious" First Amendment issues would arise if the Commission's policies had a chilling effect on broadcasters' speech and reduced their willingness to cover controversial issues.[30] In the 1980s, the Commission concluded that the fairness doctrine had that effect. Importantly, the Commission found that this alleged self-censorship took place even though it rarely enforced the doctrine, extended significant deference to broadcasters' editorial judgments, and imposed strong threshold limitations on the doctrine in an effort to cabin its scope.[31]

---

[27] *Syracuse Peace Council*, 2 F.C.C. Rcd. 5043, 5051 (1987).

[28] *Moody*, 603 U.S. at 719.

[29] *U.S. Telecom. Ass'n v. FCC*, 855 F.3d 381, 427 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc). *See also* Levi, *supra* note 9, at 1110 (stating that a critical premise of our constitutional structure is that "a press independent from government will more likely enhance democratic discourse").

[30] *See Red Lion Broadcasting Co., Inc. v. FCC*, 395 U.S. 367, 393 (1969).

[31] *Syracuse Peace Council*, 2 F.C.C. Rcd. at 5049–50.

The news distortion policy similarly chills broadcasters' speech. As the National Association of Broadcasters has explained, the news distortion policy "incentivize[s] stations to avoid controversial and partisan issues and present only 'bland, inoffensive' material, contrary to the public interest."[32] During the first Trump Administration, Chairman Ajit Pai echoed these concerns in rejecting a request to investigate a broadcaster over news distortion allegations: "I can hardly think of an action more chilling of free speech than the federal government investigating a broadcast station because of disagreement with its news coverage or promotion of that coverage."[33] Commissioner Anna Gomez recently indicated that these concerns are not just theoretical, as she has "heard from broadcasters who are telling their reporters to be careful about the way the[y] cover this administration."[34] High-profile departures from CBS—the target of an ongoing news distortion investigation—confirm this as well. The longtime executive producer of "60 Minutes" resigned in April 2025, writing that he was no longer able "[t]o make independent decisions based on what was right for 60 Minutes, right for the audience."[35]

The vast scope of the news distortion policy underlies the dangers it creates. Unlike the fairness doctrine, which applied only to coverage of "controversial issues of public importance," the news distortion policy applies broadly to coverage of *any* news event. Every news segment is open to scrutiny to determine whether the broadcaster presented the "essential facts of the news

---

[32] Comments of the National Association of Broadcasters, Docket 25-73 (March 7, 2025) at 13, https://www.fcc.gov/ecfs/document/10307109522139/1.

[33] Letter from Ajit V. Pai, Chairman, FCC, to the Honorable Maria Cantwell, Senator, United States Senate (April 12, 2018), https://docs.fcc.gov/public/attachments/DOC-350372A1.pdf.

[34] Oliver Darcy, *Alone at the FCC*, Status (July 13, 2025), https://www.status.news/p/fcc-commissioner-anna -gomez-free-speech.

[35] Niha Masih & Sarah Ellison, *'60 Minutes' Producer Bill Owens Resigns*, Wash. Post (Apr. 23, 2025), https://www.washingtonpost.com/style/2025/04/23/60-minutes-producer-bill-owens-resigns.

stories … in an accurate manner."[36] Thus, every allegation of news distortion requires the Commission to assess for itself what "accurate" coverage of the news event in question would look like and to measure the broadcaster's coverage against that determination.[37] It jeopardizes whatever news is being covered. False reporting of a high school lunch menu would be just as much of a violation as showing fake crowd footage to imply that a political rally drew a large crowd. That means broadcasters cannot minimize their liability just by avoiding controversial issues. Instead, broadcasters are more likely to meaningfully alter their news coverage in ways that align with the current administration's preferred narratives.

### C.    The policy has been weaponized for partisan purposes.

A third reason for repealing the news distortion policy is its dangerous potential for partisan abuse. Since the dawn of broadcast regulation, Congress has designed regulatory authority so that it "should be as free from political influence or arbitrary control as possible."[38] But content regulation authorities like the news distortion policy can easily be weaponized for partisan purposes.

The current Commission's conduct illustrates this danger. In January 2025, under the prior administration, Commission staff dismissed a news distortion complaint concerning CBS's editing of an election-season interview with then-presidential candidate Kamala Harris. The interview aired on two separate CBS programs, "Face the Nation" and "60 Minutes." Both broadcasts aired footage of the same question, and each program aired different portions of the response. The complaint, filed by the Center for American Rights, alleged that CBS's conduct amounted to

---

[36] *Galloway*, 778 F.2d at 20.

[37] Levi, *supra* note 9, at 1111.

[38] S. Rep. No. 69-772, at 2 (1926), https://www.govinfo.gov/content/pkg/SERIALSET-08526_00_00-038-0772-0000/pdf/SERIALSET-08526_00_00-038-0772-0000.pdf.

actionable news distortion. Applying well-settled agency precedent, the Commission dismissed the complaint and made clear that any other disposition would violate the First Amendment and Communications Act's prohibition on censorship.[39] The Commission likewise dismissed a complaint alleging news distortion by ABC in connection with the moderation of a presidential debate.[40] And the staff dismissed a petition to deny the license renewal of a Fox affiliate based in part on allegations that it condoned news distortion of a commonly owned cable channel that disseminated statements about the 2020 election even after a court found them to be false.[41] Just days after assuming office, Chairman Brendan Carr—with no explanation—reopened the news distortion complaints against broadcasters that had allegedly harmed President Trump's interests while leaving undisturbed the dismissal of the Fox petition alleging distortion in Trump's favor.[42]

This pattern has continued throughout the first several months of the second Trump administration. Chairman Carr appeared to threaten a news distortion investigation into other outlets perceived to be antagonistic to Trump, solely because they described Kilmar Ábrego Garcia, the individual at the center of a wrongful-deportation scandal, as a "Maryland man."[43] Chairman Carr publicly described the coverage by "Comcast outlets" as "news distortion,"

---

[39] Letter to Daniel R. Suhr (WCBS), (January 16, 2025), https://docs.fcc.gov/public/attachments/DOC-408899A1.pdf.

[40] Letter to Daniel R. Suhr (WPVI), (January 16, 2025), https://docs.fcc.gov/public/attachments/DOC-408880A1.pdf.

[41] Application of Fox Television Stations, LLC For Renewal of License of WTXF-TV, 40 FCC Rcd. 438, 444 and nn. 48-49 (2025).

[42] Public Notice, *FCC Establishes MB Docket No. 25-73 and Comment Cycle for News Distortion Complaint Involving CBS Broadcasting Inc., Licensee of WCBS, New York, NY*, 40 F.C.C. Rcd. 1132 (2025).

[43] Brendan Carr (@BrendanCarrFCC), X (Apr. 16, 2025, 6:58 PM), https://x.com/BrendanCarrFCC/status /1912641900558893377.

11

suggesting they were not complying with their obligation to operate in the public interest.[44] The Center for American Rights promptly filed a formal news distortion complaint with the Commission, criticizing the outlets' "extreme and evident bias."[45] This example illustrates the extraordinary intrusions on editorial decisionmaking that Chairman Carr apparently understands the news distortion policy to permit. Purporting to apply the policy, Chairman Carr has used the power of the FCC to question the precise words an outlet uses to describe an individual, as well as the outlet's decisions about which facts are relevant enough to include in any particular story. And most recently, Chairman Carr threatened ABC with allegations of news distortion over late-night host Jimmy Kimmel's jokes about the motives of Charlie Kirk's alleged killer. "We can do this the easy way or the hard way," Chairman Carr said.[46] Hours later, ABC suspended Kimmel indefinitely.

### D.    The policy is overly vague.

A fourth reason for repealing the news distortion policy is the inherent vagueness of the policy. Violations of the policy could place a broadcaster's very license at risk, yet the basic contours of the policy remain entirely unclear. As the National Association of Broadcasters has pointed out, the Commission's news distortion decisions do not even offer a "clear definition of what programming constitutes 'news'" and can therefore be challenged as allegedly distorted or slanted.[47]

---

[44] *Id.*

[45] George Winslow, *Group Files FCC Complaint Against ABC, NBC and CBS for "News Distortion,"* TV Tech (Apr. 22, 2025), https://www.tvtechnology.com/news/group-files-fcc-complaint-against-abc-nbc-and-cbs-for-news -distortion.

[46] David Folkenflik, *Jimmy Kimmel's Suspension Shows Power of FCC's Brendan Carr*, NPR (Sept. 19, 2025), https://www.npr.org/2025/09/19/nx-s1-5546764/fcc-brendan-carr-kimmel-trump-free-speech.

[47] Comments of National Association of Broadcasters, *supra* note 32, at 18.

As it developed the fairness doctrine, the Commission sought to clarify the scope of broadcasters' obligations in adjudications and reports.[48] The Commission concluded that the doctrine failed to provide adequate notice to broadcasters.[49] This is even more true of the news distortion policy, where the Commission has made no comparable efforts at clarity. Even if it were to adopt specific and clear standards for news distortion, the policy would remain hopelessly vague. While the Commission's enforcement actions have repeatedly emphasized the policy's exceedingly narrow scope, Chairman Carr's recent decision to reopen complaints that cannot plausibly satisfy the precedents previously articulated in adjudications leaves greater confusion than ever about what exactly the policy proscribes.

**E.    The policy is unnecessary, particularly in light of the rule against broadcast hoaxes.**

Finally, the fact that the news distortion policy provides so little benefit to the public is a persuasive reason to discard it, particularly when weighed against the enormous costs described above. As explained, the Commission repeatedly expressed grave concerns about intruding on the editorial judgment of broadcasters, and it purported to adopt a strict standard for news distortion to ensure the policy did not result in "omnipresent government censorship."[50] Because of that high standard, the Commission found broadcasters liable for news distortion in just *eight* cases between 1969 and 2019.[51] That record at least calls into question whether the policy actually serves the public interest in any meaningful way.

---

[48] *Syracuse Peace Council*, 2 F.C.C. Rcd. at 5046–47.

[49] *Id.* at 5043.

[50] *Mrs. J.R. Paul*, 26 F.C.C.2d at 592.

[51] *See* Raphael *supra* note 20 at 486.

Moreover, the cases in which the Commission did enforce the news distortion policy typically involved the "staging" or outright fabrication of news events (e.g., kidnappings), rather than alleged slanting or bias in the presentation of news.[52] In 1992, the Commission specifically adopted a rule that will often apply in this type of situation.[53] The rule prohibits broadcasters from "broadcasting false information concerning a crime or a catastrophe" if (1) the licensee knows this information is false, (2) it is foreseeable that broadcast of the information will cause substantial public harm, and (3) broadcast of the information does in fact directly cause substantial public harm.[54] All three prongs of the rule must be satisfied for a broadcaster to be subject to liability.

At the time of its adoption, the Commission acknowledged that the rule applies to only a narrow subset of the conduct covered by the news distortion policy: only clear, intentional falsity regarding public safety, not bias or a lack of "balance." The rule gave the agency greater "enforcement flexibility" with respect to that misconduct—i.e., the ability to impose fines in addition to issuing letters of admonition.[55] But the Commission chose not to make the rule apply broadly to all "news distortion." Instead, the Commission explained that it had carefully crafted the rule against hoaxes to survive strict scrutiny and thus avoid "an undue chilling effect on broadcast speech."[56] The hoax rule covers the type of deliberate misconduct that the government can properly regulate, without entangling the Commission in reviewing the editorial decisions that news outlets routinely make in deciding how to present the news. In effect, "the Commission has

---

[52] *See* Raphael, *supra* note 20, at 502; *Walton Broadcasting, Inc. (KIKX)*, 78 F.C.C.2d 880, 955–68 (1976).

[53] *See* Amendment of Part 73 Regarding Broadcasting Hoaxes, 7 F.C.C. Rcd. 4106 (1992).

[54] 47 C.F.R. § 73.1217.

[55] Amendment of Part 73 Regarding Broadcast Hoaxes, 7 F.C.C. Rcd. 4106, at *1.

[56] *Id.* at 3.

14

applied this [hoax] rule narrowly in light of the substantial First Amendment concerns involved with the federal government policing the content of broadcast news."[57]

As explained, the First Amendment bars the Commission from punishing news outlets for providing what the agency considers "slanted" coverage. Thus, the only legitimate interest underlying the news distortion policy is the interest in ensuring that broadcasters do not deliberately fabricate news stories about matters of public safety. That interest is adequately served by the Commission's rule against broadcasting hoaxes.

## V.    Conclusion

We respectfully request the Commission repeal the news distortion policy not only because it fails to serve the public interest, but also because it disserves the public in many ways. The news distortion policy is no longer justifiable under today's First Amendment doctrine and no longer necessary in today's media environment. Freedom of speech is the linchpin of technological innovation and progress. It encourages greater distribution and consideration of new ideas. In a culture of free speech, more ideas are considered by more people, producing a hypergolic effect on scientific progress—one of the major forces that keeps the free world free. The Commission should repeal the policy in full and recognize that it may not investigate or penalize broadcasters for "distorting," "slanting," or "staging" the news, unless the broadcast at issue independently meets the high standard for broadcasting a dangerous hoax under 47 C.F.R. § 73.1217.

Respectfully submitted,

*/s/ Conor S. Gaffney*
**Protect Democracy Project**
Conor S. Gaffney

---

[57] Letter to Jessica J. Gonzalez, *supra* note 6, at 3033.

15

201 St. Charles Avenue, Suite 114
New Orleans, LA 70170
conor.gaffney@protectdemocracy.org
(202) 579-4582

Rachel E. Goodman
82 Nassau Street, #601
New York, NY 10038
rachel.goodman@protectdemocracy.org
(202) 579-4582

**TechFreedom**
Berin Szóka
1500 K Street NW, Floor 2
Washington DC, 20005
bszoka@techfreedom.org

**G Squared Strategies, LLC**
Gigi Sohn
3503 Alton Place, NW
Washington, DC 20008
gbsohn@gmail.com

**Andrew Jay Schwartzman, PLLC**
Andrew Jay Schwartzman
525 9th Street NW, Seventh Floor
Washington, DC, 20004
andyschwartzman@gmail.com

*Counsel for Petitioners*

November 13, 2025